## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

CODY FLACK and
SARA ANN MAKENZIE,

       Plaintiffs,

    v.                          Case No. 3:18-cv-00309

WISCONSIN DEPARTMENT OF
HEALTH SERVICES and
LINDA SEEMEYER, in her official capacity
as Secretary of the Wisconsin Department of
Health Services,

       Defendants.

## COMPLAINT

## INTRODUCTION

1.    Plaintiffs Cody Flack and Sara Ann Makenzie ("Plaintiffs") are transgender Wisconsin residents who receive medical assistance through Wisconsin's Medicaid program ("Wisconsin Medicaid"). Wisconsin Medicaid is a health insurance program for low-income individuals and families that is jointly funded by the federal government and the State of Wisconsin (the "State"). Mr. Flack and Ms. Makenzie bring this lawsuit to challenge the State's discriminatory categorical prohibition on coverage for medically necessary treatments for gender dysphoria.

2.    Plaintiffs challenge a longstanding state regulation, promulgated in 1997 and enforced by the State's Department of Health Services ("DHS"), that expressly prohibits Wisconsin Medicaid coverage for "[t]ranssexual surgery" or "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual

anatomy or characteristics." Wis. Adm. Code § DHS 107.03(23)-(24) (the "Challenged Exclusion"). Because of this categorical exclusion, both Mr. Flack and Ms. Makenzie have been denied Medicaid coverage for medically necessary treatments for gender dysphoria—the clinically significant distress associated with having a gender identity (the innate, internal sense of one's sex, *i.e.*, being male or female) that conflicts with the sex one was assigned at birth.

3.      The Challenged Exclusion—which flies in the face of the medical consensus that gender-confirming medical care is the only safe and effective medical treatment for gender dysphoria, and wholly disregards the harms of denying transgender people access to critical and often life-saving care—unlawfully denies medically necessary care to transgender Medicaid beneficiaries in Wisconsin. Notably, Wisconsin covers these services when they are medically necessary to address health conditions other than gender dysphoria. In short, Wisconsin treats its transgender Medicaid beneficiaries as second-class citizens and their transition-related health care needs as "unnecessary." In doing so, Defendants expose a particularly vulnerable group in Wisconsin to significant and avoidable harms to their health and well-being, in violation of the U.S. Constitution and federal law.

4.      Plaintiffs bring this action against DHS, the state agency charged with administering Wisconsin's medical assistance programs, and Linda Seemeyer, in her official capacity as Secretary of DHS (collectively, "Defendants"), to challenge this discriminatory exclusion as a violation of their civil rights under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"); the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## BACKGROUND

5.      Mr. Flack and Ms. Makenzie are enrolled in Wisconsin Medicaid.

6.      Both Mr. Flack, a 30-year-old transgender man, and Ms. Makenzie, a 41-year-old transgender woman, have been and are continuing to be denied insurance coverage for medically necessary treatments for gender dysphoria based on the Challenged Exclusion, and they are suffering significant harm as a result.

7.      Like many Wisconsin Medicaid enrollees, Plaintiffs are low-income individuals with disabilities who rely exclusively on federal Supplemental Security Income ("SSI") benefit payments to meet their basic needs for food, clothing, and shelter. Without medical assistance from Wisconsin Medicaid, Plaintiffs would be unable to pay for their health care expenses.

8.      Both Mr. Flack and Ms. Makenzie have been diagnosed with gender dysphoria. Gender dysphoria is the clinically significant distress associated with having a gender identity that conflicts with one's assigned sex (*i.e.*, the sex one was assumed to be at birth, usually based on a cursory review of external genitalia). Both experience dysphoria related to the disconnect between their primary and secondary sex characteristics and their gender identity. Both Mr. Flack and Ms. Makenzie have undergone gender transitions, including medical treatments, to live in accordance with their respective gender identities and to treat the gender dysphoria they have experienced when living, or being incorrectly perceived by others, as their assigned sex instead of the sex matching their gender identities. Each has experienced heightened gender dysphoria when others have made incorrect assumptions about their sex, or mistreated them, based on aspects of their physical appearance.

9.      As part of their gender transitions, both Mr. Flack and Ms. Makenzie have received medical treatments, including hormone replacement therapy and certain surgical

procedures, to alleviate their gender dysphoria by aligning their physical characteristics with their gender identities.

10.     Both Mr. Flack's and Ms. Makenzie's medical and mental health providers have recommended that they obtain additional surgeries to alleviate their ongoing symptoms of gender dysphoria. Unfortunately, neither of them can obtain these medically necessary procedures because Wisconsin Medicaid will not cover them. Both Mr. Flack and Ms. Makenzie lack the financial ability to pay out-of-pocket for that medically necessary care or to obtain private insurance that might cover it. Consequently, each of them has suffered, and is continuing to suffer, symptoms of gender dysphoria, severe emotional distress, and physical injury and pain, all of which would be avoidable if they had access to this medically necessary care.

11.     In addition, Ms. Makenzie was compelled to obtain a loan to pay out-of-pocket for a medically necessary chest reconstruction surgery, which she obtained in 2016, at considerable financial expense.

12.     The Challenged Exclusion violates Section 1557's prohibitions on discrimination in federally-funded health programs, as it discriminates against Mr. Flack, Ms. Makenzie, and other transgender Wisconsin Medicaid enrollees on the basis of sex (including nonconformity to sex stereotypes, gender identity, being transgender, and undergoing a gender transition). Furthermore, the Challenged Exclusion violates the federal Medicaid Act's comparability and availability requirements. The Challenged Exclusion, which has no rational or legitimate basis, denies Plaintiffs and similarly situated individuals their constitutional right to equal protection under the laws based on impermissible consideration of sex-based classifications (including nonconformity to sex stereotypes, gender identity, being transgender, and undergoing a gender transition). It further violates the Equal Protection Clause by denying necessary health care to

4

people solely based on their membership in a disfavored group, transgender people, who are subjected to discriminatory treatment based on their membership in that class.

