**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

CODY FLACK and
SARA ANN MAKENZIE,

               Plaintiffs,

      v.

WISCONSIN DEPARTMENT OF
HEALTH SERVICES and
LINDA SEEMEYER, in her official capacity
as Secretary of the Wisconsin Department
of Health Services,

               Defendants.

Case No. 3:18-cv-00309-wmc
Judge William Conley

**EXPERT WITNESS DECLARATION OF JACLYN WHITE HUGHTO, PhD, MPH**

I, Jaclyn White Hughto, PhD, MPH, declare as follows:

1.      My name is Jaclyn White Hughto, PhD, MPH. I am a public health scholar focusing on transgender health. I am a faculty member at Brown University and an affiliated investigator at The Fenway Institute, of Fenway Health in Boston, one of the leading LGBT health centers and research institutions in the world.

2.      I have been retained by counsel for Plaintiffs in the above-captioned matter to provide an expert witness declaration providing my professional opinion on the harms to individuals with gender dysphoria (including Plaintiffs Cody Flack and Sara Ann Makenzie) related to, and the public health implications of, categorical exclusions of Medicaid coverage for medically necessary treatments for gender dysphoria.

3.      I have actual knowledge of the matters stated in this declaration.

**Background and Qualifications**

4.      The information provided regarding my professional background, experiences, publications, and presentations are detailed in my curriculum vitae, a true and correct copy of which is attached as Exhibit B to this declaration.

5.      I received my PhD in Chronic Disease Epidemiology from Yale University with a focus on the social determinants driving health inequities for Lesbian, Gay, Bisexual, and Transgender (LGBT) populations. I also earned a Masters in Public Health in Behavioral Science and Health Education from Emory University. I am a faculty investigator at the Brown University School of Public Health in the Departments of Epidemiology and Behavioral and Social Sciences and a faculty member at Brown's Center for Health Equity Research. Additionally, I am an affiliated investigator at The Fenway Institute of Fenway Health in Boston, where I have conducted epidemiological and bio-behavioral intervention research with LGBT communities since 2010. My research focuses on identifying the individual, interpersonal, structural, and geographic risk factors that place LGBT persons at disproportionate risk for poor health relative to the general population; and developing multilevel interventions to improve the health of marginalized and at-risk populations.

6.      For the past 10 years I have worked directly with hundreds of adolescents and adults whose assigned sex at birth is incongruent with their gender identity (hereafter referred to as transgender or trans individuals). My work with transgender populations first began as a Project Director at The Fenway Institute, and later continued as a Principal Investigator at The Fenway Institute, Yale University, and now Brown University. In these roles, I have worked alongside transgender and non-transgender (herein referred to as cisgender) colleagues, patients, research participants, and community members to understand and improve the health of the

transgender community. In addition to conducting research, I have been involved in programmatic work to improve transgender individuals' access to necessary health services including insurance coverage for transgender care and training of healthcare providers to increase their cultural and clinical competence to care for transgender patients. I have also utilized my research to advance policy efforts to ensure the inclusion of transgender identity in state non-discrimination laws.

7.      I have published 48 peer-reviewed journal articles and a book chapter, with the majority of these focusing on transgender populations. The majority of these publications focus on the health of transgender people, including the impact of structural forms of stigma such as laws and policies that restrict access to medically necessary care for transgender people and contribute to poor health outcomes; geographical variation in access to care for transgender people; and the psychological and quality of life benefits of access to cross-sex hormones and gender affirmation surgery (also known as gender confirmation surgery or transition-related surgery) for this population.

8.      I have presented my work via 63 scientific/academic presentations internationally, nationally, and locally; the majority of these presentations have focused on the health of transgender people.

9.      I have conducted and analyzed research with over 20,000 transgender individuals. I am currently the Principal Investigator of a study of 1,000 transgender individuals that looks to examine facilitators and barriers to engagement in care for HIV-infected and at-risk transgender patients with a focus on identifying the influence of state-level policies on the health of transgender patients. I am also Co-Investigator on a study that examines the healthcare utilization of more than 14,000 transgender patients using insurance claims data from a representative

3

sample of commercially insured and Medicare Advantage insured persons in the U.S. This study also aims to begin the process of developing performance measures for the delivery of quality care for transgender patients. Additionally, I am Co-Investigator on a longitudinal study that examines the long-term health outcomes of medical gender affirmation among transgender patients at two clinical care sites in the U.S. I was previously a Principal Investigator of a pilot intervention study that aimed to improve incarcerated transgender people's access to gender-affirming care through the delivery of an interactive training to increase correctional healthcare providers' cultural and clinical competence to care for transgender patients.

