IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CODY FLACK and
SARA ANN MAKENZIE,

                    Plaintiffs,                OPINION AND ORDER

   v.                                        18-cv-309-wmc

WIS. DEPT. OF HEALTH SERVS.
and LINDA SEEMEYER, in her official capacity,

                    Defendants.

As a group, transgender individuals have been subjected to harassment and discrimination in virtually every aspect of their lives, including in housing, employment, education, and health care. Their own families, acquaintances and larger communities can be sources of harassment. For some transgender individuals, though certainly not all, the dissonance between their gender identity and their natally assigned sex can manifest itself in the form of "gender dysphoria," a serious medical condition recognized by both sides' experts and the larger medical community as a whole. Plaintiffs Cody Flack and Sara Ann Makenzie both have long-term gender dysphoria for which they have received previous treatments covered by Wisconsin Medicaid, including hormone therapy. However, Wisconsin Medicaid categorically denies coverage for medically-prescribed "[t]ranssexual surgery" and related drugs. Wis. Admin. Code § DHS 107.03(23)-(24). Plaintiffs filed suit challenging this exclusion under the Equal Protection Clause and the Affordable Care Act, and seek to preliminarily enjoin defendants from enforcing this exclusion against their requests for insurance coverage (dkt. #40). The court held oral argument on plaintiffs' motion for a preliminary injunction on July 19, 2018.

As discussed below, plaintiffs have established a reasonable likelihood of prevailing on

the merits of their ACA claim, as well as more than a negligible chance of prevailing on the merits of their equal protection claim.   Moreover, the immediate consequence for both individuals is the effective denial of medical procedures that:  (1) meet the prevailing standard of care; *and* (2) are specifically prescribed by their treatment providers to avoid further psychological harm caused by gender dysphoria.   Accordingly, despite defendants' repeated assertions to the contrary, plaintiffs have established a material risk of irreparable harm and a reasonable likelihood of success on the merits.   The court will, therefore, grant plaintiffs' motion for a preliminary injunction.

UNDISPUTED FACTS[1]

A.  **Gender Dysphoria**

Every person has a "gender identity."   For most people, their gender identity matches the natal sex assigned at birth.   For transgender individuals, however, that is not true: their gender identity differs from the sex they were assigned at birth.   Specifically, a transgender woman's birth-assigned sex is male, but she has a female gender identity; a transgender man's birth-assigned sex is female, but he has a male gender identity.[2]

---

[1] The facts throughout are drawn from the parties' stipulated findings of fact (dkt. #51), as well as plaintiffs' proposed findings of fact (dkt. #20) and defendants' responses (dkt. #54) unless otherwise noted.   These facts are undisputed for purposes of considering plaintiffs' preliminary injunction motion, except where qualified or otherwise noted below.

[2] Although purporting to dispute portions of PFOF #11, defendants agree that "transgender people have a gender identity that is different from their assigned sex, that a transgender man has a male gender identity, and that a transgender woman has a female gender identity."   (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 11.)   Even though defendants do not expressly agree that a transgender man had been assigned a female sex at birth or that a transgender woman had been assigned a male sex at birth, their agreement that transgender people have a different gender identity from the sex assigned at birth makes their purported dispute largely one of semantics, rather than one of materiality.

2

Gender dysphoria is a serious medical condition, which if left untreated or inadequately treated can cause adverse symptoms.  The DSM-5 contains the psychiatric consensus as to the definition, diagnostic criteria and features for gender dysphoria.

> *Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender.  Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available.  The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.

(DSM-5 Excerpt (dkt. #21-1) 5.)[3]  It is worth emphasizing that not every transgender person has gender dysphoria.  Adults with gender dysphoria "often" have "a desire to be rid of primary and/or secondary sex characteristics and/or a strong desire to acquire some primary and/or secondary sex characteristics of the other gender."  (*Id.* at 8.)  Untreated, gender dysphoria can result in psychological distress:  "preoccupation with cross-gender wishes often interferes with daily activities."  (*Id.* at 12.)  Impairment -- such as the development of substance abuse, anxiety and depression -- is also a possible "consequence of gender dysphoria."  (*Id.* at 9.)  Finally, gender dysphoria "is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks . . . ."  (*Id.* at 12.)

---

[3] DSM-5 is the fifth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.  The parties have stipulated that the docketed excerpt "is a true and correct copy of the Gender Dysphoria chapter."  (Stip. PFOF (dkt. #51) ¶¶ 16-17.)  Earlier editions of DSM included diagnoses of "transsexualism" or "gender identity disorder," "indicat[ing] that the clinical problem was the discordant gender identity."  John W. Barnhill, *Chapter 14. Gender Dysphoria Introduction*, *in DSM-5 Clinical Cases* 237, 238 (John W. Barnhill ed., 2014).  However, consistent with the DSM-5's larger focus, gender dysphoria "emphasizes clinically significant distress of dysfunction along with the discordance [of gender identity]."  *Id.*

3

Gender dysphoria can be alleviated through living consistently with one's gender identity, including being treated by others accordingly.[4]  Likewise, "appropriate individualized medical care as part of their gender transitions" can mitigate or prevent symptoms of gender dysphoria.  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 16.)  In 2011, the World Professional Association of Transgender Health published the seventh version of *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (the "WPATH Standards of Care"), which identifies psychotherapy, hormone therapy and various surgical procedures as treatment possibilities for gender dysphoria.[5]

Before gender-confirming surgery, those with gender dysphoria "are at increased risk for suicidal ideation, suicide attempts, and suicides."  (DSM-5 Excerpt (dkt. #21-1) 8.)  Defendant contends that even after surgery, gender dysphoria may still result in suicide, self-harm, or serious psychological distress.  (*See* Mayer Dep. (dkt. #55-3) 54:18-20.)  The parties agree that gender-confirming surgical procedures are not necessary to alleviate gender dysphoria for all transgender people.  Plaintiffs, on the other hand, contend that surgery is the only effective treatment for many transgender people and that gender-confirming surgical procedures are "safe and effective treatments."  (Pls.' PFOF (dkt. #20) ¶¶ 18-19.)  Defendants respond that "[t]here is inadequate evidence to conclude that surgical treatments are of proven medical value

---

[4] Defendants dispute this "to the extent that [it] implies that surgical treatments are of proven medical value or usefulness for treating gender dysphoria."  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 15.)

[5] Understandably, defendants' responses are laser-focused on the possibility of surgical intervention as a treatment for gender dysphoria; however, with that narrow focus, defendants neglect to address other aspects of plaintiffs' proposed facts.  Here as well, defendants, while (confusingly) objecting to this proposed fact under Rules 802 and 1002, "do not dispute that the WPATH guidelines discuss these surgical procedures" only "disput[ing] that surgical treatments are of proven medical value or usefulness in treating gender dysphoria."  (*Id.* ¶ 17.)  Their response ignores the other identified gender dysphoria treatment options, which are considered undisputed.

4

or usefulness for treating gender dysphoria." (*See e.g.*, Defs.' Resp. to Pls.' PFOF (dkt. #54)
¶¶ 15, 18-19.)

**B. Wisconsin Medicaid**

Medicaid is a joint federal-state program to provide medical assistance to eligible low-income individuals; it was established in 1965 under Title XIX of the Social Security Act. Through Medicaid, the federal government generally reimburses a substantial portion of a state's expenditures to provide medical services to people whose resources and incomes are insufficient to afford necessary medical services.

Like all its sister states, Wisconsin participates in Medicaid. The Wisconsin Department of Health Services ("DHS") is the state agency charged with administering the Wisconsin Medicaid Program consistent with state and federal requirements. DHS receives federal funding for the program, including reimbursement of over half of the state's Medicaid expenditures from the U.S. Department of Health and Human Services. Defendant Linda Seemeyer is the DHS Secretary and she is responsible for implementing the Medicaid Act consistent with federal requirements. Wisconsin Medicaid provides coverage for "[p]hysician services," including "any medically necessary diagnostic, preventative, therapeutic, rehabilitative or palliative services . . . within the scope of the practice of medicine and surgery" that are "in conformity with generally accepted good medical practice" and provided by a physician or under one's direct supervision, unless otherwise excluded. *See* Wis. Admin. Code § DHS 107.06(1); *see also id* § 107.08(1)(a)-(b) (providing coverage for hospital inpatient and outpatient services that "are medically necessary" and provided under a doctor's direction). Wisconsin Medicaid has a budget of approximately $9.7 billion to provide for its roughly 1.2 million enrollees. Approximately 5,000 of those enrollees are transgender, and some subset of

5

this population suffers from gender dysphoria.