13.     Plaintiffs seek: (1) a declaratory judgment that the Challenged Exclusion, on its face and as applied to them, violates the prohibition against sex discrimination contained in Section 1557, violates the availability and comparability requirements of the federal Medicaid Act, and is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (2) preliminary and permanent injunctions enjoining Defendants from enforcing the Challenged Exclusion and from denying Wisconsin Medicaid coverage for medically necessary treatments for gender dysphoria; (3) compensatory damages permitted under Section 1557 to compensate Plaintiffs for their economic and non-economic injuries arising from being denied medically necessary health care coverage because of the Challenged Exclusion; and (4) their reasonable attorneys' fees and costs.

## PARTIES

14.     Plaintiff Cody Flack is an adult male resident of Green Bay, Brown County, Wisconsin. Mr. Flack is a transgender man and has lived in accordance with his male gender identity at all times material to this Complaint. In addition, Mr. Flack has been eligible for and enrolled in the Wisconsin Medicaid program at all times material to this Complaint.

15.     Plaintiff Sara Makenzie is an adult female resident of Baraboo, Sauk County, Wisconsin. Ms. Makenzie is a transgender woman and has lived in accordance with her female gender identity at all times material to this Complaint. In addition, Ms. Makenzie has been eligible for and enrolled in the Wisconsin Medicaid program at all times material to this Complaint.

16.     Defendant DHS is the Wisconsin state agency charged with the administration of Wisconsin Medicaid. Wis. Stat. § 49.45. DHS's principal offices are located at 1 West Wilson Street, Room 650, in Madison, Dane County, Wisconsin. DHS is a recipient of federal funds from the U.S. Department of Health and Human Services, including Medicaid funding. Thus, DHS is subject to the nondiscrimination requirements of Section 1557, which prohibits discrimination on the basis of sex and other factors in any health program or activity that receives funding from HHS, including Wisconsin Medicaid. Wisconsin law expressly authorizes lawsuits against DHS. Wis. Stat. § 46.017.

17.     Defendant Linda Seemeyer is the Secretary of DHS and, as such, is responsible for implementing the Medicaid Act consistent with federal Medicaid requirements. Secretary Seemeyer is sued in her official capacity.

18.     All of Defendants' actions or omissions complained of in this Complaint were under the color of state law.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

20.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.

21.     Under 28 U.S.C. § 1391, venue is proper in the Western District of Wisconsin because Defendants reside and are subject to personal jurisdiction in the District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District, and Plaintiff Sara Ann Makenzie resides in the District.

6

## FACTS

### *Gender Identity and Gender Dysphoria*

22.     Gender identity is an innate, internal sense of one's sex—*i.e.*, being male or female—and is a basic part of every person's core identity. Everyone has a gender identity. Most people's gender identity is consistent with the sex they were assigned at birth. Transgender people, however, have a gender identity that is different from their assigned sex. A transgender man is a man who was assigned female at birth but has a male gender identity. A transgender woman is a woman who was assigned male at birth but has a female gender identity.

23.     Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1] Under the DSM-5, gender dysphoria is the "clinically significant distress or impairment in social, occupational, or other areas of function" associated with the incongruence between a transgender person's gender identity and assigned sex. *Id.* at 451-53. Distress associated with gender dysphoria often arises "when physical interventions by means of hormones and/or surgery are not available." *Id.* at 451. A transgender person's gender dysphoria can be alleviated when the person is able to live, and be treated by others, consistently with the person's gender identity.

24.     When a transgender person's gender dysphoria is left untreated, or is inadequately addressed, the consequences can be dire. Symptoms of untreated gender dysphoria often include

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 removed that diagnosis and replaced it with "Gender Dysphoria," to clarify that being transgender is not itself a disorder, but that the clinically relevant condition is the dysphoria experienced by individuals whose gender identity conflicts with their assigned sex. *See* DSM-5 at 451 (noting that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se.*").

intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-harm. All of those symptoms can be mitigated, and often prevented altogether, for transgender people with access to appropriate individualized medical care as part of their gender transitions.

25.     Certain medical treatments, including hormone therapy and various surgical procedures that align one's physical characteristics with one's gender identity (collectively referred to in this Complaint as transition-related or gender-confirming surgeries),[2] are safe and medically effective treatments for gender dysphoria under the applicable standards of care, and are recognized as such by the medical profession.

### *Federal Medicaid Program*

26.     Established in 1965 under Title XIX of the Social Security Act, Medicaid is a joint federal-state program that provides medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396-1396w-5 (the "Medicaid Act"). The central objective of Medicaid is to enable states to furnish medical services to persons whose incomes and resources are insufficient to meet the cost of necessary medical services. 42 U.S.C. § 1396-1.

27.     States are not required to participate in the Medicaid program, but all states do.

28.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5).

---

[2] Certain transition-related procedures are sometimes referred to as "sex reassignment surgery," or the archaic and disfavored term "sex change surgery," which is now generally considered inaccurate and offensive. Under the contemporary medical and psychological understanding of gender identity, transition-related medical treatments serve to confirm, not "change," an individual's sex by bringing primary and secondary sex characteristics into alignment with the person's gender identity. As such, neither of those terms is used in this Complaint.