10.     I am a member of the Lesbian, Gay, Bisexual, and Transgender Caucus of Health Professionals within the American Public Health Association (APHA) (of which I am also a member). The LGBT Caucus is charged with ensuring that the most relevant and up-to-date research regarding LGBT individuals is disseminated to the full membership of APHA. The Caucus is an advocate for equal justice and rights for all individuals, regardless of their ethnicity, race, creed, sex, sexual orientation or gender identity, and is committed to combating discriminatory practices in health organizations and systems. The Caucus provides programming at the annual APHA convention to disseminate cutting-edge epidemiological and intervention research as well as innovations in public health programming and practice with LGBT individuals.

11.     I have been nominated and received several awards for my expertise and research with transgender individuals. I was recently nominated for the 2018 National Institutes of Health Early Career Award for work with Sexual and Gender Minority (SGM) populations. I was also awarded a Doctoral Student Research Award at the 2015 APHA conference for my research involving the mental health effects of stigma for transgender adults and well as the Excellence in

Abstract Submission Award at the 2014 APHA conference for my research identifying geographical risk factors for HIV infection for transgender adults. My dissertation research, which examined barriers to care and developed an intervention to overcome barriers to care for criminally-justice involved transgender persons, was awarded distinction from Yale University. I am being compensated at an hourly rate of $150/hour for actual time devoted for my expert services and testimony in this case, as well as expenses and costs. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

12.    I have not testified at deposition or trial in any case in the last four years.

### Basis for Opinions and Documents Reviewed

13.    My opinions contained in this report are based on the following sources: (1) my personal experience witnessing transgender patients, research participants, and colleagues face challenges accessing medically necessary care, including insurance coverage for gender-affirming surgeries; (2) my own research with more than 20,000 transgender participants exploring social determinants of health for this population, including the physical and mental health consequences of transgender stigma; (3) a thorough review of the peer-reviewed research on the etiology and treatment of gender dysphoria, including the medical necessity of gender affirmation surgery for transgender people as cited in the list of references to this report; and (4) the governing standards of care within the field of transgender medicine from the World Professional Association of Transgender Health, The Endocrine Society, the American Psychiatric Association, and The American Medical Association, all of which issue guidelines outlining the medical treatment of gender dysphoria.

14. In preparing this declaration, I reviewed the factual allegations contained in the Complaint filed in this case regarding the experiences of Cody Flack and Sara Ann Makenzie, and, for the purposes of this declaration, assume those allegations to be true.

15. In preparing this declaration, I also reviewed Wisconsin's categorical exclusion of transition-related surgeries and medical treatments contained in Wis. Adm. Code § DHS 107.03(23)-(24).

**Gender Identity, Sex, and Gender Dysphoria**

16. "Gender identity" is a psychological and medical term used to define a person's internal sense of being a man, woman, or another gender. Gender identity is innate and possessed by all human beings. For most human beings, awareness of one's gender identity develops around age 3, although for transgender individuals, this may occur later in life.

17. "Sex" is a term used to categorize individuals as male or female. Sex is assigned to individuals at birth by a medical provider based on the presence of specific physical characteristics and chromosomes. Infants are typically assigned a female sex at birth if they are born with external genitalia that includes a vagina, clitoris, and vulva; internal reproductive organs that include ovaries and a uterus; and XX chromosomes. Similarly, the majority of infants born with a penis, testes, and XY chromosomes are assigned a male sex at birth. Infants born with the anatomy of both sexes are considered to be intersex. For intersex infants, healthcare providers generally conduct a series of hormonal, genetic, and radiological tests, and together with parents, assign these infants a preliminary sex based on which gender they anticipate the child will feel later in life (ISNA, 2018). Intersex individuals not only represent the variability in human sexuality and development but also provide evidence that sex is a category assigned to an

individual based on a collection of traits that do not always fit within the typical sex/gender binary of male/man or female/woman.