In addition to the requirements of federal law, defendants' administration of Wisconsin Medicaid is governed by Wisconsin Statutes §§ 49.43-.65 and Wisconsin Administrative Code §§ DHS 101.01-.36.  Included in the governing regulations is the "Challenged Exclusion," § 107.03(23)-(24), at issue in this case.  The Challenged Exclusion provides that "The following services are not covered under MA: . . . (23) Drugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or characteristics; [and] (24) Transsexual surgery."  Wis. Admin. Code § DHS 107.03(23)-(24).[6]  The Challenged Exclusion was adopted in 1996 and has remained in effect since February 1, 1997.[7]

At the time of its adoption, DHS found these services were "medically unnecessary." (Clearinghouse Rule 96-154 (dkt. #21-12) 2, 3.)  Other coverage exclusions created by the 1996 amendments included "non-medical food," "ear lobe repair," "tattoo removal," and "services related to surrogate parenting."  (*Id.* at 3.)  The parties disagree about whether potential cost savings motivated these exclusions (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 45), although the fiscal estimate noted that "[t]he rule changes are expected to result in nominal savings for state government" (Fiscal Estimate (dkt. #21-14) 2).

DHS's website includes the following notice:

> For people who need medical interventions such as hormones or surgery, these might be covered under private insurance plans. Currently, Wisconsin BadgerCare, BadgerCare Plus, Medicaid, and State of Wisconsin employee health insurance (ETF) do not cover gender reassignment surgery or drugs related to gender reassignment or hormone replacement.  Please contact your

---

[6] The parties agree that DHS regulations fail to define "transsexual surgery."

[7] As its terms suggest, if inartfully, defendants contend that the Challenged Exclusion does not "prohibit[] all transition-related medical treatments, as hormone therapy is still provided to Flack and Makenzie for their gender dysphoria."  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 46.)

> health insurance company to learn more details about what
> services are covered by your insurance.

*LGBT Health - Transgender Persons*, Wis. Dept. Health Servs. (Dec. 13, 2017), https://www.dhs.wisconsin.gov/lgbthealth/transgender.htm.   Plaintiffs   contend   that "Wisconsin Medicaid covers the same services when medically necessary to treat conditions other than gender dysphoria," and defendants agree that "Medicaid may cover services as medically necessary when not excluded by law, and that such services may also be addressed by the Women's Health and Cancer Rights Act of 1998," but again challenge the "value or usefulness" of surgery to treat gender dysphoria, and specifically dispute the medical necessity of surgery for the named plaintiffs.  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 47.)

### C. Plaintiffs' Medical Needs

#### 1. Cody Flack

Cody Flack is an adult resident of Green Bay who suffers from gender dysphoria and identifies as male.[8]  He is unable to work because of cerebral palsy and other disabilities for which he receives Supplemental Security Income and Wisconsin Medicaid.  At birth, Cody was assigned the sex of female and subsequently raised as a girl.  He became aware of his male gender identity when he was about four or five years old.  As a teenager, Cody began his gender transition by seeing a gender therapist, adopting the traditionally male name Cody, and presenting as a man.  However, he was unable to complete his transition for several years because he lacked financial resources, was without emotional support, and feared isolation.

After relocating to Wisconsin in 2012, Cody found the wherewithal to resume his

---

[8] Throughout this opinion, the court will use pronouns consistent with the plaintiffs' gender identities.

gender transition as he felt his gender identity was more supported, and he increasingly lived and presented as a man.  He cut his hair, wore men's clothing, and exclusively went by Cody. He also legally changed his name to Cody Jason Flack to align with his male gender identity and obtained a Wisconsin state identification card, identifying him as male.  His Medicaid enrollment now matches his gender identity as well.

For the past several years, Cody has been receiving therapy and other medical care, both to treat his gender dysphoria and to aid his gender transition.  Since 2015, Cody has been seeing psychotherapist Daniel Bergman for his gender dysphoria and other mental health conditions.  Since August 2016, Cody has also been receiving testosterone hormone therapy under the supervision of an endocrinologist, Dr. Amy DeGueme.  This hormone therapy has caused Cody to develop facial and body hair, a more masculine appearance, and a deeper voice. In October 2016, Cody had his uterus, fallopian tubes, ovaries and cervix removed through a hysterectomy with bilateral salpingo-oophorectomy.  This procedure was paid for by Wisconsin Medicaid to treat dysmenhorrhea (lower abdominal or pelvic pain during menstruation) and premenstrual dysphoric disorder (a severe form of premenstrual syndrome).  Plaintiffs contend that Cody's "surgery also helped significantly reduce his gender dysphoria by better aligning his body with his male identity," although defendants dispute this and argue that there is inadequate evidence to determine that surgical treatments have "medical value" or are "useful[]" in treating Cody's gender dysphoria.  (*See* Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 62.)

Despite these changes, Cody still has female-appearing breasts.  Plaintiffs and their experts, as well as Cody's treating physicians, contend this causes him severe gender dysphoria, while defendants and their experts question generally whether there is sufficient evidence to

8

conclude further surgical procedures are medically valuable or useful. (*Id.* ¶ 63.) At minimum, it appears undisputed that Cody's breasts cause him significant, personal distress, as they are a marker of the female sex often contributing to his being perceived as female. Cody is particularly ashamed of his breasts when in public and routinely avoids social situations as a result. In an effort to conceal his breasts, Cody has engaged in "binding," which flattens or reduces their appearance, but has difficulty binding his breasts himself due to his disabilities and finds the technique extremely painful. Binding has caused him sores, skin irritation and respiratory distress.

Since early 2017, therefore, Cody has sought a double mastectomy and male chest reconstruction. He consulted with Dr. Clifford King, a plastic surgeon, whose specialty is transition-related surgeries. Cody provided King with letters of support from his primary care physician, his therapist, his endocrinologist, and the surgeon who performed his hysterectomy. These four letters each detailed that Cody has gender dysphoria, and he met the criteria for surgery. After determining that Cody met the criteria for a male chest reconstruction under the WPATH Standards of Care, Dr. King sought prior authorization on July 18, 2017, from DHS for Wisconsin Medicaid coverage for the procedure.

On August 2, 2017, DHS denied Dr. King's prior authorization request without reviewing the medical necessity of his requested surgery as "a non-covered service" and a "not covered benefit" based on the Challenged Exclusion. (*See* Aug. 2, 2017 Letter (dkt. #21-18) 2 (capitalization altered); *see also* Not. Appeal Rights (dkt. #21-19) 3 ("The service requested is not a covered benefit. The request does not meet one or more of the criteria found in Wisconsin Administrative Code." (capitalization altered)); Sept. 25, 2017 Letter (dkt. #21-22) 2 (explaining that Flack's "request was denied by DMS as Wis. Admin. Code DHS

107.03(24) specifically lists 'transsexual surgery' as a non-covered service under medical assistance" while recognizing that "[t]he medical necessity of the services requested was not taken into account").)

Cody Flack appealed DHS's denial.  During his appeal, DHS noted that "gender dysphoria . . . is an accepted medical indication for the surgical treatment requested." (Sept. 25, 2017 Letter (dkt. #21-22) 2.)  Nevertheless, an administrative law judge dismissed the appeal on November 21, 2017, on the basis that "the Wisconsin Administrative Code specifically defines transsexual surgery as not covered by [medical assistance]." (ALJ Decision (dkt. #21-20) 3.)  Even so, the ALJ also noted that "the proposed surgery presumably would favorably address [Flack's] gender dysphoria." (*Id.*)  Cody's formal reconsideration request was denied by DHS on December 11, 2017.

Because Cody is unable to pay for the surgery himself, he reports being profoundly depressed and feeling hopeless and distressed by his chest.  While not acting on any such impulses, Cody has considered performing the chest reconstruction himself and contemplated suicide.  Plaintiffs further claim that Cody's gender dysphoria has worsened greatly since being denied coverage for the surgery.  Defendants purport to dispute these claims because "[t]here is no *current* mental status examination in Flack's medical records" and without it "there is an insufficient basis for any clinician to conclude that Flack faces an imminent risk of suicide or other self-harm." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 81 (emphasis added).)  Plaintiffs' retained expert, Stephanie L. Budge, PhD, LP, disagrees, having reviewed Cody Flack's treatment records and concluded that his treating therapist "routinely assessed his mental status during Mr. Flack's weekly therapy sessions." (Budge Supp. Decl. (dkt. #60) ¶ 6.)