29.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of the U.S. Department of Health and Human Services. 42 U.S.C. § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

30.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

31.     The Medicaid Act requires that participating states cover health care services when medically necessary, including in-patient and out-patient hospital services and physician services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d. In addition, the statute gives states the option to provide other services, including prescription drugs, when medically necessary.

32.     Under the Medicaid Act, "the medical assistance made available to any individual . . . shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

33.     In addition, a state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

34.     Moreover, state Medicaid programs must provide medical assistance "in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396(a)(19).

### *Wisconsin Medicaid*

35.     The State of Wisconsin participates in the federal Medicaid program.

36.     DHS is the state agency that administers the Wisconsin Medicaid program.

37.     More than half of Wisconsin's Medicaid expenditures are reimbursed with federal Medicaid funds.

38.     Wisconsin Medicaid provides Medicaid-funded medical assistance through several programs, including Medicaid for the Elderly, Blind, or Disabled, which covers low-income individuals who are age 65 or older and people with disabilities, and BadgerCare Plus, which covers low-income children, pregnant women, and low-income adults under 65 without a qualifying disability.

39.     Wisconsin Medicaid programs are governed by Wisconsin's medical assistance statute, Wis. Stat. §§ 49.43-65, and its implementing regulations. Under the regulations, DHS "shall reimburse providers for medically necessary and appropriate health care services" listed in the statute, including inpatient and outpatient hospital services and physician services. Wis. Adm. Code § DHS 107.01. The State's medical assistance statute does not explicitly address, let alone exclude, coverage for transgender individuals seeking treatments for gender dysphoria.

### *Wisconsin Medicaid's Categorical Exclusion on Transition-Related Health Care for Transgender Medicaid Enrollees*

40.     Notwithstanding the federal Medicaid and state statutory mandates that Wisconsin Medicaid provide medically necessary health care to Wisconsin Medicaid enrollees, Defendants deny coverage for medically necessary transition-related health care, including gender confirmation surgeries and related care, based on the Challenged Exclusion in Defendant DHS's medical assistance regulations.

41.     The Challenged Exclusion prohibits Wisconsin Medicaid coverage for "[t]ranssexual surgery" or "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or characteristics." Wis. Adm. Code § DHS 107.03(23)-(24). Although the Challenged Exclusion does not define "transsexual surgery," it has been used since its promulgation to deny coverage to transgender Wisconsin

10

Medicaid enrollees seeking gender-confirming surgical procedures and related treatments for gender dysphoria, including chest and genital reconstruction surgeries.

42.     The Challenged Exclusion was approved and adopted by the Wisconsin Department of Health and Family Services ("DHFS") (the predecessor to Defendant DHS) on December 11, 2016, as part of Clearinghouse Rule CR 96-154, and went into effect on February 1, 1997.

43.     At the time the Challenged Exclusion was proposed and ultimately implemented, the federal Medicaid law and Wisconsin medical assistance statute already prohibited coverage for medically unnecessary services. Nevertheless, the State saw fit to single out transition-related care for an express exclusion based on the incorrect premise that such care was medically unnecessary in all instances.

44.     When proposing the Challenged Exclusion in 1995, DHFS issued a bulletin explaining that the proposed rule was intended "to limit or discontinue coverage of medically unnecessary services" and "strengthen some definitions of covered services." DHFS, Summary of the Amendments to the Medicaid Rules that Discontinue Coverage of Medically Unnecessary Services, at 1 (Jan. 6, 1995). That document enumerated six "services and products determined not to be medically necessary," including "transsexual surgery" and "drugs or hormone therapy to alter physical sexual characteristics." *Id.* The other enumerated services included "ear lobe repair," "nipple reconstruction and repair," "tattoo removal," and "food products." *Id.*

45.     In promulgating the rule, the State was not motivated by cost savings, but purely by the incorrect premise that the excluded services, including "transsexual surgery" and related care, were *always* medically unnecessary. The agency's fiscal estimate of the proposed rule reiterated that the proposed amendments to the medical assistance regulations "clarify existing

policy and clearly eliminate coverage of some services that [DHFS] has determined are not medically necessary." DHFS, Fiscal Estimate: Medical Assistance: Medically Unnecessary Services, at 1 (Sept. 27, 1996). That document also noted that "[t]he rule changes are expected to result in nominal savings for state government." *Id.* In an accompanying document, DHFS's Office of Legal Counsel ("OLC") explained that "[t]he rule changes make clear that the [Medical Assistance] program will not pay for the specified services or will not pay for them when they are provided for certain purposes." DHFS, OLC, Transmittal to Legislative Council Rules Clearinghouse, Medical Assistance: Medically Unnecessary Services, at 1 (Sept. 27, 1996). OLC's statement admitted that, "[a]ctually the program has hardly ever paid for any of these services or for those purposes, but questions about coverage continue to come up." *Id.* The final rule approved on December 11, 1996 reiterated that the newly-prohibited services were "determined to be medically unnecessary," but noted that "[u]nder current rules the [medical assistance] program requires prior authorization for most of these services and pays infrequently for them." DHFS, Clearinghouse Rule 96-154, 1 (Dec. 11, 1996).

46.     There is no medical or scientific support for Wisconsin's contention that transition-related health care for transgender people with gender dysphoria is "medically unnecessary." To the contrary, there is a strong consensus among medical and mental health professionals that gender-confirming surgical procedures and hormonal treatments are the only safe and effective medical treatments for the gender dysphoria experienced by many transgender people.