18.     The majority of individuals assigned a female sex at birth will experience themselves as female and identify as women, while the majority of individuals assigned a male sex at birth will experience themselves as male and identify as men. While there is considerable variability in who falls under the transgender umbrella, it is estimated that approximately 1.4 million U.S. adults, or 0.06% of the U.S. adult population, are transgender (Flores, Herman, Gates, & Brown, 2016).

19.     "Gender dysphoria" describes the psychological distress associated with having an incongruent gender identity and assigned birth sex (American Psychiatric Association, 2013). Many transgender people receive a formal diagnosis of gender dysphoria as listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) and the World Health Organization's International Classification of Diseases (ICD-10) (under the now-outdated name "gender identity disorder"). Individuals with gender dysphoria present with a variety of symptoms, including extreme emotional distress and intense desires to be seen and validated in accordance with their innate gender identity.

20.     The criteria for identifying gender dysphoria in adults under section 302.85 of the DSM-5 include:

    a. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least 2 of the following:

        i. A marked incongruence between one's experienced/expressed gender and primary and or/secondary sex characteristics;

ii. A strong desire to be rid of one's primary and/or secondary sex characteristics (in order to align one's physical gender presentation with one's identified gender);

iii. A strong desire for the primary and/or secondary sex characteristics of the "other" gender (i.e., identified gender);

iv. A strong desire to be of the "other" gender (i.e., identified gender);

v. A strong desire to be treated as the "other" gender (i.e., identified gender); and

vi. A strong conviction that one has the typical feelings and reactions of the "other" gender (i.e., identified gender).

**Standards of Care**

21. The treatment for gender dysphoria is outlined in the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People – the authoritative clinical guidelines for transgender care in the U.S. and internationally. The SOC is published by the World Professional Association of Transgender Health (WPATH), an international, interdisciplinary professional and educational organization devoted to disseminating evidence-based care, education, research, advocacy, and public policy to promote the highest standards of healthcare for transgender individuals. Since 1979, the SOC has outlined clinical guidelines for the care of transgender individuals. The treatments outlined in the SOC are endorsed and recommended by the leading medical and mental health organizations in the U.S. and including, the American Medical Association; the Endocrine Society, the American Psychiatric Association; and the American Psychological Association.

8

22.     The SOC is based on the best available science and expert professional consensus (Coleman et al., 2012). The overall goal of the SOC is to provide clinical guidance for health professionals to assist transgender people with safe and effective pathways to alleviate gender dysphoria and maximize their physical and psychological health and well-being. The SOC recommends several treatments to alleviate gender dysphoria. While the specific treatments transgender individuals may desire and ultimately access often vary based on the psychological, physiological, and situational needs of each individual, gender-affirming treatments generally consist of one or more social, psychological, and/or medical component that allows the individual to be authentically seen and live as their innate gender identity.

23.     Under the SOC, the process of socially affirming one's gender, also called social transition, involves changing one's social identity and presentation to align with one's gender identity. Social gender affirmation can include disclosing one's gender identity to others (e.g., "coming out") as well as changing one's mannerisms, dress, name, and/or pronoun to align with one's gender identity. Medical gender affirmation, also known as medical transition or gender confirmation, involves the use of cross-sex hormone therapy and/or surgery (e.g., chest surgery, genital surgery) to masculinize or feminize the body. According to the SOC, these social and medical processes serve to alleviate gender dysphoria by aligning one's social and physical gender expression with one's gender identity thereby eliminating gender incongruence and associated distress (Coleman et al., 2012).

24.     Social and medical gender affirmation have been used for more than 60 years to alleviate gender dysphoria and are considered safe and effective (Coleman et al., 2012; Spade, 2010). Further, two systematic reviews, based on more than 32 research studies from across the world establish the benefit of these social and medical processes on the mental health of

transgender people (Murad et al., 2010; White Hughto & Reisner, 2016). Specifically, these reviews overwhelmingly find a positive relationship between hormone therapy and surgery and improvements in gender dysphoria, psychological symptoms (e.g., depression and anxiety), and overall quality of life for transgender individuals who had socially affirmed their gender and were able to access gender-affirming medical therapies (Murad et al., 2010; White Hughto & Reisner, 2016). Conversely, several studies have found that denied access to hormones and surgery is associated with poor mental health, suicidality, and non-suicidal self-injury for transgender individuals (e.g., Brown, 2010; Cole, O'Boyle, Emory, & Meyer III, 1997; Rotondi et al., 2013). Thus, across clinical care guidelines, hormone therapy and surgery are considered medically necessary for transgender people.