Defendants further contend that the recent outpatient notes by Cody's treating

10

physician "primarily focus on issues unrelated to gender reassignment surgery" and "do not indicate that he is so destabilized such that a substantial risk of imminent self-harm exists," arguing that Cody's "self-reports are insufficient . . . to conclude that a serious risk of self-harm exists, let alone that receiving the surgical procedures he seeks will eliminate that risk." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 81.)  Defendants add that Cody has been transitioning for years, which "further indicat[es that] he does not present a substantial risk of self-harm in the near term." (Id.)[9]  Dr. Budge disagrees with these assessments as well. (Budge Supp. Decl. (dkt. #60) ¶¶ 7-9.)  She contends that "self-reports regarding suicidality and self-harm should be taken seriously" because Cody has a history of them, and "self-injurious thoughts and behaviors are risk factors for future suicidal ideation, attempts, and death from suicide." (Id. ¶ 11.)  The parties likewise disagree whether there is a substantial risk of harm to Cody's health and wellbeing, including worsening anxiety, depression, and thoughts of self-harm and suicide, without the chest reconstruction surgery. (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶¶ 85-86.)

### 2. Sara Ann Makenzie

Sara Ann Makenzie is an adult resident of Baraboo and lifelong resident of Wisconsin. She also suffers from gender dysphoria after being assigned the male sex at birth and subsequently raised as a boy.  Like Cody, Sara Ann has also been found to be disabled and receives Supplemental Security Income.[10]  She has been eligible and enrolled in Wisconsin

---

[9] Defendants also claim that "[w]hen patients present with thoughts of self-harm, those thoughts are often created by accompanying depression, anxiety, or other psychiatric disorders" that must be treated first -- before "any potential gender reassignment surgical procedures." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 81.)

[10] Defendants contend that Supplemental Security Income is not Sara Ann's only source of income based on her receipt of a bank loan in 2017 to fund breast augmentation surgery (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 89), although they do not appear to dispute her eligibility for medical coverage under the Wisconsin Medicaid Program.

Medicaid for many years.

Despite being assigned the male sex at birth, Sara Ann first identified as female as a child, and she has been diagnosed with gender dysphoria for most of her life.  She has legally changed her name to Sara Ann Makenzie, uses feminine pronouns, and wears women's clothing to conform with her female gender identity.  Her birth certificate, passport, driver's license and Medicaid enrollment all reflect her name and female identity.

Sara Ann began seeking treatment for gender dysphoria in approximately 2012.  She has been on hormone therapy since 2013, which has helped lessen her gender dysphoria.  In 2014, she consulted with Dr. Trisha Schimek, her then primary care physician, about genital reconstruction surgery.  Dr. Schimek informed her that Wisconsin Medicaid would not cover the surgery.  She then sought a breast augmentation surgery because she was often misgendered due to her undeveloped chest.  Having been told that Wisconsin Medicaid would not cover that cost either, Sara Ann took out a $5,000 loan from her bank to pay for the procedure, which was performed by Dr. Venkat Rao at UW Health in Madison, Wisconsin, in August 2016.  Since the procedure, she is less often mistaken for a man and less often mistreated for having masculine features.  Plaintiffs contend that the procedure "has been an effective treatment for [her] gender dysphoria"; defendants dispute this, arguing that "there is inadequate evidence to conclude that surgical treatments are of proven medical value or usefulness for treating Makenzie's gender dysphoria."  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 103.)

Sara Ann Makenzie reports great distress upon seeing her male-appearing genitalia, which negatively affects her occupational functioning, sexuality and social life.  She finds showering or seeing her body in a mirror painful; she lives in constant fear that someone will

be able to see her male genitals through her clothing; and she is concerned that she may be attacked or mistreated by someone who recognizes her as transgender.  Accordingly, she tries to minimize the appearance of her genitals by wearing multiple pairs of underwear at a time and engaging in "tucking," which is uncomfortable and very painful.  She also does not have sex with her fiancée, which adds to her depression and anxiety.  Sara Ann's treating physicians have recommended that she have surgery to create female-appearing external genitalia, specifically a bilateral orchiectomy and vaginoplasty.  The parties dispute whether these surgical procedures "are of proven medical value or usefulness for treating gender dysphoria." (*Id.* ¶ 106.)

As her current primary care physician, Dr. Beth Potter referred Sara Ann to a plastic surgeon at UW Health in February 2018, for possible genital reconstruction surgery.  Dr. Katherine Gast specializes in treating transgender individuals, and she informed Sara Ann of her eligibility for genital reconstruction after submitting two letters of support from mental health providers.  However, she also advised that Wisconsin Medicaid would not pay for the procedure.  While Sara Ann was prepared to obtain and submit the requisite letters, she was greatly distressed that Medicaid would not pay for the surgery because she could not afford it otherwise so she did not request the letters at that time.  (*See* Makenzie Supp. Decl. (dkt. #61) ¶ 3.)  Sara Ann has thoughts of removing her genitals on her own and of committing suicide. As a result, plaintiffs contend that her gender dysphoria has worsened.

Her psychotherapist, Jessica Bellard, notes that Sara Ann "continues to report symptoms of anxiety, depression, anger, and distress in response to the stressors of transitioning prior to completing gender reassignment surgery" and that she "has expressed a persistent desire for surgery since our original meeting."  (Ballard Letter (dkt. #67) 1.)  Sara

13

Ann's independent evaluating therapist, Chelsea O'Neal Karcher, opined that "Sara's hope that the surgery will help lessen symptoms of anxiety and depression, increase happiness, help to increase her confidence, and align her body more fully with her identity" were "realistic expectations for the procedure" and that she "has met all the eligibility and readiness criteria outline[d] in the [WPATH Standards of Care]." (Karcher Letter (dkt. #61-2) 2.) Her former primary care physician opined that "genital reconstruction is a *medically necessary* treatment for Ms. Makenzie's gender dysphoria as it would treat the excessive mental distress that she experiences every day because she lives with genitals that do not match her gender." (Schimek Decl. (dkt. #31) ¶ 9 (emphasis added).) At oral argument, the parties agreed that: (1) her surgeon had not yet sought prior authorization for this surgery; and (2) before that request could be considered by DHS, it would need to be considered by her third-party HMO.

Because Sara Ann Makenzie's medical records lack a current mental status examination, defendants contend that "there is insufficient basis for any clinician to conclude that Makenzie faces an imminent risk of suicide or other self-harm"; indeed, defendants point to a June 14, 2018, letter, which describes her psychiatric symptoms as "appear[ing] . . . quite stable" and records her denying "current or recent history of self-harming behaviors and/or suicidal thoughts." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 104.) Plaintiffs' expert, Dr. Budge, again disagrees about the importance of locating a formal mental status exam, because "changes in mental status would be charted by the provider" recording "any changes in mental status from week to week." (Budge Supp. Decl. (dkt. #60) ¶ 5.) Likewise, Dr. Budge explains that "[p]sychological stability does not indicate that one does not currently experience significant distress, nor does it indicate that one will not experience continuing or worsening distress." (*Id.* ¶ 10.)

As with Cody Flack, defendants assert that "Makenzie's own self-reports are an insufficient basis to conclude that a serious risk of self-harm exists, let alone that receiving the surgical procedures she seeks will reduce or eliminate that risk," in part because she has been transitioning for several years and lacks any evidence of prior self-harm.[11] (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 104.) Likewise, defendants contend that there is not enough evidence to conclude that surgery is "of proven medical value or usefulness for treating Makenzie's gender dysphoria." (*Id.* ¶ 111.) The parties also dispute whether Sara Ann Makenzie has engaged in self-harm: cutting in her genital area; and whether her short- and long-term health and well-being are at risk. (*Id.* ¶¶ 119-20.)

## OPINION

Plaintiffs seek a preliminary injunction enjoining defendants from enforcing the Challenged Exclusion against them. As "an extraordinary remedy," preliminary injunctions are "never awarded as a matter of right." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1044 (7th Cir. 2017), *cert. dismissed* 138 S. Ct. 1260 (2018). The moving party must "mak[e] a threshold showing: (1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action; (2) inadequate remedies at law exist; and (3) he has a reasonable likelihood of success on the merits." *Id.* (citing *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015)). Once the moving party has done so,

---

[11] Again, defendants contend that "[w]hen patients present with thoughts of self-harm, those thoughts are often created by accompanying depression, anxiety, or other psychiatric disorders" and that "those accompanying disorders" must be treated before "any potential gender reassignment surgical procedures." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 104.) As noted with Cody, Dr. Budge contends that Sara Ann's history with "self-injurious thoughts and behaviors are risk factors for future suicidal ideation, attempts, and death from suicide." (Budge Supp. Decl. (dkt. #60) ¶ 11.)

the court "determine[s] whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Id.* (citing *Jones v. Markiweicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016)).