47.     Under the standards of care for gender dysphoria issued by the World Professional Association of Transgender Health ("WPATH")—widely considered the authoritative international standards of care for transgender health care—gender-confirming

medical procedures or treatments are medically necessary for many transgender patients.
WPATH, Standards of Care for the Health of Transsexual, Transgender, and Gender
Nonconforming People, 9-10, 33-34, 54-55 (7th Ver. 2011) ("WPATH Standards of Care"). As
part of a medical transition, effective, recognized, medically necessary treatments may include
"[h]ormone therapy to feminize or masculinize the body" and "[s]urgery to change primary
and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial
features, body contouring)." *Id.* at 8-9. The WPATH Standards of Care expressly states that these
services are medically necessary for many transgender people with gender dysphoria. *Id.* at 33-
34, 54-55. Recognizing that particular medical interventions are not appropriate or necessary for
every transgender person, the WPATH Standards of Care sets forth criteria to evaluate an
individual's eligibility for hormonal treatments and various transition-related surgeries.

48.     The broader medical community agrees that, for many transgender people,
surgical interventions and hormonal treatments are safe, effective, and medically necessary
treatments for gender dysphoria. The American Medical Association, American Psychological
Association, American Psychiatric Association, Endocrine Society, American College of
Obstetricians and Gynecologists, American Academy of Family Physicians, and other major
medical organizations have recognized that gender-confirming surgeries and hormonal
treatments are safe and effective treatments for gender dysphoria, and that access to such
treatments improves the health and well-being of transgender people. Each of these groups has
publicly opposed prohibitions on insurance coverage for transition-related health care, including
categorical prohibitions on such care like the Challenged Exclusion.

49.     Ignoring the medical consensus that gender-confirming medical treatments are
effective and medically necessary to treat gender dysphoria in many transgender individuals,

Defendants have failed to take any action to remove the Challenged Exclusion from Wisconsin's medical assistance regulations. Indeed, Defendants continue to enforce the Challenged Exclusion against transgender Medicaid recipients, including Plaintiffs, who are eligible for and in medical need of these forms of care.

50.     Wisconsin is one of just ten states that maintain explicit discriminatory prohibitions on Medicaid coverage for medically necessary treatments for gender dysphoria. In contrast, 18 states and the District of Columbia have express policies affirmatively providing coverage to transgender Medicaid enrollees for transition-related health care. The remaining states have no explicit Medicaid policies pertaining to coverage for such care.

51.     On its website, DHS confirms that Wisconsin Medicaid does not cover medically necessary health care to treat gender dysphoria. On a webpage entitled, "LGBT Health - Transgender Persons," which was last revised on December 13, 2017, DHS states:

> For people who need medical interventions such as hormones or surgery, these might be covered under private insurance plans. Currently, Wisconsin BadgerCare, BadgerCare Plus, Medicaid, and State of Wisconsin employee health insurance (ETF) do not cover gender reassignment surgery or drugs related to gender reassignment or hormone replacement.[3]

52.     In an April 20, 2018 response to a public records request initiated by Plaintiffs' attorneys, Defendant DHS acknowledged that, pursuant to the Challenged Exclusion, the agency has recently denied multiple requests for prior authorization "for any transsexual surgery" sought by transgender Wisconsin Medicaid enrollees.

53.     On information and belief, many transgender Wisconsin Medicaid recipients have been deterred from seeking preauthorization for transition-related surgeries because of their

---

[3] DHS, LGBT Health - Transgender Persons, https://www.dhs.wisconsin.gov/lgbthealth/transgender.htm (last visited Apr. 30, 2018).

knowledge, or the knowledge of their medical providers, that the Challenged Exclusion would make such preauthorization requests futile.

54.     Wisconsin Medicaid covers surgical procedures and hormone therapy when necessary to treat conditions other than gender dysphoria. Specifically, Wisconsin Medicaid covers chest reconstruction surgeries (including mastectomies), genital reconstruction surgeries, hormonal treatments, and related services to treat serious injuries or certain conditions. However, Wisconsin Medicaid denies coverage for these procedures when they are sought by transgender individuals as medically necessary treatments for gender dysphoria.

### *Plaintiff Cody Flack*

55.     Plaintiff Cody Flack is a 30-year-old man who resides in Green Bay, Wisconsin. Mr. Flack was born in Pennsylvania and moved to Wisconsin in 2012.

56.     Mr. Flack has cerebral palsy and other disabilities. Because of his cerebral palsy, Mr. Flack has limited mobility and uses a motorized wheelchair. Due to his disabilities, Mr. Flack is unable to work and relies on SSI for his income and Wisconsin Medicaid for his health care needs.

57.     Mr. Flack is a transgender man. That is, he was assigned female at birth, but is male and has lived in accordance with his male gender identity for many years.

58.     Mr. Flack became aware of his male gender identity around age four or five.

59.     Mr. Flack was later diagnosed with gender dysphoria.

60.     Mr. Flack took steps to begin his gender transition at around age 18. At that time, he began seeing a gender therapist, adopted a traditionally male name, and took other steps to outwardly present as the male he is. Due to a lack of support and resources, and fears that coming out as transgender might isolate him from his family and others, Mr. Flack felt unable to

15

undergo a full transition for several more years, despite experiencing significant gender dysphoria. In 2012, after moving to Wisconsin and feeling more supported in his gender identity, Mr. Flack reinitiated his gender transition and took steps to socially transition to living and presenting as a man in all aspects of his life. He again chose and began to exclusively use a traditionally male name, Cody; began using masculine pronouns to refer to himself; and outwardly presented in a more masculine manner by wearing traditionally men's clothing and cutting his hair; correcting his identity documents to reflect the fact that he is male; and obtaining ongoing therapy and medical care to further his gender transition and treat his gender dysphoria.