25.     Consistent with the medical necessity of hormone therapy and surgery, 18 U.S. states and the District of Columbia have instituted Medicaid policies that explicitly cover healthcare related to medical gender affirmation (MAP, 2018). Under these policies, transgender people cannot be denied Medicaid coverage for hormone therapy or surgery that is medically necessary to treat gender dysphoria. Additionally, under these policies, transgender individuals who demonstrate the medical necessity of hormones and/or surgery according to current clinical care guidelines, are eligible to receive Medicaid coverage for these procedures. Despite recognition of the medical necessity of hormones and surgery by nearly half the states in the U.S., 22 states do not have an explicit Medicaid policy regarding transgender healthcare coverage; and 10 states have a Medicaid policy that explicitly excludes transgender healthcare coverage. The states with exclusionary policies include: Alaska, Georgia, Iowa, Maine, Missouri, Nebraska, Ohio, Tennessee, Wyoming, and Wisconsin.

26.     In my professional opinion, the states with exclusionary Medicaid policies are in direct opposition to the transgender clinical care guidelines set forth by the leading medical organizations in the U.S. that recommend that these safe and effective treatments be made available to transgender individuals as a means to alleviate gender dysphoria. Exclusionary state Medicaid policies not only create inequitable access to needed care for transgender Medicaid recipients in these states, but as discussed in-depth below, such policies also have the potential to exacerbate gender dysphoria and place affected transgender individuals at risk for a variety of negative health outcomes including intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self- harm.

### Stigma Associated with Being Transgender

#### Multilevel Sources of Transgender Stigma

27.     Stigma is the social process of labeling, stereotyping, and rejecting human difference as a form of social control (Link & Phelan, 2001; Phelan, Link, & Dovidio, 2008). Central to stigma is power, which is used by the stigmatizing majority to exclude and marginalize those who are different.

28.     In the U.S., transgender individuals are often considered deviant for having a gender identity that is discordant with the gender typically associated with their assigned birth sex and experience widespread stigma as a result (Bockting, Miner, Romine, Hamilton, & Coleman, 2013; Grant et al., 2011; James et al., 2016; Lombardi, Wilchins, Priesing, & Malouf, 2002; White Hughto, Reisner, & Pachankis, 2015).

29.     Transgender individuals often experience stigma through diverse and multi-level mechanisms (White Hughto et al., 2015). *Interpersonal* stigma refers to direct or enacted forms of stigma including verbal harassment, discriminatory practices such as refusal of care by a

11

healthcare provider, physical violence, and sexual assault due to one's gender identity. *Individual* stigma includes the negative feelings transgender people hold about themselves or the beliefs they perceive others to hold about them that may shape future behavior such as the avoidance of health-promoting resources as a means of minimizing distress. Finally, s*tructural* stigma refers to the societal norms, governmental laws, and institutional policies that constrain access to health-promoting resources such as employment, housing, and healthcare. Here I describe the primary pathways through which each form of stigma contributes to poor health for transgender people.

### *The Effects of Interpersonal Stigma on the Health of Transgender People*

30.    Societal norms and beliefs often translate into enacted stigma at the interpersonal level, which can produce negative consequences for transgender people. Goffman (1963), an early and influential theorist in the field of stigma, described those with visible stigmas as the "discredited," as their stigmatized condition is readily apparent and therefore more susceptible to mistreatment. Conversely, the "discreditable" are those whose stigma is invisible but who would experience stigma should their stigma become known to others. To that end, transgender people with low visual gender conformity, such that other people can tell they are transgender, experience more discrimination and worse health outcomes than those with high visual gender conformity (Grant et al., 2011; Reisner, Hughto, et al., 2015; Reisner et al., 2016). Transgender individuals who are unable to access gender affirmation procedures due to cost and lack of insurance coverage are, therefore, at risk of experiencing enacted forms of stigma as their gender nonconforming appearance is visible to others (White Hughto et al., 2015).