## I.  Irreparable Harm & Inadequate Remedy at Law

While the moving party must show "more than a mere possibility of harm" to establish that it likely will suffer irreparable harm absent injunctive relief, this does not mean that the harm must occur or be certain to occur before the merits can be addressed. *Whitaker,* 858 F.3d at 1044-45.  To be irreparable, the harm "cannot be prevented or fully rectified by the final judgment after trial." *Id.* at 1045 (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).

As noted, plaintiffs are being denied coverage for medically necessary treatment that was prescribed by their doctors and meets the prevailing standards of care.  They contend that allowing them to obtain their surgeries is necessary to protect their well-being and health because they "are at high risk of worsening mental health, exacerbated gender dysphoria, self-harm and stigma" -- "none of which has an adequate remedy at law." (Pls.' Br. (dkt. #19) 23, 27.)  More specifically, Cody Flack explained that his noticeable breasts, which he painfully attempts to bind, cause him to "experience severe gender dysphoria" and to think about self-harm and suicide.  (Flack Decl. (dkt. #22) ¶ 15.)  Moreover, Cody reports that his gender dysphoria and depression have "become even worse" after coverage for his chest reconstruction surgery was denied; he testified to "often think[ing] about removing [the breasts him]self" and about committing suicide.  (*Id.* ¶ 28.)

Importantly, Cody Flack's treating doctors agree.  His psychotherapist, Dr. Daniel Bergman: (1) opines that "the chest reconstruction surgeries [Flack] is seeking *are medically*

*necessary* treatments for gender dysphoria"; (2) reports that following the denial of coverage, Cody "became very depressed and started having suicidal thoughts" and "*the denial* is continuing to have a substantial negative impact on his mental and emotional well-being"; (3) predicts that without access to surgery "in the *near future*," Cody "would be at risk of suicidality and self-harm"; and (4) opines that "continued denial of this necessary surgery could lead to possible suicidality and an extended inpatient hospitalization." (Bergman Decl. (dkt. #28) ¶¶ 9, 11, 13 (emphasis added).)   In contrast, Dr. Bergman expects surgery "would *significantly improve* [Flack's] gender dysphoria and alleviate his symptoms of severe depression and anxiety," allowing him to "move forward with his life." (*Id.* ¶ 14 (emphasis added).) Likewise, Cody Flack's endocrinologist, Dr. Amy Degueme, opined that: (1) he "meets and exceeds" the WPATH Standard of Care criteria for chest reconstruction, which could diminish his gender dysphoria symptoms; (2) chest reconstruction "is a *medically necessary* treatment for gender dysphoria as it would treat the excessive mental distress that he experiences every day because of his chest"; and (3) continued denial of surgery "could lead to increased depression, anxiety, and thoughts of suicide or self-harm, arising from and related to [Flack's] gender dysphoria." (Degueme Decl. (dkt. #29) ¶¶ 9, 10, 13 (emphasis added).) Finally, Dr. Clifford King, Cody Flack's consulting surgeon, also concluded that he "met the criteria for obtaining chest reconstruction under the WPATH Standards of Care," and further declares that he is "prepared to schedule and perform the chest reconstruction surgeries on Mr. Flack if DHS approves a prior authorization for Wisconsin Medicaid coverage."[12]   (King Decl. (dkt. #30)

---

[12] The WPATH Standards of Care list the following requirements for a male chest reconstruction:

    1.  Persistent, well-documented gender dysphoria;
    2.  Capacity to make a fully informed decision and to consent for treatment;

¶¶ 5, 7.)

As to Sara Ann Makenzie, she testified that her chest reconstruction in August 2016 "helped minimize [her] gender dysphoria," and reduced the incidents of harassment and misgendering she experienced.  (Makenzie Decl. (dkt. #23) ¶ 22.)  Yet, she still "experience[s] profound distress" because of her penis and the fear that others will notice it.  (*Id.* ¶¶ 23-24.) After being told that Wisconsin Medicaid would not pay for the genital reconstruction, she frequently "thought about killing [her]self" and "considered cutting off [her] genitals [her]self." (*Id.* ¶ 33.)  She testified that being unable to get the surgery "has made [her] gender dysphoria worse," and has led her to "engage[] in some self-harming behaviors, including cutting in [her] genital area."  (*Id.* ¶ 34.)

And again, Sara Ann Makenzie's treating doctors agree.  First, her consulting surgeon, Dr. Katherine Gast, "determined that once Ms. Makenzie provided two letters of support from her treating medical providers, . . . Ms. Makenzie would be eligible for the surgical procedures," a bilateral orchiectomy and vaginoplasty.  (Gast Decl. (dkt. #32) ¶ 3.)  Second, as discussed above, her treating therapist and an independent evaluating therapist also support this treatment.  (Ballard Letter (dkt. #67) 1; Karcher Letter (dkt. #61-2) 2.)  Third, her former primary care physician, Dr. Trisha Schimek opined that "genital reconstruction is a *medically necessary* treatment for Ms. Makenzie's gender dysphoria as it would treat the excessive mental distress that she experiences every day because she lives with genitals that do not match her

---

3.  Age of majority in a given country . . .;
4.  If significant medical or health concerns are present, they must
    be reasonably well controlled.

(WPATH Standards of Care (dkt. #55-6) 65.)  In fact, plaintiffs represent that Cody "tentatively scheduled surgery with Dr. King for September 5, 2018, in the event [that] an injunction were to issue."  (Pls.' Status Rpt. (dkt. #66) 1.)

gender," and further opined that Sara Ann Makenzie meets the WPATH Standards of Care criteria for genital reconstructive surgery.[13]  (Schimek Decl. (dkt. #31) ¶¶ 9-10 (emphasis added).)  Fourth, her current primary care physician, Dr. Beth Potter, concurs that "once Ms. Makenzie provided letters of support from two mental health providers, [she] would meet the [WPATH Standard of Care]."  (Potter Decl. (dkt. #33) ¶ 8.)

Accordingly, these plaintiffs have advanced more than enough evidence to establish that they face a possibility of irreparable harm at this point.  *See Bontrager v. Ind. Family and Soc. Servs. Admin*, 697 F.3d 604, 611 (7th Cir. 2012) (affirming grant of preliminary injunction enjoining monetary cap limiting Medicaid coverage of dental procedures finding that plaintiffs "will likely suffer irreparable harm if the injunction is not granted, as they would be denied medically necessary care").[14]  Defendants' principal response to all this evidence is that "there is no proven medical benefit to the procedures for which Plaintiffs seek Medicaid coverage, and

---

[13] The WPATH Standards of Care list the following as criteria for an orchiectomy:

1. Persistent, well documented gender dysphoria;
2. Capacity to make a fully informed decision and to consent for treatment;
3. Age of majority in a given country;
4. If significant medical or mental health concerns are present, they must be well controlled.
5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

(WPATH Standards of Care (dkt. #55-6) 66.)  These same criteria apply for a vaginoplasty, with the additional requirement of "12 continuous months of living in a gender role that is congruent with their gender identity."  (*Id.*)

[14] Defendants' attempts to distinguish *Bontrager* (Opp'n (dkt. #53) 14-15) fall flat.  The evidence establishes that for the named plaintiffs -- the only individuals the court is concerned with at this stage -- their requested gender-conforming surgeries are medically necessary and will benefit them, such that enforcement of the Challenged Exclusion threatens their well-being.

19

so Plaintiffs here will not face irreparable harm absent a preliminary injunction." (Opp'n (dkt. #53) 15.) Defendants point to their expert reports for support. *First*, Dr. Lawrence Mayer opines that "[m]edical and surgical treatments have not been demonstrated to be safe and effective for gender dysphoria." (Mayer Rpt. (dkt. #55-1) 4.) More specifically, he opines based on a survey of published reports that there is only "minimal" evidence that these treatments are effective, safe and optimal, and further that "[t]here is even less evidence that [medical and surgical interventions] would be cost effective compared to social and psychological interventions." (*Id.* at 8, 11.)[15]

Even Dr. Mayer acknowledges, however, that gender dysphoria "is a serious medical condition that deserves to be treated" and that such treatment "must be borne of medical necessity." (*Id.* at 8.) He agrees that "reducing or eliminating" the very real distress associated with this condition is the "[o]ptimality consideration[]" for treating gender dysphoria. (*Id.* at 9.)[16] As outlined above, plaintiffs have the support of their treating physicians -- to say nothing

---

[15] At oral argument, defense counsel alluded to a recent Tenth Circuit case that purportedly confirmed Mayer's opinion. The court assumes that counsel was referring to *Lamb v. Norwood*, No. 17-3171, 2018 WL 3341031 (10th Cir. July 9, 2018), which found that "there is no governing medical consensus on the appropriateness of the treatment options that [plaintiff] is requesting," specifically higher doses of hormones and authorization for surgery. *Id.* at *3. However, the *Lamb* court initially explained that "[p]anels in our court are typically bound by precedents issued by other panels, and we typically do not reconsider the medical assumptions underlying our precedents" such that "scientific advances in treating gender dysphoria [do not] render [the court's] 1986 precedent obsolete." *Id.* at *2. Further, the two articles cited do not appear to support the court's conclusion. *See id.* at *3 n.13. Finally, *Lamb* is distinguishable on its facts: Lamb's treating physician concluded that her "existing treatment has proven beneficial and that surgery is impractical and unnecessary in light of the availability and effectiveness of more conservative therapies." *Id.* at *3. *See also Mitchell v. Kallas*, No. 16-3350, 2018 WL 3359113, at *4 (7th Cir. July 10, 2018) ("Prison officials have been on notice for years that leaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference.").