61.    All of Mr. Flack's identity documents reflect his male sex. On May 1, 2014, Mr. Flack was granted a legal name change, pursuant to Wis. Stat. § 69.13, from his traditionally female birth name to his chosen male name, Cody Jason Flack. He has obtained a Wisconsin state identification card with a male sex marker. In addition, Mr. Flack is eligible to receive an amended birth certificate with a male sex marker from Pennsylvania, where he was born, but has not yet obtained that document due to his inability to pay the associated fees.

62.    Since 2015, Mr. Flack has seen a psychotherapist, Daniel P. Bergman, MS, LPC, NCC. Mr. Bergman has treated Mr. Flack for gender dysphoria and other conditions. Mr. Bergman has recommended that Mr. Flack obtain medical treatments, including hormone therapy and chest reconstruction, as part of his treatment for gender dysphoria.

63.    In 2016, Mr. Flack contacted Amy DeGueme, MD, ECNU, an endocrinologist at Madison Medical Affiliates in Mequon, Wisconsin, to initiate medical treatments related to his gender transition. Dr. DeGueme determined that Mr. Flack would benefit from hormonal therapy to further his gender transition and treat his gender dysphoria. In August 2016, Dr. DeGueme prescribed Mr. Flack hormone replacement therapy (testosterone). Under Dr. DeGueme's

16

supervision, Mr. Flack has remained on this hormone treatment since then. As a result of the

testosterone treatments, he has developed male secondary sex characteristics, including facial

and body hair, a deeper voice, and a more masculine appearance.

64.     Wisconsin Medicaid has covered Mr. Flack's hormonal therapy, despite the

apparent coverage ban on such medical treatment in the Challenged Exclusion. *See* Wis. Adm.

Code § DHS 107.03(23). However, because of the Challenged Exclusion, Mr. Flack is worried

that coverage for his ongoing testosterone treatments may be denied in the future.

65.     On October 11, 2016, Mr. Flack underwent a hysterectomy with bilateral

salpingo-oopherectomy (the total removal of the uterus, cervix, fallopian tubes, and ovaries) for

the treatment of dysmenorrhea (a condition characterized by pelvic or lower abdominal pain

during menstruation) and premenstrual dysphoric disorder ("PMDD") (a severe form of

premenstrual syndrome) under the care of a gynecologist. Wisconsin Medicaid covered that

surgery because it was necessary to treat his dysmenorrhea and PMDD. That surgery, while

performed to treat those other conditions, had the effect of reducing Mr. Flack's gender

dysphoria by further bringing his physical characteristics in alignment with his male identity and

by eliminating the pain and distress he experienced from menstruation.

66.     For many years, Mr. Flack has experienced severe gender dysphoria related to the

presence of female-appearing breasts on his body. He experiences distress at the sight of his

breasts, which are incongruous with his male gender identity, and he has wished to have them

removed since developing them during puberty. In addition, because of his breasts, he has been

mistaken as female countless times during his life, often being mistreated as a result. Despite his

efforts to present as the man that he is, he considers the breasts an undesired visible marker of

something he is not—female—that subjects him to mistreatment, social stigma, and related

symptoms of gender dysphoria and emotional distress. At various points in his life, Mr. Flack has felt helpless and has had thoughts of suicide and self-harm because of the presence of his breasts.

67.     In an effort to conceal his breasts from public view, Mr. Flack has engaged in a technique called "binding." Binding flattens or reduces the appearance of breasts with chest binders or other constricting materials. Because of Mr. Flack's cerebral palsy and use of a wheelchair, he needs the help of others to bind his chest. In addition, Mr. Flack finds binding extremely painful and has experienced skin irritation and sores as a result of binding. As a result, he does not consider binding a viable or safe long-term option to alleviate the gender dysphoria associated with his breasts.

68.     In late 2016, with the support of his psychotherapist and medical providers, Mr. Flack sought to obtain chest reconstruction surgery to further his gender transition and treat the ongoing gender dysphoria he has experienced for many years because of the presence of female-appearing breasts on his body. In particular, and consistent with the prevailing standards of care for treating gender dysphoria, Mr. Flack has sought to obtain chest reconstruction surgery in the form of a double mastectomy and male chest reconstruction. These procedures are commonly referred to as "top surgery" or "upper surgery" for transgender men. They are widely accepted and effective surgical procedures for treating gender dysphoria in transgender men.

69.     In consultation with his primary care providers and psychotherapist, Mr. Flack consulted with Clifford King, MD, PhD, a plastic surgeon in Madison, Wisconsin who specializes in providing transition-related surgeries for transgender people.

70.     Mr. Flack provided Dr. King letters of support from Mr. Bergman, his psychotherapist; Dr. DeGueme, his endocrinologist; Erich G. Metzler, MD, the gynecologist who performed his hysterectomy and oopherectomy; and Maryam Shittu, MD, his primary care

physician at the time. In their letters, each provider offered their medical opinion that Mr. Flack

has gender dysphoria and meets the criteria for male chest reconstructive surgery. Mr. Bergman

wrote that, in his professional opinion, Mr. Flack "is quite comfortable and well-adjusted in

terms of his male gender identification," that "he is highly intelligent / insightful and most

certainly possesses the capacity to make fully informed decisions and consent for treatment,

including gender reassignment surgeries," and that Mr. Flack "has my full recommendation and

support with respect to his request for surgery." Dr. DeGueme described Mr. Flack's diagnosis

and treatments for gender dysphoria and concluded that "[h]e meets and exceeds the criteria as

set forth by the World Professional Association for Transgender Healthcare" for the requested

surgery. His primary care physician confirmed his gender dysphoria diagnosis and wrote that

"[t]he next step in his treatment is Bilateral Mastectomies with Reconstructive Surgery." His

gynecologist confirmed his previous surgeries and his knowledge of Mr. Flack's hormonal

treatment for gender dysphoria.