31.    In the 2015 U.S. Transgender Survey, a national study of more than 27,000 transgender people, 46% of the sample were verbally harassed and 9% were physically attacked for being transgender in the past year alone (James et al., 2016). A review of violence against

12

U.S. transgender people found that the prevalence of lifetime physical assault due to gender identity ranged from 33–53% (Stotzer, 2009). Sexual assault has also been shown to be common among transgender people. In the U.S. Transgender Survey, 47% of the sample had been sexually assaulted at some point in their lifetime and 1 in 10 were sexually assaulted in the past year (James et al., 2016). Violence at the hands of intimate partners was also particularly common, with 54% of the sample experiencing some form of coercive control and physical harm and nearly a quarter (24%) experiencing severe physical violence by an intimate partner in their lifetime.

32.    It is theorized that gender nonconformity causes perpetrators of violence to become anxious and angry, ultimately enacting violence against transgender people as a means of rejecting and diminishing that which they fear (Westbrook & Schilt, 2013). In the case of sexualized interactions between cisgender men and transgender women, it has been argued that cisgender men feel threatened when they learn a woman is transgender, and react violently in an effort to prove their heterosexuality and reclaim their masculinity and power (Schilt & Westbrook, 2009). Studies also show high levels of reported violence among young and low-income transgender people (Stotzer, 2009), suggesting that violence on the basis of transgender identity often affects the most marginalized transgender subpopulations.

33.    Research finds that individuals with physical appearances that do not align with their gender identity, for example, the presence of breasts in a transgender man or the absence of breasts in a transgender woman, are at heightened risk for interpersonal forms of mistreatment (Reisner, Hughto, et al., 2015; White Hughto, Rose, Pachankis, & Reisner, 2017). Interpersonal stigma related to a transgender person's physical characteristics can carry direct costs via

physical violence as well as through the emotional distress that results from identity-based mistreatment.

34. Additionally, experimental studies among diverse populations show that stigma-related stress has an immediate effect on the body including diastolic blood pressure reactivity, increased cortisol output, and elevated cardiometabolic risk (Guyll, Matthews, & Bromberger, 2001; Hatzenbuehler, Slopen, & McLaughlin, 2014; Townsend, Major, Gangi, & Mendes, 2011). Chronic activation of the body's stress response system can compromise health over time, a phenomenon termed "allostatic load" (McEwen & Stellar, 1993). For many, chronic stress is associated with adverse health outcomes, such as hypertension, diabetes, and even death (Anderson, 1989; Hatzenbuehler, Bellatorre, et al., 2014; Taylor et al., 2006). Persistent stress has also been linked to anxiety, depression, suicidality, and substance use to cope in transgender populations (Clements-Nolle, Marx, & Katz, 2006; Hatzenbuehler, Nolen-Hoeksema, & Erickson, 2008; Reisner, Greytak, Parsons, & Ybarra, 2014).

35. While a dearth of research has explored the long-term physical health effects of stigma-related stress in transgender people, studies among other stigmatized groups reveal that stigma can affect health over the life-course, as middle age Black women in one study, were found to be 7.5 years biologically older than their white peers (Geronimus et al., 2010). Given that transgender people experience stigma in numerous contexts throughout their lives, it is likely that these experiences take a similarly additive toll on their health. Further, adults with multiple disadvantaged statuses (e.g., physical and mental health disabilities, low income) are more likely to experience poor physical and mental health than those with a single stigmatized identity (Grollman, 2014). Transgender individuals with multiple disadvantaged statuses may be at

particularly increased risk of poor health due the chronic stress associated with experiencing stigma through multiple pathways.

36.     Based on the Complaint in this case, both Cody Flack and Sara Ann Makenzie have been mistreated because of gender nonconforming physical traits (for Cody, the presence of breasts, and for Sara, the past underdevelopment of breasts). Their experiences, and the harms to their health and well-being, are consistent with the research described above. Moreover, because both Cody and Sara have multiple disadvantaged and stigmatized statuses—including living with disabilities and having limited incomes—it is reasonable to assume that they are at even greater risk for experiencing discrimination, violence, and other forms of interpersonal stigma which, in turn places, them at heightened risk for poor physical and mental health.