[16] *See, e.g.,* excerpted portions of Mayer's opinion, stating that:
   - "Gender dysphoria, unlike transgenderism, is a serious medical condition that deserves to be treated."

of their retained experts -- who confirm that the surgeries they seek (1) are medically necessary and (2) will reduce their distress and gender dysphoria.  Perhaps Dr. Mayer's opinions will prevail on the *general* efficacy of surgical interventions for gender dysphoria, although the apparent endorsement in DSM-5 and by the larger medical community would appear to make this a decidedly uphill battle.[17]  Still, Dr. Mayer lays at most the foundation for defendants' general policy, while the only question at this point is whether Cody Flack and Sara Ann Makenzie have a medical need for these surgeries such that denial will be detrimental to *their* health.  On the current record, the answer clearly is yes.

*Second*, Dr. Chester Schmidt opines that "there is an insufficient clinical basis to conclude that either Flack or Makenzie will suffer imminent, irreparable harm if they do not receive gender reassignment surgery prior to the conclusion of this case."  (Schmidt Decl. (dkt. #56) ¶ 8.)  Dr. Schmidt's opinion is based on what he describes as:  (1) a lack of current mental status examinations for plaintiffs, creating "an insufficient basis for any clinician to conclude that either Flack or Makenzie faces an imminent risk of suicide or other self-harm"; (2) the insufficiency of plaintiffs' self-reports "to conclude that a serious risk of self-harm exists, let

---

- "Treatment for gender dysphoria must be borne of medical necessity and address the medically relevant portion of this condition, which is distress associated with the conflict between an individual's gender and their sex."
- "Optimality considerations for the treatment of gender dysphoria, the distress associated with have a non-conforming gender, should aim at reducing or eliminating this distress."

(Mayer Rpt. (dkt. #55-1) 8-9.)

[17] (*See* Am. Psychiatric Assoc. (dkt. #21-4) 3 ("[A]ppropriately evaluated transgender and gender variant individuals can benefit greatly from medical and surgical gender transition treatments"); Am. Med. Assoc. (dkt. #21-5) 2 ("[M]edical and surgical treatments for gender dysphoria, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice"); Am. Endocrine Soc'y (dkt. #21-9) 3 ("Medical intervention for transgender individuals (including both hormone therapy and medically indicated surgery) is effective, relatively safe (when appropriately monitored), and has been established as the standard of care.").)

alone that receiving the surgical procedures . . . will reduce or eliminate that risk"; (3) Cody Flack's outpatient notes "do not indicate that he is so destabilized such that a substantial risk of imminent self-harm exists"; and (4) Flack's transition has been ongoing for several years, without any evidence of prior self-harm, indicating no substantial short-term risk of self-harm.[18] (*Id.* ¶¶ 9-13.)  While at least focused on the medical needs of the individual plaintiffs now before the court, Schmidt's opinion fundamentally misses the mark.  Initially, as plaintiffs point out, he was misinformed as to the relevant standard.  (Reply (dkt. #62) 3-4.)  Plaintiffs were not required to prove "a substantial risk of imminent self-harm," but rather to show a likelihood of irreparable injury.  Moreover, his opinion that a clinician could not conclude that these plaintiffs need these surgeries because of missing mental status reports misreads the record since both plaintiffs have opinions from their treatment providers supporting the proposed surgical interventions.  Regardless, Dr. Schmidt's 10,000-foot review of the medical record and criticisms of the course of treatment proposed by plaintiffs' doctors, without offering a viable option to relieve their ongoing gender dysphoria, pales in comparison with the informed opinions of plaintiffs' treating physicians.  To discount the opinions of plaintiffs' treating physicians as to the need for surgery to relieve plaintiffs' suffering at the preliminary injunction stage on the current, limited record would be tantamount to this court playing doctor.

Accordingly, plaintiffs have established that they are at risk of irreparable harm, and

---

[18] Dr. Schmidt apparently did not have access to Makenzie's outpatient notes.  (Schmidt Decl. (dkt. #56) ¶ 10.)

this factor weighs strongly in favor of injunctive relief.[19]  As to whether plaintiffs would have an adequate remedy at law, the Seventh Circuit already held in *Whitaker* that serious, ongoing impact on plaintiffs' health "demonstrate[s] that any award would be 'seriously deficient as compared to the harm suffered.'"  858 F.3d at 1046 (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)).  Under binding precedent, therefore, this factor also weighs in favor of a preliminary injunction.

## II. Reasonable Likelihood of Success

As to the next factor, the moving party "need not demonstrate a *likelihood of absolute success on the merits*.  Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'"  *Whitaker*, 858 F.3d at 1046 (emphasis added) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)).  Here, plaintiffs have demonstrated that they have at least a reasonable likelihood of success on the merits of their Affordable Care Act claim, so again this factor weighs in favor of granting a preliminary injunction.

### A. Affordable Care Act Claim

Plaintiffs claim that the Challenged Exclusion violates § 1557 of the ACA by unlawfully discriminating on the basis of sex -- being transgender.  (Pls.' Br. (dkt. #19) 28-33.)  Before the court can address the merits of that claim, however, it must take up defendants' argument that plaintiffs lack a private right of action under § 1557.  (*See* Opp'n (dkt. #53) 45-47.)

---

[19] Plaintiffs also argue that "the Court can presume irreparable injury here" based on their "strong likelihood of success on their Fourteenth Amendment equal protection claims."  (Pls.' Br. (dkt. #19) 27.)  However, as they have a reasonable likelihood of success on their Affordable Care Act claim, the court does not need to consider plaintiffs' equal protection claim for purposes of addressing their motion for a preliminary injunction.  *See Gishon v. Am. Cyanamid Co.*, 760 F.3d 600, 608 (7th Cir. 2014) (recognizing the court's "general duty to avoid *federal* constitutional issues if the matter can be resolved on other grounds").

Congress has the power to create private rights of action to enforce federal statutes through explicit language or by implication. *Edmo v. Idaho Dept. of Correction*, No. 1:17-cv-00151, 2018 WL 2745898, at *8 (D. Idaho June 7, 2018) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). Section 1557 provides that:

> an individual shall not, on the ground[s] prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . . The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116.

Such an express "incorporation of '[t]he enforcement mechanisms' of other statutes is congressional recognition that the act can be enforced through the kind of private right of action authorized by the referenced statutes." *Audia v. Briar Place, Ltd.*, No. 17 CV 6618, 2018 WL 1920082, at *3 (N.D. Ill. Apr. 24, 2018) (denying motion to dismiss claim under § 1557 where defendant nursing home failed to provide an ASL interpreter to deaf plaintiff despite multiple requests); *Edmo*, 2018 WL 2745898 at *8-*9 ("Section 1557 expressly incorporates four federal civil rights statutes and includes similar rights-creating language found in those statutes. . . . The cross reference to these statutes and the use of similar rights-creating terms sufficiently manifests Congressional intent to create a private right."). While no appellate court has determined whether § 1557 provides a private right of action, "several district courts have found that it does." *Audia*, 2018 WL 1920082 at *3 (collecting cases). For the same reasons, this court agrees.