71.     Following a lengthy consultation in which Dr. King and Mr. Flack discussed the

requested procedures and the associated risks and benefits, Dr. King determined that Mr. Flack

met the criteria for obtaining chest reconstruction under the applicable standards of care.

72.     Following the consultation, Dr. King, through Dean Health Systems, Inc.,

submitted a request on July 18, 2017 for prior authorization to DHS for Wisconsin Medicaid

coverage of the chest reconstruction surgeries (bilateral complete simple mastectomy and breast

reconstruction). The request submitted to DHS included a prior authorization form completed by

Dr. King, Dr. King's clinical notes, the letters of support from Mr. Flack's mental health and

medical providers, and surgical notes from his hysterectomy and oopherectomy.

73.     DHS denied the prior authorization request by letter, dated August 2, 2017. For

both the requested mastectomy and breast reconstruction procedures, the denial letter stated,

"THE SERVICE REQUESTED IS NOT A COVERED BENEFIT," accompanied by the

notation, "08/02/17: Per WI administrative code DHS 107.03(24) transsexual surgery is a non-

covered service."

74.     Mr. Flack immediately petitioned for a review of the DHS decision by requesting

a hearing before the Wisconsin Department of Administration's Division of Hearings and

Appeals ("DHA"), the state agency designated to adjudicate administrative appeals involving

DHS.

75.     As part of that administrative appeal process, DHS notified DHA that its denial of

preauthorization was based solely on the Challenged Exclusion. DHS noted that it recognized the

requested surgeries as medically-accepted treatments for gender dysphoria, but that it did not

consider the medical necessity of the requested services for Mr. Flack in reaching its decision. In

a September 25, 2017 letter to DHA, DHS stated the following:

> Mr. Flack is a 29 year old transgender man who is seeking the aforementioned
> services as part of gender confirmation surgery. The primary diagnosis listed with
> the prior authorization request is transsexualism (F64.0). Mr. Flack also carries a
> diagnosis of gender dysphoria which is an accepted medical indication for the
> surgical treatment requested.
>
> This request was denied by [DHS's Division of Medicaid Services] as Wis. Admin.
> Code 107.03(24) specifically lists 'transsexual surgery' as a non-covered service
> under medical assistance.
>
> The medical necessity of the services requested *was not taken into account* as
> reimbursement by Medicaid for this type of surgery is currently excluded by DHS
> regulations.

(emphasis added).

20

76.     Following an administrative hearing on November 14, 2017, the administrative law judge dismissed Mr. Flack's petition, affirming the denials on the basis that the requested surgeries are excluded from coverage by the Wisconsin Medicaid program under the Challenged Exclusion.

77.     In his decision, the administrative law judge found that "[t]he requested surgery is part of [Mr. Flack's] transition from female to male." The judge further added that "[w]hile the proposed surgery presumably would favorably address [Mr. Flack's] gender dysphoria, the surgery nevertheless is transsexual surgery that specifically is not covered under the code," and upheld DHS's denial of prior authorization based solely on the Challenged Exclusion.

78.     Mr. Flack's timely rehearing request was denied by the administrative law judge on December 11, 2017.

79.     Since being denied coverage for surgery last summer, Mr. Flack's gender dysphoria has worsened considerably. Without any other financial means to obtain these medically necessary procedures, Mr. Flack feels hopeless and has experienced profound depression and emotional distress resulting from the denial and his inability to complete these critical steps of his gender transition. He continues to experience distress at the sight of his breasts and has occasional thoughts of self-harming behavior to remove the breasts himself, as well as more frequent suicidal thoughts, though he has not acted on those thoughts. He is also embarrassed to go into public because of his experiences being treated as a woman by others due to the presence of his breasts, and avoids social situations whenever possible. When in public, Mr. Flack is self-conscious about his breasts and, when he becomes aware that others might notice them, experiences immediate distress and does whatever he can to conceal them from view.

80.     Without the chest reconstruction surgeries he seeks, Mr. Flack's psychological health will decline. The failure of Defendants to provide coverage for the necessary treatments of Mr. Flack's gender dysphoria has already caused him serious harm and will continue to have serious detrimental effects on his short- and long-term health and well-being.

### *Plaintiff Sara Ann Makenzie*

81.     Plaintiff Sara Ann Makenzie is a 41-year-old woman who resides in Baraboo, Wisconsin. Ms. Makenzie was born in, and has been a lifelong resident of, Wisconsin.

82.     Ms. Makenzie has been diagnosed with mental health disabilities, including bipolar disorder, since childhood. Due to her disabilities, Ms. Makenzie is unable to work and relies on SSI for her income and Wisconsin Medicaid for her health care needs.

83.     Ms. Makenzie is a transgender woman. That is, she was assigned male at birth but is female and has lived fully in accordance with her female gender identity since at least 2012.

84.     Ms. Makenzie has been diagnosed with gender dysphoria.

85.     Ms. Makenzie's birth certificate and current identity documents reflect her female sex. In 2013, Ms. Makenzie obtained a court-ordered legal name change from her traditionally male birth name to her chosen female name, Sara Ann Makenzie. Also in 2013, she obtained a Wisconsin driver's license with her new name and a female sex marker. In 2014, Ms. Makenzie obtained a United States Passport reflecting her name and containing a female sex marker. In 2017, she obtained an amended Wisconsin birth certificate also listing her legally-changed name and indicating that her sex is female.

86.     To treat her gender dysphoria, Ms. Makenzie has been on hormonal therapy (estrogen) since 2013, as prescribed by her doctors. Her symptoms of gender dysphoria diminished significantly after beginning hormone therapy. Her hormone treatments are currently

paid for by Wisconsin Medicaid but, due to the Challenged Exclusion, she is concerned that her coverage for these treatments could end at any time.