### *The Effects of Individual Stigma on the Health of Transgender People*

37.     Experiencing stigma at the interpersonal level can affect how transgender people evaluate and approach future situations at the individual level. Anxiously expecting discrimination can lead to avoidance of interpersonal situations, which can take a toll on one's mental and physical health (Reisner, Hughto, et al., 2015; Reisner et al., 2016; White Hughto, Pachankis, Willie, & Reisner, 2017). For example, many transgender people report experiencing mistreatment in healthcare settings, which is associated with postponing necessary care and the development of otherwise preventable conditions that ultimately require emergency care (Cruz, 2014; Dewey, 2008; Grant et al., 2011; Reisner, White Hughto, et al., 2015; Xavier et al., 2013). Transgender individuals' avoidance of social interactions due to past and anticipated mistreatment supports the stigma-based rejection sensitivity model (Mendoza-Denton, Downey, Purdie, Davis, & Pietrzak, 2002) in which stigmatized individuals nervously anticipate (hypervigilance), routinely observe (perceived stigma), and anxiously react to rejection with

15

important health costs (e.g., the onset of otherwise preventable health conditions) (Hughto, Pachankis, & Reisner, In Press).

38.    The internalization of stigma can also impact an individual's ability to cope with external stressors, erode self-efficacy for enacting health-promoting behaviors, and eventually diminish an individual's ability to remain resilient in the face of negative events (Hendricks & Testa, 2012; Mizock & Mueser, 2014). In fact, high levels of internalized transgender stigma is associated with increased probability of lifetime suicide attempts (Perez-Brumer, Hatzenbuehler, Oldenburg, & Bockting, 2015). Additionally, internalized stigma has been shown to reduce self-care and help-seeking behaviors for mental health problems resulting in a failure to access mental health services when needed (Hellman & Klein, 2004).

39.    As alleged in the Complaint, both Cody and Sara report avoiding social interactions due to the distress associated with having a non-conforming gender identity. For Cody, the avoidance of social situations is driven by the desire to prevent future mistreatment, which intensifies his feelings of gender dysphoria. For Sara, the avoidance of sexual activity with her fiancée is driven by feelings of gender dysphoria that are exacerbated by the sight of her gender identity incongruent genitalia. Cody's experiences are consistent with prior research showing that transgender people who have experienced mistreatment may develop a heightened awareness and fear of future stigma, leading to anxious behavioral reactions including the avoidance of social situations as a means of reducing the threat of stigma (Hughto et al., In Press; White Hughto et al., 2015). Similarly, Sara's avoidant behaviors are supported by research showing that transgender people may avoid social interactions in which their incongruent genitalia is visible to others (e.g., sexual or healthcare encounters) as these experiences often serve to invalidate their gender identity and heighten feeling of gender dysphoria (Reisner et al.,

2017). The behavioral avoidance of social interactions can carry both direct and indirect social and health-related costs for transgender people. For example, as Sara personally experienced, the avoidance of sexual interactions can directly contribute to relationship problems and also prevent transgender people from benefiting from health-promoting resources such as physical affection and emotional support (White Hughto et al., 2015). The avoidance of social interactions may also indirectly contribute to poor health, as the avoidance of social interactions can prevent transgender individuals from receiving other health-promoting resources such as healthcare (White Hughto et al., 2015).

40.    In my professional opinion, providing access to gender-affirming therapies that allow Cody, Sara, and other transgender individuals to align their physical gender expression with their internal gender identity can, therefore, reduce gender dysphoria, prevent mistreatment from others, and ultimately allow individuals to benefit from health-promoting social interactions and resources.

### *The Effects of Structural Stigma on the Health of Transgender People*

41.    Distal forms of structural stigma codified in governmental laws and organizational policies can carry dire health consequence for transgender people.