24

Turning to the heart of plaintiffs' ACA claim, there is no dispute that Wisconsin Medicaid is "a health program or activity" that "receiv[es] Federal financial assistance"; nor is there any dispute that Title IX prohibits discrimination "on the basis of sex."  Instead, the parties dispute whether plaintiffs' transgender status falls under "sex."  (*See* Pls.' Br. (dkt. #19) 29-33; Opp'n (dkt. #53) 39-45.)  Facially, the answer would appear to be "yes," but because the Challenged Exclusion discriminates against coverage for "transsexual surgery," defendants argue that this no longer involves sex discrimination.  Even though "sex" would seem to encompass "trans*sex*ual," defendants would distinguish between "gender identity" -- what plaintiffs would define as an "internal sense of one's sex," which is innate -- from one's "sex" -- which is, according to defendants, "assigned at birth, refer[ring] to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy," and is "immutable."  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶¶ 4-5, 8.)[20]

Even accepting defendants' definition of sex, however, the Challenged Exclusion certainly denies coverage for medically necessary surgical procedures based on a patient's *natal* sex, the same "immutable" sex the defendants claim the ACA intends to cover.  Moreover, as plaintiffs' expert Dr. Loren Schechter explains, "[w]hen performing gender confirming surgery, surgeons use many of the same procedures that they use to treat other medical conditions."  (Schechter Decl. (dkt. #27) ¶ 38.)  For example, if a natal female were born without a vagina,

---

[20] At the same time, defendants suggest that gender "refers to the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for boys and men or girls and women," making one's gender identity "a developmental process."  (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶¶ 4-5; *but see e.g.*, Budge Decl. (dkt. #24) ¶ 16 ("Gender identity is innate and generally considered an immutable characteristic"); Shumer Decl. (dkt. #25) ¶ 13 ("The scientific evidence supports the idea that there are biologically-rooted, immutable, and unchangeable determinants of gender identity"); Hughto Decl. (dkt. #26) ¶ 16 ("Gender identity is innate[.]").)

she could have surgery to create one, which would be covered by Wisconsin Medicaid if deemed medically necessary.[21]   However, a natal male suffering from gender dysphoria would be denied the same medically necessary procedure because of her sex.  Likewise, if a natal male were in a car accident and required a phalloplasty, that surgery would be covered if deemed medically necessary.  However, a natal female seeking that same medically necessary procedure for gender dysphoria would be denied because of his sex.  In this case, if plaintiffs' natally assigned sexes had *matched* their gender identities, their requested, medically necessary surgeries to reconstruct their genitalia or breasts would be covered by Wisconsin Medicaid.[22]   Here, plaintiffs have instead been denied coverage because of their natal sex, which would appear to be a straightforward case of sex discrimination.

Even if defendants' more tortured interpretation of the Challenged Exclusion prevailed, and "sex" needed to include transgender status, plaintiffs still have more than a reasonable likelihood of success on the merits under United States Supreme Court and Seventh Circuit precedent.  This is because the scope of what qualifies as prohibited sex discrimination has changed over time.  *See Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc).  As the *Hively* court explained, Title VII's prohibition on sex discrimination "has

---

[21] This is not just a hypothetical example.  Approximately 1/100 people have bodies with anatomy differing from the typical male or female form, and one out of every 6,000 births involves a baby with vaginal agenesis (an undeveloped vagina).  *See How Common Is Intersex?*, Intersex Society of North America, http://www.isna.org/faq/frequency (last visited July 24, 2018) (; *see also* Schechter Decl. (dkt. #27) ¶ 38 ("[S]urgeons perform procedures to reconstruct male or female external genitalia for individuals who have certain medical conditions . . . .  For the female genitalia, this would include procedures to correct conditions such as congenital absence of the vagina or reconstruction of the vagina/vulva following oncologic resection, traumatic injury, or infection.")).

[22] Despite the possible implication of the opinions of one of their experts, defendants do *not* argue that the proposed surgical procedures are excluded because they remain experimental, perhaps out of recognition that they are now commonly offered and performed across the country to ease the suffering of those with gender dysphoria.  In fact, during oral argument, defendants acknowledged this type of surgery was not experimental in nature.

been understood to cover far more than the simple decision of an employer not to hire a woman for Job A, or a man for Job B"; it now "reaches sexual harassment in the work place, including same-sex workplace harassment; it reaches discrimination based on actuarial assumptions about a person's longevity; and it reaches discrimination based on a person's failure to conform to a certain set of gender stereotypes," which may "have surprised some who served in the 88th Congress." *Id.* (internal citations omitted).[23]  As the Seventh Circuit explained in *Whitaker*, "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."  858 F.3d at 1048; *see also Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . .  There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms."); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136 (D. Idaho 2018) ("[T]ransgender is an adjective used to describe a person who has a gender identity that differs, in varying degrees, from the sex observed and assigned at birth.").

By the same reasoning, discriminating on the basis that an individual was going to, had, or was in the process of changing their sex -- or the most pronounced physical characteristics of their sex -- is *still* discrimination based on sex.  The U.S. District Court for the District of Columbia cogently explained why this is so in *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008), with the example of an individual who is discriminated against for changing religions:

> Imagine that an employee is fired because she converts from

---

[23] The Seventh Circuit has recognized that Title VII may be helpful in interpreting Title IX.  *See Whitaker*, 858 F.3d at 1047.

> Christianity to Judaism.  Imagine too that her employer testifies
> that he harbors no bias toward either Christians or Jews but only
> "converts."  That would be a clear case of discrimination "because
> of religion."   No court would take seriously the notion that
> "converts" are not covered by the statute.   Discrimination
> "because of religion" easily encompasses discrimination because
> of a change of religion.

*Id.*; *see also EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018)

(holding that "discrimination on the basis of transgender and transitioning status is necessarily

discrimination on the basis of sex"), *petition for cert. filed*.  In the Title VII context, the Sixth

Circuit explained that:

> [A]n employer cannot discriminate on the basis of transgender
> status without imposing its stereotypical notions of how sexual
> organs and gender identity ought to align.  There is no way to
> disaggregate discrimination on the basis of transgender status
> from discrimination on the basis of gender non-conformity, and
> we see no reason to try.

*R.G. & G.R. Harris Funeral Homes*, 844 F.3d at 576-77.

Defendants nevertheless would point this court to the Seventh Circuit's decision some

34 years ago in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984).  (*See* Opp'n (dkt.

#53) 27, 40.)  The *Ulane* decision was based on the premise that "the same reasons for holding

that [homosexuals and transvestites] do not enjoy Title VII coverage apply with equal force to

deny protection for transsexuals."  742 F.2d at 1085.  The Seventh Circuit, sitting *en banc* in

*Hively*, drastically undercut the force of that very premise by holding that "discrimination on

the basis of sexual orientation *is* a form of sex discrimination."  853 F.3d at 341 (emphasis

added).  Moreover, in *Whitaker*, the Seventh Circuit declined to conclude that a transgender-

student plaintiff lacked a claim under Title IX, expressly holding that *Ulane* did *not* "foreclose

. . . sex-discrimination claims based on a theory of sex-stereotyping as articulated four years

later by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104

L.Ed.2d 268 (1989)."  *Whitaker*, 858 F.3d at 1047.

Indeed, the Seventh Circuit further concluded in *Whitaker* that a policy subjecting a transgender student -- because he was transgender -- "to different rules, sanctions, and treatment [compared to] non-transgender students" violated the prohibition against sex discrimination under Title IX.  858 F.3d at 1049-50.  This is what the Challenged Exclusion does as well:  it creates a different rule governing the medical treatment of transgender people. Specifically, Wisconsin Medicaid covers medically necessary treatment for other health conditions, yet the Challenged Exclusion expressly *singles out and bars* a medically necessary treatment solely for transgender people suffering from gender dysphoria.  In fact, by excluding "transsexual surgery" from coverage, the Challenged Exclusion directly singles out a Medicaid claimant's transgender status as the basis for denying medical treatment.  *See* Wis. Admin. Code § DHS 107.03(23)-(24).  As defendants conceded at the preliminary injunction hearing, this means that if breast reduction surgery were deemed medically necessary due to back, neck or shoulder pain, a natal female's surgery would be covered by Wisconsin Medicaid.  However, if breast reduction surgery were deemed medically necessary due to gender dysphoria, a natal female's surgery would *not* be covered under the Challenged Exclusion.  This is text-book discrimination *based on sex*.[24]

While defendants raise a number of other arguments, none come close to undermining plaintiffs' showing of *at least* a "better than negligible" chance of success on the merits, which as set forth above is the relatively low bar they must meet given proof of their ongoing, irreparable pain and suffering.  Perhaps defendants' least persuasive, though most creative,

---

[24] At oral argument defendants also conceded that a natal male with breasts who had a medical need other than gender dysphoria for a breast reduction would have coverage.

argument is that § 1557 cannot be read to cover transgender status without violating the Spending Clause of the United States Constitution because "Wisconsin could have had no idea that this interpretation would someday prevail when it chose to accept federal Medicaid funding." (Opp'n (dkt. #53) 43-44.) Nonsense. By the time that the Affordable Care Act was enacted, federal courts had already interpreted prohibitions on sex discrimination to cover adverse treatment of transgender people, and the Supreme Court had already recognized that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *See Whitaker*, 858 F.3d at 1048 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)); *see also e.g.*, *Schroer*, 577 F. Supp. 2d at 306-08; *Glenn*, 663 F.3d at 1317.