87.     In 2013, Ms. Makenzie consulted with her doctor and sought Wisconsin Medicaid coverage for genital reconstruction as part of her medical gender transition and to treat her gender dysphoria. Her doctor's office told her that Wisconsin Medicaid would not cover that surgery because of the Challenged Exclusion.

88.     Ms. Makenzie experienced gender dysphoria related to her lack of female-appearing breasts. Although her hormone treatments resulted in some breast growth, those treatments alone proved inadequate for the development of female-appearing breasts. As a result, Ms. Makenzie has been perceived by others to be a "man" and has consequently experienced mistreatment and harassment. In 2017, in consultation with her medical providers, Ms. Makenzie sought to obtain chest reconstruction surgery, in the form of breast augmentation, to outwardly appear as the woman that she is and to treat her gender dysphoria.

89.     Ms. Makenzie contacted DHS to inquire about whether Wisconsin Medicaid would cover the chest reconstruction. DHS advised her that the procedure was not a covered benefit because of the Challenged Exclusion.

90.     After learning that chest reconstruction would not be covered by Wisconsin Medicaid, Ms. Makenzie sought and obtained a personal loan from her bank of approximately $5,000 to pay out-of-pocket for the procedure. Due to her lack of income and limited financial means, paying back this loan has imposed financial hardship on Ms. Makenzie. She accepted this hardship, however, because she believed it to be her only option to obtain this medically necessary care for her gender dysphoria and to further her gender transition.

23

91.     In 2017, Ms. Makenzie underwent chest reconstruction (breast augmentation) under the care of Venkat K. Rao, MD, MBA, a plastic surgeon with the University of Wisconsin Health System and a faculty member at the University of Wisconsin School of Medicine and Public Health. She paid for this procedure using funds from the personal loan.

92.     The chest reconstruction procedure has been an effective treatment for Ms. Makenzie's gender dysphoria. As a result of that surgery, Ms. Makenzie has experienced fewer instances of being mistaken as male by others and of being mistreated or harassed for having masculine features.

93.     Ms. Makenzie continues to experience profound distress at the sight of her male-appearing genitalia. To complete her gender transition and further treat her gender dysphoria, Ms. Makenzie needs additional surgeries. Specifically, her medical providers recommend that she obtain genital reconstruction in the form of a bilateral orchiectomy and vaginoplasty. For transgender women like Ms. Makenzie, these clinically accepted procedures result in the creation of female-appearing external genitalia. Moreover, the applicable standards of care recognize these procedures as effective in treating gender dysphoria in transgender women. Ms. Makenzie has recently consulted with a plastic surgeon, Katherine Gast, MD, at UW Health in Madison, Wisconsin, whose practice focuses on the treatment of transgender people. Dr. Gast advised Ms. Makenzie that she meets the criteria under the applicable standards of care to obtain genital reconstruction surgery for the treatment of gender dysphoria.

94.     As with her earlier chest reconstruction surgery, Ms. Makenzie contacted DHS to inquire about whether Wisconsin Medicaid would cover genital reconstruction. Once again, DHS informed her that this was not a covered procedure under the state Medicaid regulations. Dr.

Gast also advised Ms. Makenzie that Wisconsin Medicaid would not cover the procedures because of the Challenged Exclusion.

95.     Without coverage from Wisconsin Medicaid, Ms. Makenzie lacks the financial means to pay for the surgery she needs.

96.     Ms. Makenzie's inability to obtain this necessary care due to the Challenged Exclusion has resulted, and will continue to result, in exacerbated symptoms of gender dysphoria and significant emotional distress. She experiences profound distress at the sight of her male-appearing genitalia and tries to avoid sexual activity with her fiancée to minimize that distress. However, that only results in further anxiety and depression, creating a catch-22 for her and straining her relationship with her fiancée. She has engaged in self-harming behaviors, including cutting in her genital area, and has experienced suicidal ideation and other thoughts of self-harm as a result of being unable to complete her gender transition.

## INJURIES TO PLAINTIFFS

97.     Through their acts and omissions described above, Defendants have injured and are continuing to injure Plaintiffs by denying them Wisconsin Medicaid coverage for necessary health care treatments for gender dysphoria because of the Challenged Exclusion.

98.     Defendants' promulgation and enforcement of the Challenged Exclusion, and Defendants' denial of necessary medical treatments to Plaintiffs on the basis of the Challenged Exclusion, have exposed Plaintiffs to significant emotional distress, including, but not limited to, heightened symptoms of gender dysphoria, depression, and anxiety resulting from their inability to obtain medically necessary care.

99.     Plaintiffs have also suffered embarrassment, humiliation, social isolation, and stigma resulting from their inability to obtain necessary gender-confirming surgical procedures as a result of Defendants' promulgation and enforcement of the Challenged Exclusion.

100.    Plaintiffs have suffered physical pain and injuries as a result of Defendants' promulgation and enforcement of the Challenged Exclusion, including Plaintiffs' injuries from self-harming acts related to their exacerbated gender dysphoria and Mr. Flack's pain and injuries sustained from chest binding to conceal his female-appearing breasts.

101.    Plaintiffs have suffered economic injuries, including out-of-pocket expenses incurred in seeking and/or obtaining medical procedures not covered by Wisconsin Medicaid as a result of Defendants' promulgation and enforcement of the Challenged Exclusion, including Ms. Makenzie's out-of-pocket expenses for her chest reconstruction surgery in 2017.