42.    Structural stigma is perhaps best evidenced by the limited availability of insurance coverage for transgender care. Research finds that many transgender people lack insurance, which may be due in part to employment discrimination and resulting high levels of unemployment for transgender people relative to cisgender people (Conron, Scott, Stowell, & Landers, 2012; Grant et al., 2011; James et al., 2016). Although, even when transgender people are insured, barriers to accessing medically necessary hormones and surgery persist as some insurance policies, including some state-level Medicaid laws, exclude coverage for gender-

affirming medical interventions claiming these procedures are "cosmetic" or "medically unnecessary" (MAP, 2018). These exclusionary insurance policies are considered a form of structural stigma as they serve to restrict transgender people's access to medically necessary health resources that are otherwise routinely provided to cisgender people. This inequitable access to needed medical care is common among transgender individuals and ultimately serves to harm the health of this population.

43.     In the 2015 U.S. Transgender Survey, 55% of those who sought coverage for medical gender affirmation surgery in the past year were denied (James et al., 2016). Transgender people who do not have access to insurance for transgender-specific care are forced to pay out of pocket for medical gender affirmation procedures, which can be cost-prohibitive for many people, particularly those living in poverty or who are unable to work due to disability (Gonzales & Henning‐Smith, 2017; James et al., 2016; Khan, 2013; White Hughto et al., 2015). Faced with an inability to access needed medical care, transgender people are at risk of experiencing poor physical and mental health.

44.     In a study of transgender individuals in Massachusetts conducted before the implementation of State's comprehensive gender-identity-related protections, 65% of the sample reported being discriminated against in healthcare settings in the past year and nearly a quarter (23.6%) of those who sought medical gender affirmation reported being unable to access this care (Reisner, Hughto, et al., 2015; White Hughto, Rose, et al., 2017). Further, individuals who were unable to access gender affirmation-related care were more likely to experience poor physical and mental health, including a gastrointestinal-related diagnosis and depression than those who were able to access such care in the past year (White Hughto & Reisner, 2018).

18

45.     Unable to access needed medical gender affirmation procedures, some transgender people have been found to self-perform needed surgeries (e.g., mastectomy, auto-castration) (Brown, 2010; Cole, O'boyle, Emory, & Meyer III, 1997; Rotondi et al., 2013). Reports also document suicide attempts by transgender individuals who desire surgery but are unable to access medically necessary care (Cole et al., 1997; Haas, Rodgers, & Herman, 2014). Indeed, a national study of transgender adults found that the high and highest prevalence of suicide attempts were found among respondents who said that they wanted chest or genital surgery, respectively, suggesting that desiring these procedures but not yet having them may exacerbate transgender individuals' distress related to the incongruence between their gender identity and physical appearance (Haas et al., 2014). These life-threatening behaviors highlight the overwhelming desperation of many transgender individuals to alleviate their gender dysphoria.

46.     As alleged in the Complaint, both Cody and Sara report elevated negative mental health symptoms, suicidality, financial strain, and ongoing engagement in self-harm behaviors as a result of being denied coverage for chest surgery and genital reconstruction—procedures that their medical providers deem essential to reducing their extreme feelings of gender dysphoria. In my professional opinion, the adverse physical and mental health symptoms experienced by Cody and Sara are consistent with the above referenced research linking the structural denial of needed care to poor health in transgender individuals. The morbidity and mortality associated with the denial of medically necessary transgender care underscores the importance of ensuring that transgender individuals have access to medically necessary, gender-affirming care.

### *Geographic Variation in Medicaid Coverage for Transgender Care and Implications for the Health of Transgender People*

47.    Research shows that regional differences in structural stigma correspond to differential health outcomes for transgender persons. In a nation-wide study of transgender adults, participants living in states with more structural stigma (i.e., states with a more conservative social climate), were more likely to report having been refused healthcare than individuals living states with less structural stigma (White Hughto, Murchison, Clark, Pachankis, & Reisner, 2016). Similarly, in another national study, transgender individuals living in a state with more structural stigma (i.e., states with a higher prevalence of stigmatizing social attitudes and discriminatory policies), were more likely to have attempted suicide than transgender individuals living in a state with less structural stigma (Perez-Brumer et al., 2015).

48.    Extending these findings to transgender individuals who require gender-affirming surgery and are insured under Medicaid in the State of Wisconsin, it is my professional opinion that it is highly likely that the stigma codified in the exclusionary Wisconsin Medicaid policies not only place these individuals at increased risk for the denial of needed medical services but could contribute to heightened morbidity and mortality for this already vulnerable and underserved population.