Defendants' argument that Congress's failure to amend Title IX to cover "gender identity" explicitly (Opp'n (dkt. #53) 42-43) is similarly unpersuasive, and in any event, it was already rejected by the Seventh Circuit in *Whitaker*. *See* 858 F.3d at 1049 ("Congressional inaction is not determinative" because it "'lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.'" (quoting *Pension Benefit. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990))). Defendants' sundry other arguments similarly miss the thrust of plaintiffs' ACA claim, including that the Challenged Exclusion prevents the state from "encouraging surgeries meant to conform persons' appearances to their own perceived sex stereotypes" and that "[i]f Plaintiffs had been born with the sexes that they believe match their gender identities, they would not be seeking any surgical treatments at all." (Opp'n (dkt. #53) 30, 45).

Aside from being unsympathetic to a medical condition which they acknowledge both plaintiffs suffer from, defendants fail to grasp that not every transgender person requires, or

even desires, gender-confirming surgery.[25]  On the contrary, as explained in the fact section above, not all transgender people have gender dysphoria; not all people suffering from gender dysphoria are interested in surgery; and only a subset of those people will meet the WPATH Standards of Care making the surgery medically necessary.  Instead, as in other areas of health care covered by Wisconsin Medicaid, individuals should be allowed to decide in consultation with their treatment providers what treatment is best and then ultimately whether to pursue it.  If anything, the Challenged Exclusion feeds into sex stereotypes by requiring all transgender individuals receiving Wisconsin Medicaid to keep genitalia and other prominent sex characteristics consistent with their natal sex no matter how painful and disorienting it may prove for some.  *See R.G. & G.R. Harris Funeral Homes*, 844 F.3d at 576-77.

Accordingly, plaintiffs have made a persuasive evidentiary showing, albeit a preliminary one, that the Challenged Exclusion prevents them from getting medically necessary treatments on the basis of both their natal sex *and* transgender status, which surely amounts to discrimination on the basis of sex in violation of the ACA.

### B. Equal Protection Claim

As plaintiffs have already established substantially more than a negligible likelihood of success on their ACA claim, the court need not address plaintiffs' equal protection claim.  *See Gisbon v. Am. Cyanamid Co.*, 760 F.3d 600, 608 (7th Cir. 2014) (recognizing the court's "general duty to avoid *federal* constitutional issues if the matter can be resolved on other grounds").  However, because this may be an alternative basis for the Seventh Circuit to rule

---

[25] It is perhaps worth noting that a policy need not discriminate against all members of a class to be discriminatory.  *See Whitaker*, 856 F.3d at 1051 ("[T]here is no requirement that every girl, or every boy, be subjected to the same stereotyping.  It is enough that [plaintiff] has experienced this form of sex discrimination.").

31

on appeal, the court will address this claim briefly as well.  The outcome of plaintiffs' equal protection claim may largely turn on the standard of review: rational basis or heightened scrutiny.  Even if rational basis review applies, the so-called "rational basis with a bite" standard may be justified if the Challenged Exclusion is found to be the product of "animus or a desire to harm a politically unpopular group." *See United States v. Wilde*, 74 F. Supp. 3d 1092, 1096-97 (N.D. Cal. 2014) (explaining that "the rational basis 'with a bite' standard is less deferential" so that "a challenged law will be struck down if the court determines that it is in fact arbitrary, irrational, and/or unreasonable" (citing *Allegheny Pittsburgh Coal Co. v. Cnty. Commissioner*, 488 U.S. 336, 344-45 (1989); *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); *Romer v. Evans*, 517 U.S. 620, 634 (1996)));[26] *see also Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wis. 2010) (granting permanent injunction blocking Wisconsin statute preventing the Department of Corrections from providing transgender inmates with hormone therapy or gender-confirming surgery under rational basis review as "no reasonably conceivable state of facts provides a rational tie between Act 105 and prison safety and security"), *aff'd on other grounds*, 653 F.3d 550 (7th Cir. 2011).

On the other hand, heightened scrutiny may be appropriate either on the basis of sex discrimination or through the recognition of transgender as a suspect or quasi-suspect class. *See Whitaker*, 858 F.3d at 1051 (applying heightened scrutiny to invalidate policy preventing transgender teen from using the bathroom consistent with his gender identity because the "policy cannot be stated without referencing sex, as the School District decides which bathroom

---

[26] Despite the possibility, *Wilde* did not ultimately apply rational basis with a bite because the criminal defendant in that case had "submitted no evidence that Congress passed the CSA, or chose to list marijuana as a Schedule I controlled substance, because of animus or some discriminatory legislative purpose." 74 F. Supp. 3d at 1098.

a student may use based upon the sex listed on the student's birth certificate," making it "inherently based upon a sex-classification"); *Glenn*, 663 F.3d at 1316 (holding that discrimination based on gender non-conformity is sex-based discrimination under the equal protection clause); *id.* at 1317-18 (collecting cases recognizing that discrimination based on gender non-conformity is sex discrimination); *Barron*, 286 F. Supp. 3d at 1140-41, 1144-45 (finding equal protection violation caused by state policy categorically rejecting requests by transgender persons to amend their birth-assigned sex on their birth certificates and requiring substitute policy to meet heightened scrutiny because "to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning"); *Karnoski v. Trump,* No. C17-1297-MJP, 2018 WL 1784464, at *9 (W.D. Wash. Apr. 13, 2018) (concluding transgender is a protected class subject to strict scrutiny review in assessing the ban on transgender people from serving in the military), *appeal docketed;*[27] *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (concluding that heightened scrutiny applied to equal protection claim arising from a transgender girl being denied access to the girls' bathroom because transgender individuals are a quasi-suspect class).

The court has already found that plaintiffs have made a strong showing of sex discrimination. As to whether the transgender population in Wisconsin is a suspect or quasi-suspect class, plaintiffs' proffered evidence is equally strong. Greater than a quarter of adult transgender Wisconsinites live in poverty, which is greater than twice the overall national poverty rate. One in five is unemployed. Nearly 60% of Wisconsin's transgender people "have

---

[27] The Ninth Circuit recently declined to stay the related preliminary injunction. *See Karnoski v. Trump*, No. 18-35347, slip. Op. at 2 (9th Cir. July 18, 2018).

recently experienced mistreatment by law enforcement officers who perceived or knew them to be transgender." (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶ 27.)[28] In terms of health care, 30% of transgender adults in Wisconsin have been denied insurance coverage because of their transgender status; one-third had a recent negative experience with a health care provider because of their transgender status; and a quarter had chosen not to go to a doctor because of concerns about being mistreated. Further, visibly nonconforming transgender individuals suffer worse health outcomes and more discrimination than transgender individuals whose appearance aligns with their gender identity. Gender-confirming medical care may decrease mistreatment caused by being visibly gender-nonconforming. Likewise, transgender people unable to afford (or otherwise unable to access) gender-confirming surgical procedures are more at-risk for discrimination and other harms. In short, other than certain races, one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse

---

[28] Defendants do not dispute these facts as to the transgender population generally, but dispute the applicability of these generalizations to the named plaintiffs. (Defs.' Resp. to Pls.' PFOF (dkt. #54) ¶¶ 25-28.) Likewise, defendants purport to dispute any assertion that the named plaintiffs "ha[ve] suffered or [are] at risk of suffering irreparable harm due to discrimination, mistreatment, or harassment," "a worse health outcome because of nonconformity with their gender identity," or "other harms." (*Id.* ¶¶ 20-24.) There is evidence of harassment and discrimination experienced by the named plaintiffs themselves. (Flack Decl. (dkt. #22) ¶ 14 (explaining that "[o]ften when [he] go[es] out [he]'ll hear, 'Ma'am, sir? Ma'am? Miss? Oh, sir?' or, 'Is that a guy or a girl?'"); Makenzie Decl. (dkt. #23) ¶ 17 (explaining that before her chest reconstruction others "perceived [her] to be a man 'dressing like a woman' or as transgender, causing [her] to stick out in [her] small town" such that "[a]s a result, [she has] been harassed and mistreated in the community, including by neighbors and the police"); Budge Decl. (dkt. #24) ¶ 60 (noting that "when [Flack] experiences additional dysphoria, discrimination, or misgendering, it increases his worries about other aspects of other parts of his life").) However, since court's ultimate ruling does not depend on this evidence, however, the distinction defendants would draw is largely immaterial.

treatment, than transgender people.[29]

## III. Balance of Harms & Public Interest

As the Seventh Circuit has often instructed, the balancing of harms "is done on a 'sliding scale' measuring the balance of harms against the moving party's likelihood of success. The more likely he is to succeed on the merits, the less the scale must tip in his favor" on the likelihood of irreparable injury. *Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1054 (7th Cir. 2017) (citing *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)). Additionally, the moving party must show that the irreparable harm "absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted." *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 619 (7th Cir. 2004) (affirming in part and vacating in part order partially granting plaintiff's request for a preliminary injunction enjoining ordinances governing adult entertainment establishments and associated fees).