102.    As a direct and proximate result of Defendants' denial of coverage for Plaintiffs' medically necessary gender-confirming care because of the Challenged Exclusion, Plaintiffs' gender transitions have been impeded and their symptoms of gender dysphoria and related distress have increased.

103.    If Defendants continue to deny Wisconsin Medicaid coverage to Mr. Flack and Ms. Makenzie for their surgical treatments for gender dysphoria, the above-referenced harms to their physical and emotional health and well-being will continue, subjecting each of them to significant ongoing risks to their health and safety.

## FIRST CAUSE OF ACTION

### Unlawful Discrimination on the Basis of Sex in Violation of
### Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116

*Against Defendant Wisconsin Department of Health Services (for compensatory damages, declaratory relief, and injunctive relief) and*
*Defendant Seemeyer (for declaratory and injunctive relief)*

104.     Plaintiffs reallege and incorporate by reference paragraphs 1 to 103 of this Complaint.

105.     Under Section 1557 of the Affordable Care Act, "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

106.     Section 1557's prohibitions on sex discrimination are enforceable by Plaintiffs in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference. 42 U.S.C. § 18116(a).

107.     The Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), on its face and as applied to Plaintiffs, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

108.     Plaintiffs have been and are continuing to be injured by Defendants' application of the Challenged Exclusion to deny them medically necessary care, and have suffered damages as a result.

## SECOND CAUSE OF ACTION

### Violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A)

#### *Against Defendant Seemeyer (for declaratory and injunctive relief)*

109.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 103 of this Complaint.

110.    The Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), and Defendant Seemeyer's refusal, based on the Challenged Exclusion, to provide coverage for Plaintiff Flack's medically necessary chest reconstruction surgery and Plaintiff Makenzie's medically necessary chest reconstruction and genital reconstruction surgeries, eliminate mandatory Medicaid coverage of medically necessary services, violating Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

### Violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)

#### *Against Defendant Seemeyer (for declaratory and injunctive relief)*

111.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 103 of this Complaint.

112.    The Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), and Defendant Seemeyer's refusal, based on the Challenged Exclusion, to provide coverage for Plaintiff Flack's medically necessary chest reconstruction surgery and Plaintiff Makenzie's medically necessary chest reconstruction and genital reconstruction surgeries, while covering the same services for other Wisconsin Medicaid enrollees with different diagnoses, violate

Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 1983 Based on the Deprivation of Plaintiffs' Rights Under the Equal Protection Clause of the Fourteenth Amendment

### *Against Defendant Seemeyer (for declaratory and injunctive relief)*

113.   Plaintiffs reallege and incorporate by reference paragraphs 1 to 103 of this Complaint.

114.   First, the Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs on the basis of sex and violates Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

115.   Second, the Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs for being transgender and violates Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

116.   The promulgation and Defendant Seemeyers's continued enforcement of the Challenged Exclusion did not, and do not, serve any rational, legitimate, important, or compelling state interest. Rather, the Challenged Exclusion serves only to prevent Plaintiffs and other transgender Wisconsin Medicaid enrollees from obtaining medically necessary health care that will enable them to treat their gender dysphoria, complete their gender transitions, and fully live as their authentic selves. In effect, the Challenged Exclusion punishes vulnerable transgender people for being transgender and taking necessary steps to live in accordance with their gender identities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue preliminary and permanent injunctions enjoining any further enforcement or application of the Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), and directing Defendants to provide Medicaid coverage for all medically necessary care, including surgical treatments, necessary for the treatment of gender dysphoria;

B.    Enter a declaratory judgment that the Challenged Exclusion, Wis. Adm. Code § DHS 107.03(23)-(24), both on its face and as applied to Plaintiffs:

    1.    Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs on the basis of sex (including sex stereotyping, gender identity, being transgender, and undergoing a gender transition);

    2.    Violates the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A);

    3.    Violates the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B); and

    4.    Violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against Plaintiffs on the basis of sex (including sex stereotyping, gender identity, being transgender, and undergoing a gender transition), and for being transgender;

C.    Award compensatory damages, as permitted under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, in an amount that would

30

fully compensate Plaintiffs for: (1) the harms to their short- and long-term health and well-being, including emotional distress, from being denied access to medically necessary health care as a result of the Challenged Exclusion and its application to them, (2) their economic losses, and (3) all other damages that have been caused by Defendants' acts and omissions alleged in this Complaint;

D.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

E.     Award such other and further relief as the Court may deem just and proper.


Dated: April 30, 2018                              Respectfully submitted,

                                                   /s/ Robert Theine Pledl
Joseph J. Wardenski*                               Robert Theine Pledl (SBN 1007710)
Jennifer I. Klar*                                  Mark A. Peterson (SBN 1016259)
Orly May*                                          Daniel A. Peterson (SBN 1093343)
RELMAN, DANE & COLFAX PLLC                         MCNALLY PETERSON, S.C.
1223 19th Street, NW, Suite 600                    1233 North Mayfair Road, Suite 200
Washington, DC  20036                              Milwaukee, WI  53226-3255
Telephone: (202) 728-1888                          Telephone: (414) 257-3399
Facsimile: (202) 728-0848                          Facsimile: (414) 257-3223
jwardenski@relmanlaw.com                           rpledl@mcpetelaw.com
jklar@relmanlaw.com                                mpeterson@mcpetelaw.com
omay@relmanlaw.com                                 dpeterson@mcpetelaw.com

Abigail Coursolle*
Catherine McKee*
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro Street, Suite D-13
Carrboro, NC  27510
Telephone: (919) 968-6308
Facsimile: (919) 968-8855
coursolle@healthlaw.org
mckee@healthlaw.org


*Attorneys for Plaintiffs*

*Application for *pro hac vice* admission to this Court to follow

31