### *Estimation of Wisconsin's Transgender Population at Risk for Poor Health under the State's Exclusionary Medicaid Policies*

49.    In Wisconsin, 0.43% of the state's 4.5 million adult population, or approximately 19,363 people, were estimated to be transgender as of the end of 2017. In a nationally representative study of transgender people receiving inpatient care, 27.6% of transgender patients were insured through Medicaid, compared to approximately 18% of the general population (Canner et al., 2018). This data suggests that transgender people are

20

disproportionately represented among Medicaid beneficiaries. With just under 1.2 million children and adults on Medicaid in Wisconsin (Healthcare Enrollment (Wisconsin Medicaid), 2018), and extrapolating the data referenced above, I estimate that at least 5,000 Wisconsin Medicaid recipients are transgender adults who may be affected by the surgical exclusion at some point in their lives. Although not all of those adults may be seeking gender-affirming surgeries at this time, it is my opinion that Wisconsin's categorical policy barring access to gender-affirming care has harmful health implications for those who currently require such care as well as those who will require this care in the future. Given the number of people in Wisconsin affected by the transgender Medicaid exclusions, and the public health harms of healthcare denial, it is my professional opinion that policy changes are urgently needed to increase access to medically necessary care for transgender individuals living in Wisconsin in order to improve health outcomes and prevent future harms to this population.

### Conclusions

50.    In sum, based on the available research, transgender clinical care guidelines, and my personal encounters with transgender individuals who have struggled to receive the healthcare they need, it is my professional opinion that Medicaid exclusions of gender-affirming surgeries and related medical care, including the State of Wisconsin's categorical exclusion on Medicaid coverage for such care, have a harmful effect on the mental and physical health of transgender people who are denied access to this care. Specifically, this form of structural stigma creates inequitable access to care and prevents transgender people from being able to obtain health-promoting and medically necessary resources. The denied access to care not only increases transgender people's risk for anxiety, depression, and suicidality but also places this

vulnerable community at risk for experiencing verbal harassment and physical and sexual assault at the hands of others due to their visual gender non-conformity.

51.    In contrast, it is my professional opinion that the policies of the 18 states plus the District of Columbia that affirmatively provide Medicaid coverage for gender-affirming care are consistent with sound public health practices and likely contribute to the lower morbidity and mortality observed among transgender individuals in these states relative to individuals in states with exclusionary policies like Wisconsin. The implementation of protective policies equates to a structural-level intervention that dismantles the stigma codified in state insurance policies by providing equitable access to care for all people, regardless of gender identity.

52.    It is my professional opinion that ending the elimination of Wisconsin's categorical exclusion on Medicaid coverage for gender-affirming care and providing access to medically-necessary care has the potential to alter societal attitudes toward transgender people and, in turn, diminish enacted forms of stigma towards transgender people by establishing transgender people as equal under the law and deserving of the same rights, privileges and resources afforded to cisgender people. It is, therefore, my professional opinion that removing Medicaid exclusions and instituting Medicaid protections for transgender people would yield significant public health benefits to transgender Medicaid enrollees in the state.

53.    It is my professional opinion that the social, psychological, and physical harms reported by Cody Flack and Sara Ann Makenzie as a result of being denied medically necessary surgery, as alleged in their Complaint, is consistent with the public health literature linking multiple forms of transgender stigma to poor health in transgender populations. Specifically, the heightened levels of gender dysphoria, anxiety, depression, and suicidal ideation, the behavioral avoidance of social interactions that increase feeling of distress, the strained relationships and

22

social costs that result from avoidant behaviors, and the financial burden of accessing care not covered by insurance are common consequences of interpersonal and structural stigma for transgender individuals. Notably, these costs can be alleviated by safe and effective treatments that serve to reduce gender dysphoria and the likelihood of experiencing interpersonal mistreatment due to having a gender non-conforming physical appearance; however, such treatments must be made available to Cody and Sara for them to experience the health benefits of these therapies. It is therefore my professional opinion that Cody and Sara should be provided with Medicaid coverage to receive their medically necessary surgeries in order to arrest the multitude of physical, mental, social, and financial costs they continue to experience and prevent any further harm to these individuals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __17__ day of May, 2018.

_____

Jaclyn White Hughto, PhD, MPH

23