Here, the likelihood of ongoing, irreparable harm facing these two, individual plaintiffs outweighs any marginal impacts on the defendants' stated concerns regarding public health or

---

[29] As the *Barron* court explained in arriving at the heightened scrutiny for categorical treatment of transgender persons:

> (1) transgender people have been the subject of a long history of discrimination that continues to this day; (2) transgender status as a defining characteristic bears no relation to ability to perform or contribute to society; (3) transgender status and gender identity have been found to be obvious, immutable, or distinguishing characteristic[s]; and (4) transgender people are unarguably a politically vulnerable minority.

286 F. Supp. 3d. at 1144-45 (internal citations and quotation marks omitted). *See also* John W. Barnhill, *Chapter 14. Gender Dysphoria Introduction*, *in DSM-5 Clinical Cases* 237, 238 (John W. Barnhill ed., 2014) (noting the belated recognition that being transgender is not itself a disorder).

35

limiting costs.  As addressed above, defendants' concern about protecting the public health by limiting Wisconsin Medicaid to "medically necessary purposes" (Fiscal Estimate (dkt. #21-14) 3) is misplaced here, given the substantial likelihood that this interest would be served, rather than hindered, by covering plaintiffs' recommended surgical procedures.  As to the latter concern, the court readily acknowledges the state's ongoing interest in reasonably reducing medical expenditures where appropriate, but as defendants also acknowledged the Challenged Exclusion is "expected to result in *nominal* savings for state government."  (*Id.* at 2 (emphasis added).)  Likewise at oral argument, defendants could not identify any other exclusions from coverage under Wisconsin Medicaid that were based on a balancing of cost versus medical efficacy, except those enacted along with the Challenged Exclusion.  Moreover, those exclusions -- such as "non-medical food" and "non-emergency intestinal bypass or gastric stapling" (*id.*) -- are simply of a different character.[30]  Finally, while defendants suggest that removing the Challenged Exclusion would cost the state approximately $2.1 million (Opp'n (dkt. #53) 11), at this point the only relevant cost is for the treatment of Cody Flack and Sara Ann Makenzie -- two of the 1.2 million Wisconsin Medicaid enrollees.[31]  As such, the irreparable harm these

---

[30] In fairness, two of the other exclusions identified in the fiscal estimate fit within so-called political "wedge" issues -- "drugs that are administered to induce abortions" and "services and drugs to treat infertility" -- but that hardly makes the case for singling out transgender people for discriminatory treatment based on their natal sex.

[31] While defendants base their $2.1 million figure on the estimated cost of covering similar benefits through state-employee insurance, this "rough analogue" (calculated as: (1,200,000/167,500) * $300,000 = $2,149,253.73) (Opp'n (dkt. #53) 10-11, n.2)) is obviously inappropriate.  First, it assumes that the transgender population -- or more specifically, the subset of the transgender population with gender dysphoria -- has the same prevalence across groups.  Second, as plaintiffs suggest, "Medicaid reimbursement rates are much lower than the payment rates in standard insurance plans" so "current Medicaid rates for Plaintiffs' surgeries for the treatment of other diagnoses are a more appropriate benchmark."  (Reply (dkt. #62) 8.)  Defendants have since recognized that utilization rates among different insured populations may be different, as well as that the federal government would reimburse approximately half the cost through Medicaid and Medicaid reimbursement rates are different from private insurance costs.  (Defs.' Status Rpt. (dkt.

36

plaintiffs face without injunctive relief substantially outweighs the harm the state will suffer by preliminarily enjoining the application of the Challenged Exclusion to their individual prior authorization requests.  *See Bontrager*, 697 F.3d at 611.

Even if the state were required to cover such procedures for a few additional claimants who meet the same high burden as plaintiffs of proving a medical need during the pendency of this case, the cost of these additional payments would be equally outweighed by the likelihood of reducing those claimants' suffering and of fulfilling the public interest in providing medically necessary procedures.[32]

The court recognizes that granting preliminary relief alters the status quo, if barely so, given the present uncertainty about the requirement of coverage under federal regulation, *compare* 45 C.F.R. § 92.4 *with Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016), which weighs in favor of the state.   However, defendants acknowledge that the balancing of equities weighs in favor of the plaintiffs should the court find that plaintiffs have shown a likelihood of success on the merits and a risk of irreparable harm.  (*See* Opp'n (dkt.

---

#65) 5-6.)   Defendants contend that plaintiffs' proposed reimbursement rates "significantly underestimate" the total cost because of related non-physician fees.  (*Id.* at 6 n.1.)  Regardless, the court will give defendants another opportunity to submit realistic evidence as to the likely, near-term financial cost of enjoining the Challenged Exclusion more generally with particular reference to the actual costs and claims experienced quarterly or yearly by those 18 states and the District of Columbia covering "transsexual surgeries."

[32] Defendants submitted the expert report of David V. Williams from *Boyden v. State of Wis. Dept. of Emp. Tr. Funds*, No. 17-cv-264-wmc (W.D. Wis.), in which Williams opined that "[i]n an insured population of 167,543, the estimated number of individuals who obtain the more expensive gender reassignment surgery is between 3-4 individuals" per year.  (Williams Rpt. (dkt. #55-5) 15.)  As noted above, the incidence of gender dysphoria among the population covered by Wisconsin Medicaid may differ.

#53) 47 n.9.)[33]  Having so found, therefore, the court also has little difficulty finding that the equities and the public interest favor entry of a preliminary injunction prohibiting the defendants from enforcing the Challenged Exclusion to deny the named plaintiffs medically necessary surgery in furtherance of treating their gender dysphoria.

## IV. Bond

Finally, plaintiffs ask that the court not require them to post a security bond as a condition of the preliminary injunction.  (Pls.' Br. (dkt. #19) 49.)  Defendants failed to address this request in their brief and at oral argument confirmed that they are not seeking a bond. Moreover, while Rule 65(c) states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), a bond is not always necessary.  "Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c).  Indigence is such a circumstance."  *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 702 (7th Cir. 1977) (citations omitted) (affirming district court's decision to not require a bond for the preliminary injunction based on plaintiff's indigency).  As demonstrated by their inability to work, receipt of Supplemental Security Income, and enrollment in Wisconsin Medicaid, plaintiffs are plainly indigent.  Accordingly, the court will not require plaintiffs to post a bond. Nor, for all the reasons already set forth above, will the court stay enforcement of this

---

[33] As defendants noted, they prepared their opposition to plaintiffs' request for preliminary relief based on the court-facilitated agreement with plaintiffs to limit the request to the named plaintiffs. (Defs.' Status Rpt. (dkt. #65) 1-3.)  They may likewise contest the balancing of harms of a broader injunction (*see id.* at 4) with their updated cost analysis.  Of course, if the court does enjoin the broader enforcement of the Challenged Exclusion, defendants could always come back to the court for relief if the applications proved unduly burdensome in practice.

preliminary injunction given the plaintiffs' already-long wait to receive medically necessary surgery for gender dysphoria, particularly since the time required for DHS's authorization review of plaintiffs' requests for coverage should provide sufficient time for defendants to seek a stay from the Seventh Circuit.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for a preliminary injunction (dkt. #18) is GRANTED. Defendants are ENJOINED from enforcing the Challenged Exclusion (Wis. Admin. Code § DHS 107.03(23)-(24)) against either of the named plaintiffs.

2) As to plaintiff Cody Flack, defendants will complete their authorization review within 10 business days of this order.

3) As to plaintiff Sara Ann Makenzie, defendants will provide a copy of this decision to her third-party HMO and, if applicable, complete their authorization review within 10 business days of receipt of any appeal from the denial of coverage by the HMO.

4) Defendants shall also have 21 days to provide any evidence they may have as to the likely, realistic cost of enjoining the Challenged Exclusion during the remainder of this lawsuit. Plaintiffs may have five days to respond.

Entered this 25th day of July, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge