IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CODY FLACK, et al.,
*Individually and on behalf of all others similarly situated*,

                  Plaintiffs,                    OPINION AND ORDER

    v.

                                            18-cv-309-wmc

WISCONSIN DEPARTMENT OF HEALTH
SERVICES and LINDA SEEMEYER,
in her official capacity,

                  Defendants.

In July 2018, the court issued a preliminary injunction enjoining defendants from enforcing Wis. Admin. Code § DHS 107.03(23)-(24) (the "Challenged Exclusion") against plaintiffs Cody Flack or Sara Ann Makenzie. (Dkt. #70 at 39.) Since then, plaintiffs have filed an amended complaint to name additional, individual plaintiffs Marie Kelly and Courtney Sherwin, as well as assert a class action. (Dkt. #85 at ¶¶ 17-18, 141-49.) Now before the court are plaintiffs' (1) motion to amend the preliminary injunction (dkt. #107) and (2) their unopposed motion to certify a class under Federal Rule of Civil Procedure 23 (dkt. #89; *see* dkt. #115). For the reasons that follow, both motions will be granted.

SUPPLEMENTAL FACTS[1]

## A. Additional Plaintiffs

### 1. Marie Kelly

Marie Kelly is a 38-year-old transgender woman with gender dysphoria, who lives

---

[1] A detailed set of undisputed facts can be found in the court's preliminary injunction opinion and order (dkt. #70). Unless otherwise noted, the supplemental facts laid out here are drawn from the

in Milwaukee, Wisconsin.  Since approximately 2014, Kelly has relied on Wisconsin Medicaid to cover her healthcare needs.  Although identifying as female for most of her life, she was assigned the sex of male at birth.[2]  Kelly has lived as a woman since 2010.  Since 2011, Kelly has taken feminizing hormone treatments to address her gender dysphoria.

While the hormone therapy has reduced her symptoms, Kelly's gender dysphoria and anxiety are exacerbated by facial hair and male-appearing chest and genitalia.  Because Kelly cannot afford gender-confirming procedures on her own, she is seeking Medicaid coverage for female genital reconstruction, chest reconstruction, and electrolysis for facial hair removal.  Several times over the years, including in August 2018, Kelly has inquired about Wisconsin Medicaid's coverage for gender-confirming procedures, but has been told by her managed care organizations that there is no such coverage available.[3]

plaintiffs' proposed findings of fact in support of an amendment to the court's preliminary injunction order (dkt. #110), as well as defendants' responses (dkt. #117).  These facts are also undisputed for purposes of considering plaintiffs' request to amend the preliminary injunction except where noted below.

[2] Defendants revive their contention that "[s]ex refers to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy" while gender "refers to the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for boys and men or girls and women."  (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 7.)  According to defendants, "sex is immutable."  (*Id.*)

[3] Defendants object to plaintiffs' proposed finding of fact that Kelly "has been told each time she inquired that these procedures are not covered because of the Challenged Exclusion" on hearsay grounds under Federal Rule of Evidence 802.  However, the underlying statement in support of this proposed fact is not being offered for the truth of the matter asserted.  Rather, it is offered merely to show *Kelly's* understanding.  Defendants also contend that electrolysis is not addressed by the Challenged Exclusion, but rather "is a non-covered service for *all* Medicaid recipients" under Wis. Admin. Code § 107.06(5)(i).  (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 13.)  Likewise, defendants note that the Challenged Exclusion does not preclude coverage for all transition-related treatments, as evidenced by Kelly's receipt of hormone therapy.  (*Id.*)

Kelly's primary care provider, Linda Wesp, is a Family Nurse Practitioner / Advanced Practice Nurse Prescriber. She opines that "Kelly meets the criteria set forth in the WPATH SOC for receiving gender-confirming surgeries as medically necessary treatment for persistent gender dysphoria, including genital reconstruction and female chest reconstruction." (Wesp Decl. (dkt. #94) ¶ 12.) Nurse Practitioner Wesp represents that she is also "willing to provide [Kelly] with letters of support stating [her] professional opinion that she meets the criteria for and is eligible to obtain those surgeries." (*Id.* ¶ 13.) Wesp opines that "these surgeries are medically necessary and would treat Ms. Kelly's gender dysphoria, enhance her quality of life, and improve her mental health."[4] (*Id.* ¶ 14.)

While neither disputing that Kelly is seeking these treatments to advance her transition, nor that her treatment providers consider gender-confirming surgery medically necessary for her, defendants contend that "[t]here is inadequate evidence to conclude that surgical treatments or electrolysis are of proven medical value or usefulness for treating Kelly's gender dysphoria." (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶¶ 11-12.) Likewise, they contend that there is no evidentiary support for the assertion that Kelly's treatment provider determined that facial hair removal through electrolysis is medically necessary. (*Id.* ¶ 12.)

---

[4] Wesp explains that:

> for the individuals, like Ms. Kelly, who need surgery to treat their gender dysphoria, the inability to access these treatments causes significant distress in their lives. The distress then ripples through all aspects of their life, from not wanting to socialize due to anxiety, to not being able to get a job, to being attacked or constantly worrying about their safety.

(Wesp. Decl. (dkt. #94) ¶ 15.)

### 2. Courtney Sherwin

Courtney Sherwin is a 35-year-old transgender woman with gender dysphoria. At birth, she was assigned the male sex, but has recognized herself as female since she was approximately ten years old. Sherwin lives in Janesville, Wisconsin, and has been dependent on Wisconsin Medicaid for her healthcare needs for the past two years.

Before identifying as transgender, Sherwin suffered from anxiety, depression, stress and suicidal ideation caused by the dissonance between her female identity and others' perception of her as a man. In late 2017, she publicly identified as transgender and began her gender transition in early 2018, which is also when she began living as a woman full-time. Specifically, Sherwin abandoned her traditionally male birth name, adopted the name Courtney, and started wearing women's clothing. In March 2018, Sherwin also began feminizing hormone treatments under the direction of her primary care physician. Sherwin contends that Wisconsin Medicaid covers her testosterone blockers, but not her estrogen, progesterone, and finasteride treatments. (Sherwin Decl. (dkt. #95) ¶ 13.)[5]

While Sherwin's hormone therapy has reduced her gender dysphoria, she is still distressed by her male-appearing chest and genitals, her masculine voice, and her facial hair. Additionally, she contends that the testosterone blockers have had some adverse side effects: dizziness, difficulty focusing, fatigue, dry mouth, nausea, respiratory problems, blackouts, and worsened irritable bowel syndrome. (*Id.* ¶ 14.) Sherwin further contends that her medical providers consider gender-confirming surgeries and voice therapy to be

---

[5] Defendants "[d]ispute that Wisconsin Medicaid does not cover hormone therapy for transgender individuals with gender dysphoria," adding that one component of Sherwin's hormone therapy -- spironolactone -- is covered. (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 23.)

medically necessary, both to treat her gender dysphoria and to prevent the adverse side effects of testosterone blockers, but plaintiffs only offer hearsay to support these assertions. (Pls.' Suppl. PFOF (dkt. #110) ¶¶ 25-27; Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶¶ 25-27.) Likewise, defendants contend that there is no evidence establishing the medical necessity of these treatments for treating Sherwin's gender dysphoria. (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 29.)

Regardless, Sherwin expects that Wisconsin Medicaid will not cover her proposed chest and genital reconstructive surgeries, because of the Challenged Exclusion, and she cannot afford these treatments on her own. While defendants do not dispute that the Challenged Exclusion is enforced, they contend that it was not responsible for denials of voice therapy and a prescription promoting hair growth. (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶¶ 17, 27.) Defendants contend that the voice therapy request was denied because her treatment provider did not provide sufficient documentation for DHS to determine if the service was medically necessary.

## B. Impact of Removing the Challenged Exclusion

Of course, the Challenged Exclusion has the potential to impact other transgender Wisconsin Medicaid beneficiaries suffering from gender dysphoria who may be recommended for gender-confirming surgical treatments. For example, Wisconsin Medicaid declined to cover a medically recommended orchiectomy for Lexie Vordermann, a 19-year-old transgender woman with gender dysphoria. (See Vordermann Decl. (dkt. #99) ¶¶ 3-5; Jan. 25, 2018 Denial (dkt. #99-1) 2 ("We have reviewed a request from Dan R Gralnek, MD for coverage of removal of testes. Unfortunately, we cannot approve this

request."); Sept. 27, 2018 Denial (dkt. #99-2) 2 ("We have reviewed a request from Dan R Gralnek, MD for coverage of gender reassignment surgery. Unfortunately, we cannot approve this request.").)[6] Similarly, plaintiffs have submitted affidavits from medical providers who complain of an inability to provide treatment that they believe is both appropriate and medically necessary because of the Challenged Exclusion. (Wesp Decl. (dkt. #94) ¶ 16 ("As a medical provider, I find it incredibly frustrating to know the exact procedure that would help treat my patients, but be unable to obtain that treatment for them because of Wisconsin Medicaid's exclusion."); Oriel Decl. (dkt. #109) ¶ 14 ("As a physician, I have been trained to provide the best possible care to my patients. The Wisconsin Medicaid exclusion is a flagrant barrier to my ability to do so. The exclusion intrudes on the doctor-patient relationship and limits my ability to provide my patients with treatments I know would alleviate their gender dysphoria and suffering.").) As this and other courts have previously found, the prohibited procedures are also contrary to what has become accepted, best practice among major medical and psychological professions for those suffering from severe gender dysphoria. (Prelim. Injunction Op. (dkt. #70) 21 n.17;) *Good v. Iowa Dept. of Human Servs.*, No. 18-1158, 2019 WL 1086614, at *2 (Iowa Mar. 8, 2019) (noting testimony establishing "the accepted standards of medical care to alleviate gender dysphoria . . . involve the following options: socially transitioning

---

[6] Two other transgender Wisconsinites submitted declarations opining that gender-confirming surgeries would drastically improve their lives, but that the surgeries are unaffordable without Wisconsin Medicaid coverage. (Vancil Decl. (dkt. #97) ¶¶ 14-15; Grunenwald-Ries Decl. (dkt. #98) ¶¶18-19.) Defendants acknowledge that they currently enforce the Challenged Exclusion, but point out that there is no evidence showing that these individuals requested or were denied coverage for gender-confirming surgeries. (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 30.)

to live consistently with one's gender identity, counseling, hormone therapy, and gender-affirming surgery to conform one's sex characteristics to one's gender identity."); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *3 (E.D. Mo. Feb. 9, 2018) (noting testimony establishing that the WPATH Standards of Care are "the internationally recognized guidelines for the treatment of persons with gender dysphoria").

The parties dispute to what extent -- if any -- removing the Challenged Exclusion would impact Wisconsin Medicaid's budget. Defense expert David Williams estimates that of the 1.2 million beneficiaries of Wisconsin Medicaid, approximately 63 -- or 0.005% -- would seek Medicaid coverage for a gender-confirming surgery in a given year, which he estimates would cost approximately $300,000 per year -- or 0.008% of the $3.9 billion Wisconsin spends on Medicaid annually. Defendants contend that if 97% of the estimated 5,000 transgender Wisconsin Medicaid beneficiaries sought gender-confirming surgery, the state would be responsible for paying approximately $1.2 million per year. (Williams Suppl. Decl. (dkt. #122) ¶¶ 25-28.) However, this assumption seems wholly unfounded. (*See* Prelim. Injunction Op. (dkt. #70) 31 ("[N]ot all transgender people have gender dysphoria; not all people suffering from gender dysphoria are interested in surgery; and only a subset of those people will meet the WPATH Standards of Care making the surgery medically necessary."); Cal. Dept. of Ins. Econ. Impact Assessment: Gender Nondiscrimination in Health Ins. (dkt. #96-2) 9 (explaining that "treatment options for GID vary greatly and not all transgender people with the diagnosis will undergo surgical intervention," "gender-confirming healthcare is an individualized treatment that differs according to the needs and pre-existing conditions of individual transgender people," and

that many factors "impact utilization and cost," including "[o]ther health factors [that] can contraindicate treatment").

Plaintiffs' expert Jaclyn White Hughto, PhD, MPH, opined that removing the Challenged Exclusion "would result in minimal short-term costs to the State of Wisconsin and would lead to significant longer-term cost savings for the State." (Hughto Suppl. Decl. (dkt. #96) ¶ 5.) As to the short term, predictions of minimal costs for including coverage for gender-confirming surgery appear reasonable. (Cal. Dept. of Ins. Econ. Impact Assessment: Gender Nondiscrimination in Health Ins. (dkt. #96-2) 3 ("While insurers may use someone's health status to determine their premium, analysis of the potential increase in claim costs from the proposed regulation shows that any such costs are immaterial and insignificant."); *id.* ("[T]he aggregate cost to the state population as a whole will be very insignificant."); *id.* at 9 ("Based on evidence of low utilization and prevalence rates . . ., the Department has determined that the impact on costs or increases in premiums due to the adoption of the proposed regulation would be immaterial.").)[7] As for the longer term, Dr. Hughto opines that these savings would result from the "significant benefits for transgender individuals on Wisconsin Medicaid [for whom treatment is medically necessary], including reductions in gender dysphoria, depression, anxiety, suicidality,

---

[7] While the California Department of Insurance "believe[d] that there may be a possible spike in demand for such services in the first few years after the adoption of the proposed regulation due to the possible existence of some current unmet demand," that "was not the experience of the University of California or San Francisco" when they provided coverage for gender confirming surgery. (Cal. Dept. of Ins. Econ. Impact Assessment: Gender Nondiscrimination in Health Ins. (dkt. #96-2) 10.) Accordingly, the Economic Impact Assessment concluded that "the small size of the impacted population will likely make the magnitude of [any possible] increase insignificant and immaterial." (*Id.*) Regardless, at this point, the court is only considering the near-term costs of enjoining the Challenged Exclusion until trial.

substance abuse, HIV transmission and acquisition, and physical and sexual assault, as well as improvements in socioeconomic status," which would "offset the cost of providing gender-confirming surgeries." (Hughto Suppl. Decl. (dkt. #96) ¶ 7; *see also id.* ¶¶ 10-20.) Defendants dispute this, arguing that Hughto's opinion is based on evidence lacking an adequate foundation and that her opinion provides "no reliable basis to calculate any cost savings," except as to the estimated cost savings of approximately $2,600 relating to decreased suicidal ideation, plans and attempts. (Defs.' Resp. to Pls.' Suppl. PFOF (dkt. #117) ¶ 2; Williams Suppl. Decl. (dkt. #122.) ¶¶ 6-8.)

OPINION

## I. Motion to Certify a Class

At the outset, plaintiffs seek to certify a class under Federal Rules of Civil Procedure 23(a) and 23(b)(2) to pursue declaratory and injunctive relief. (Mot. to Certify (dkt. #89) 1.) Specifically, they propose and seek to represent the following class: "All transgender individuals who are or will be enrolled in Wisconsin Medicaid, have or will have a diagnosis of gender dysphoria, and who are seeking or will seek surgical or medical treatments or services to treat gender dysphoria." (*Id.*)

To certify a class, plaintiffs must satisfy a two-step process. *See* Fed. R. Civ. P. 23(a)-(b); *Lacy v. Cook Cty., Ill.*, 897 F.3d 847, 864 (7th Cir. 2018). First, the proposed class must satisfy the four threshold requirements under Rule 23(a): numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). If the Rule 23(a) prerequisites are satisfied, then "the plaintiffs must demonstrate that one of the conditions of Rule 23(b) is met."

*Lacy*, 897 F.3d at 864. In this case, plaintiffs must establish that the challenged conduct "appl[ies] generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Because plaintiffs meet these requirements, this motion will be granted. *Lacy*, 897 F.3d at 863 ("A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." (quoting *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)).

### A. Threshold Requirements

#### 1. Numerosity

First, the plaintiffs must establish that their proposed "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class's size need not be determined with absolute certainty; rather, the requirement is satisfied "so long as it's reasonable to believe [that the class is] large enough to make joinder impracticable and thus justify a class action suit." *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677-78 (7th Cir. 2009)).

As the court noted previously, "[a]pproximately 5,000 of [the Wisconsin Medicaid] enrollees are transgender, and some subset of this population suffers from gender dysphoria." (Prelim. Injunction Op. (dkt. #70) 5-6.) Of the subset that suffers from gender dysphoria, gender-confirming surgeries may also be deemed medically necessary for some. (*See* Hughto Decl. (dkt. #26) ¶ 49 (estimating that "at least 5,000 Wisconsin Medicaid recipients are transgender adults who may be affected by the surgical exclusion

at some point in their lives"); Hughto Suppl. Decl. (dkt. #96) ¶ 22 (explaining how she arrived at estimate of 5,000).) While this suggests the number of present, and even future, members of the class are far fewer than 5,000, the court will accept that the proposed class may be too numerous to join in a single lawsuit, especially since some members of the class are not capable of being identified until sometime in the future. Likewise, as plaintiffs point out, even if joinder were possible it would be ill-advised and difficult to achieve because of the sensitive nature of the claims, the plaintiffs' limited financial means, and their varied locations across the state. (Mot. to Certify Br. (dkt. #90) 17-18.) Accordingly, the proposed class which seeks to cover all Wisconsin Medicaid-enrolled transgender individuals with gender dysphoria who "seek[] or will seek" treatment for gender dysphoria is numerous enough to make "joinder of all members . . . impracticable." Fed. R. Civ. P. 23(a)(1).

### 2. Commonality

Next, the plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, plaintiffs "must assert a common injury that is 'capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Lacy*, 897 F.3d at 865 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Put another way, "the key to commonality is 'not the raising of common 'questions' . . . but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting *Dukes*, 546 U.S. at 350).

As plaintiffs contend, "this case presents a common challenge to the lawfulness of a uniformly enforced Medicaid policy" such that "all members of the Proposed Class suffer the same injury resulting from [that policy]": the denial of coverage for gender-confirming surgeries to treat their gender dysphoria. (Mot. to Certify Br. (dkt. #90) 20.) Plaintiffs identify a number of legal questions common to the class:

1) Does the Challenged Exclusion violate § 1557's prohibition on sex discrimination in federally-funded health programs?

    a. Does § 1557 provide a private right of action?

    b. Does § 1557's prohibition on sex discrimination extend to gender identity and transgender status?

2) Does the Challenged Exclusion violate the Medicaid Act's availability requirement?

3) Does the Challenged Exclusion violate the Medicaid Act's comparability requirement?

4) Does the Challenged Exclusion violate the Equal Protection Clause?

    a. Does the Challenged Exclusion warrant intermediate scrutiny because of sex-based distinctions?

    b. Does transgender status qualify as a suspect or quasi-suspect class warranting heightened scrutiny?

(*Id.* at 21.)

Plaintiffs also identify fact questions common to the class:

1) Are gender-confirming treatments ever medically necessary to treat gender dysphoria?

2) Which procedures used for gender confirmation are covered by Wisconsin Medicaid for other conditions?

(*Id.* at 22.)  Accordingly, plaintiffs have established commonality.

### 3. Typicality

Plaintiffs must also show that their claims "are typical of the claims" of the class. Fed. R. Civ. P. 23(a)(3).  This ensures that the named plaintiffs' claims share "the same essential characteristics as the claims of the class at large." *Lacy*, 897 F.3d at 866 (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)).  In other words, plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Id.* (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  Plaintiffs easily meet this requirement because their claims and the relief sought are *identical* to those of other class members.  In fact, all the claims arise from defendants' enforcing the Challenged Exclusion, and the relief sought simply seeks to allow the class members the right to individually seek treatment based on medical necessity, free from enforcement of the Challenged Exclusion.  (Mot. to Certify Br. (dkt. #90) 23-24.)  Accordingly, typicality is also met.

### 4. Adequacy

Finally, the plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  A class representative is *not* adequate if he is subject to a defense to which other class members are not subject or could not prove the elements of the class claim for reasons particular to him. *CE Design Ltd. v. King Architectural*

*Metals, Inc.*, 637 F.3d 721, 724-25 (7th Cir. 2011). In addition to the named plaintiffs, courts are also required to determine whether the proposed class counsel is adequate. *See Gen. Tele. Co. of S.W. v. Falcon*, 457 U.S. 147, 157-58 n.13 (noting that adequacy "raises concerns about the competency of class counsel and conflicts of interest").

Here, the named plaintiffs and their counsel both meet the adequacy requirement of Rule 23(a). Certainly, the named plaintiffs are sufficiently interested in the case's outcome and are not subject to a conflict of interest: the named plaintiffs "all suffer the same injuries and have the same interests as the class members, and they will rigorously advocate for the class." (Mot. to Certify Br. (dkt. #90) 24-25.)

Likewise, plaintiffs' counsel meets the adequacy requirement because of their experience in class action and complex civil rights litigation. The Relman attorneys have a background in complex civil rights cases. (Klar Decl. (dkt. #100) ¶¶ 8, 11; Wardenski Decl. (dkt. #101) ¶¶ 7-8.) Attorney Pledl of Davis & Pledl, S.C., has experience both in litigating civil rights and disability law cases and in serving as class counsel. (Pledl Decl. (dkt. #103) ¶¶ 5-6.) The National Health Law Program ("NHeLP") "is a non-profit law firm that provides consultation and co-counseling assistance to legal services, disability rights, and other attorneys nationwide on a range of health issues affecting the poor" and has "significant experience in federal Medicaid law." (Courolle Decl. (dkt. #104) ¶ 1.) Counsel also has experience litigating transgender rights. (Wardenski Decl. (dkt. #101) ¶¶ 7-8; Pledl Decl. (dkt. #103) ¶ 4.) There is nothing to challenge the adequacy of counsel's representation of the class. Accordingly, adequacy is met; the individual plaintiffs will be named class representatives and Relman, Davis & Pledl and NHeLP will be named

class counsel.

## B. General Applicability

Having met the Rule 23(a) prerequisites, plaintiffs must establish that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" because the opposing party's actions are based "on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Classes under Rule 23(b)(2) are appropriate "when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 787 F.3d 426, 441 (7th Cir. 2015).[8] A Rule 23(b)(2) class is appropriate if "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* at 443 (quoting *Dukes*, 564 U.S. at 360).

As plaintiffs argue, "[c]ertification of the Proposed Class is warranted under Rule 23(b)(2) because the categorical coverage ban on gender-confirming care under the Challenged Exclusion is generally applicable to the class, making a final injunction and corresponding declaratory judgment appropriate to the full class." (Mot. to Cert. Br. (dkt. #90) 27-28.) Accordingly, plaintiffs' motion to certify a class under Rule 23(b)(2) is granted.

## II. Motion to Amend the Preliminary Injunction

Also before the court is plaintiffs' request to extend the preliminary injunction to

---

[8] Like here, the plaintiffs in *Chicago Teachers Union* sought "the same declaratory and injunctive relief for everyone" which would be the predicate for future individualized determinations for members of the class. 797 F.3d at 442.

enjoin defendants' enforcement of the Challenged Exclusion during the pendency of this case. (Mot. to Amend Prelim. Injunction Br. (dkt. #108) 8.) In essence, plaintiffs argue that expanding the preliminary injunction "is appropriate for substantially the same reasons warranting the current injunction" as: (1) the entire class of plaintiffs "face irreparable harm with no adequate remedy at law"; (2) the court already determined they "have a sufficient likelihood of success on their Section 1557 and Equal Protection Clause claims"; and (3) expanding the injunction would have a negligible financial cost and is in the public interest. (*Id.* at 21.) Likewise, plaintiffs argue that they are sufficiently likely to succeed on their Medicaid Act claims, which were not previously considered by the court, and expanding the injunction would likely lead to public health benefits and potentially long-term cost savings. (*Id.*) Defendants disagree on all points and oppose the expansion of the preliminary injunction. (Defs.' Opp'n (dkt. #116).)

In considering plaintiffs' request, the court -- like the parties -- will frame its analysis around the requirements for issuing an injunction. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1044 (7th Cir. 2017), *cert. dismissed* 138 S. Ct. 1260 (2018) (explaining that a party seeking an injunction must show: (1) irreparable harm, (2) inadequate remedies at law, (3) a reasonable likelihood of success on the merits, and (4) that the balance of harms favors the moving party). As the Seventh Circuit has noted, "a district judge has discretion to revise a preliminary remedy if persuaded that change had benefits for the parties and the public interest." *Commodity Futures Trading Comm'n v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015). The court is persuaded that the requested modification is in the public interest and will benefit the

parties.

## A.  Irreparable Harm & Inadequate Remedy at Law

Primarily, plaintiffs contend that members of the class face irreparable harm from the Challenged Exclusion because it "categorically prohibits all class members from receiving coverage for gender dysphoria treatments," which leads to "untreated or insufficiently treated gender dysphoria" and the "associated but avoidable psychological harms (including anxiety, depression, suicidality, and self-harm), physical injury, interpersonal and social harms, safety risks, and experienced stigma."  (Mot. Amend Prelim. Injunction Br. (dkt. #108) 24.)  Defendants argue that the class and individual plaintiffs Kelly and Sherwin cannot show a risk of irreparable harm because "inadequate evidence exists to conclude that the surgical procedures at issue can safely and efficaciously treat gender dysphoria."  (Defs.' Opp'n (dkt. #116) 36.)

As the court previously explained, a party seeking a preliminary injunction does not need to show that the harm threatened is certain to occur; rather, "the moving party must show 'more than a mere possibility of harm.'"  (Prelim. Injunction Op. (dkt. #70) 16 (quoting *Whitaker*, 858 F.3d at 1044-45).)  While the class is comprised of transgender Wisconsin Medicaid beneficiaries with gender dysphoria who will seek treatment, practically the only class members seeking relief through an expanded injunction are those who are currently or will be medically prescribed gender-confirming surgery and related hormones during the pendency of this lawsuit.  As to this subgroup, plaintiffs have met their burden:  these individuals' prior authorization requests should be evaluated based on the *medical necessity* of the treatments sought.

As this court previously held, plaintiffs have provided overwhelming evidence that gender-confirming surgical treatments can be medically necessary. As the court previously recognized, the larger medical community considers gender-confirming treatments -- including surgery -- to be valid aspects of medical care. (*See id.* at 21 n.17 (quoting statements from the American Psychiatric Association, American Medical Association, and American Endocrine Society).) Likewise, plaintiffs' experts have opined that gender-confirming surgical procedures can be both medically necessary and beneficial. (*See* Schechter Decl. (dkt. #27) ¶ 40 ("It is my professional opinion, consistent with the prevailing standards of care, that gender confirming surgery is safe, effective, and medically necessary for many individuals with gender dysphoria."); *id.* ¶ 43 ("The standards of care confirm, based on clinical evidence, that gender confirmation surgeries are medically necessary to help people alleviate an often lifelong struggle to find peace of mind and lasting comfort with their bodies."); Shumer Decl. (dkt. #25) ¶ 42 ("[F]ailure to provide a transgender person with clinically appropriate medical treatments consistent with the prevailing standards of care . . . is medically harmful.")

While defendants and their experts continue to challenge the medical necessity of certain of these procedures, they recognize that gender dysphoria is a serious medical condition. (*See* Mayer Rpt. (dkt. #55-1) 3 ("Gender dysphoria is a serious medical condition that deserves treatment."); *id.* at 8, 11; Defs.' Resp. to Pls.' PFOF (dkt. # 54) ¶ 12.) In fact, Mayer even conceded that there is "minimal" evidence that these treatments are effective, safe and optimal, and that "reducing or eliminating" the very real distress associated with this condition is the "[o]ptimality consideration[]" for treating gender

dysphoria. (Mayer Rpt. (dkt. #55-1) 8-9.) Likewise, Dr. Sutphin recognizes that "it logically and morally follows that the declared gravity of the patient's condition (i.e. clearly stated suicidal ideation apparently secondary to severe dysphoria) seems to warrant urgent surgical intervention irrespective of whether the State or any third party payor will support the same." (Sutphin Decl. (dkt. #118) ¶ 64.)

In fairness, Dr. Sutphin goes on to question whether those physicians truly believe that surgery is urgently needed, since "willingness to provide surgical treatment -- if the treatment is truly as urgent as the Plaintiffs declare -- should not hinge on the availability of Medicaid coverage. However, as this availability seems contingent on Medicaid coverage, the more likely conclusion is that they do not see withholding treatment as creating an imminent threat to Plaintiffs' well-being." (*Id.* ¶ 66.) While acknowledging the moral dilemma Dr. Sutphin poses, it is more in the legal, rather than medical, realm and certainly more argument than medical opinion. Practically speaking, if the procedures being discussed were a true medical emergency, the doctor's obligation under law is to treat and stabilize. *See* Emergency Medical Treatment & Labor Act, 42 U.S.C. § 1395dd (requiring hospital to examine and treat an individual with "an emergency medical condition . . . as may be required to stabilize" regardless of benefit eligibility). Here, the claim is not one of "emergency," but of medical necessity, and the issue is whether the state may refuse medical procedures based on sex, rather than medical efficacy.

As a result, plaintiffs' experts have shown that a blanket exclusion, like the Challenged Exclusion here, is likely to harm class members. (*See* Schechter Decl. (dkt. #27) ¶ 42 ("[I]t is my professional opinion that the denial of necessary medical care is

19

likely to perpetuate gender dysphoria and create or exacerbate other medical issues, such as depression and anxiety, leading to an increased possibility of self-harm, negative health outcomes, and even suicide."); Hughto Decl. (dkt. #26) ¶ 49 ("Wisconsin's categorical policy barring access to gender-affirming care has harmful health implications for those who currently require such care as well as those who will require this care in the future."); *id.* ¶ 50 ("[I]t is my professional opinion that Medicaid exclusions of gender-affirming surgeries and related medical care . . . have a harmful effect on the mental and physical health of transgender people who are denied access to this care."); Shumer Decl. (dkt. #25) ¶ 43 ("[A] categorical exclusion on Medicaid/insurance coverage for transition-related surgeries and hormone treatments is at complete odds with the prevailing standards of care. Such a policy puts the lives of individuals living with gender dysphoria at risk."); Wesp Decl. (dkt. #84) ¶ 16 ("[I]t is my professional opinion that eliminating the exclusion would benefit all of my transgender patients on Wisconsin Medicaid seeking gender-confirming treatments for gender dysphoria."); Oriel Decl. (dkt. #109) ¶ 13 ("I have also seen first-hand the devastating effect that the Wisconsin Medicaid 'transsexual' exclusion has on the health of an already vulnerable group of people. Without access to medical treatment, many of my transgender patients are unable to physically appear to others as they see themselves. This causes them substantial psychological distress and an increased risk of suicide, as well as risks to their safety, jobs and relationships."); *id.* ¶ 14 ("The exclusion intrudes on the doctor-patient relationship and limits my ability to provide my patients with treatments I know would alleviate their gender dysphoria and suffering. Eliminating the exclusion would undeniably allow me to provide my patients with better, clinically

appropriate medical care.").)  The lived experiences described by class member plaintiffs support the conclusions of these experts.  (*See* Vancil Decl. (dkt. #97) ¶¶ 10-12; Grunenwald-Ries Decl. (dkt. #98) ¶¶ 14-15; Vordermann Decl. (dkt. #99) ¶¶ 7, 13.)  As delayed/denied medical care cannot "be prevented or fully rectified by the final judgment after trial," it is an irreparable harm that lacks an adequate remedy at law.  *See Whitaker*, 858 F.3d at 1045-46.  Accordingly, this factor weighs in favor of expanding the preliminary injunction.

### B.  Reasonable Likelihood of Success

As the court previously explained, plaintiffs need "only show that [their] chances to succeed on [their] claims are better than negligible."  (Prelim. Injunction Op. (dkt. #70) 23 (quoting *Whitaker*, 858 F.3d at 1046 (internal citation omitted)).)  The court declines to modify its analysis regarding the reasonable likelihood of success on the Affordable Care Act and Equal Protection claims because that analysis is not limited to the individual claims of Mr. Flack and Ms. Makenzie.  (*See* Prelim. Injunction Op. (dkt. #70) 1-2, 23-35.)  Accordingly, the court's conclusion that plaintiffs had shown at least a reasonable likelihood of success on the merits is enough for this factor to weigh in favor of extending the preliminary injunction to other class members, without considering the Medicaid Act claims.

### C.  Balance of Harms & Public Interest

Finally, the balance of harms and the public interest favor modifying the preliminary injunction.  Defendants argue that expanding the preliminary injunction would cause it

irreparable harm due to the irrecoverable costs of covering gender-confirming surgeries, which they contend would total between $240,000 and $960,000 until the resolution of the case.[9] (Opp'n (dkt. #116) 42-43.) Plaintiffs respond that these amounts are "nothing more than a rounding error in the State's annual Medicaid spending" as $240,000 "represents only about 0.006 percent (six thousandths of one percent) of the State's $3.9 billion share of the $9.7 billion annual Wisconsin Medicaid spending" and "$960,000 represents only about 0.03 percent" of that figure. (Pls.' Reply (dkt. #127) 29-31.) Plaintiffs add that these additional costs "are likely to be mitigated further by the cost savings to the State associated with properly treated gender dysphoria." (*Id.* at 31.)

As previously discussed, plaintiffs' expert Hughto also opines that providing coverage "would provide significant benefits for transgender individuals on Wisconsin Medicaid, including reductions in gender dysphoria, depression, anxiety, suicidality, substance abuse, HIV transmission and acquisition, and physical and sexual assault, as well as improvements in socioeconomic status." (Hughto Suppl. Decl. (dkt. #96) ¶ 7.) While Williams criticizes Hughto for "fail[ing] to provide a quantified savings amount," he opines that if the information contained in the Hughto declaration about suicide is accurate, "an annual savings of $1,075 per Medicaid enrollee who underwent surgical treatment for

---

[9] These cost estimates are based on different assumptions. The $240,000 is based on Williams's original cost estimate of an annual cost of $301,577. (Williams Rpt. (dkt. #74-1) 6.) As to the $960,000, Williams considers Hughto's estimated 5,000 transgender Wisconsin Medicaid beneficiaries and "assume[s] a uniform distribution of gender transition surgeries per year over a ten year period" which results in the cost of $3 million per year, of which Wisconsin would be responsible for 40% or $1.2 million per year. (Williams Supp. Decl. (dkt. #122) ¶¶ 25, 27-28.) For both estimates, the defendants assumed the injunction would be in place for four-fifths of a year. (Opp'n (dkt. #116) 39.) While even the lower of these estimates seem inflated, the court will accept it as a possible "worst case" scenario, especially in light of the fact that we are less than five months away from trial.

gender transformation and who may have attempted suicide," which translates to "a total yearly savings of $6,450" for six individuals each year, saving Wisconsin Medicaid $2,580 per year. (Williams Suppl. Decl. (dkt. #122) ¶¶ 6, 12.) Thus, it appears that extending the preliminary injunction throughout the litigation would result in either nominal cost increases or cost savings. This is generally consistent with the "nominal savings" Wisconsin Medicaid anticipated in adopting the Challenged Exclusion. (Fiscal Estimate (dkt. #21-14) 2 (emphasis added).) Accordingly, the balance of harms and the public interest weigh in favor of plaintiffs on this score.

Defendants also contend that the state faces its own irreparable harms in the form of "being forced to fund procedures with a meaningful risk of harm that have not been proven to effectively treat gender dysphoria" and being unable to enforce a valid law. (Opp'n (dkt. #116) 43-44.) At this point, however, the medical community at large seems to have recognized gender-confirming surgery as part of standard of care. (*See* Prelim. Injunction Op. (dkt. #70) 21 n.17 (quoting statements from the American Psychiatric Association, American Medical Association, and American Endocrine Society).) Likewise, as Dr. Schechter notes, "gender-confirming surgeries do not have a particularly high rate of complications when compared with analogous procedures for other conditions."[10] (Schechter Decl. (dkt. #129) ¶ 14.)

While all medical treatment has risks, an individual patient and their doctor would seem substantially better able to weigh those risks than the state, much less this court, and

_____

[10] Defense expert Dr. Daniel Sutphin contends that there are generic surgical and specific risks associated with gender-confirming surgeries and that these rates "remain[] unverified in terms of durable objective benefit." (Sutphin Decl. (dkt. #118) ¶¶ 13, 36.)

so the risk of a negative outcome does not weigh in defendants' favor either.

Finally, considering plaintiffs' likelihood of success on the merits, defendants' concerns about their inability to enforce a valid law during the interim are simply unavailing. Accordingly, plaintiffs have sufficiently established that the balance of harms and public interest weigh in favor of expanding the preliminary injunction to a general prohibition on the enforcement of the Challenged Exclusion.

### D. Scope

Defendants contend that plaintiffs improperly seek to expand the preliminary injunction not just to a general prohibition, but also to include coverage for electrolysis, finasteride (a hair growth stimulant), and voice therapy. (Opp'n (dkt. #116) 33-34.) Defendants explain that: (1) these treatments are not excluded from Wisconsin Medicaid coverage by the Challenged Exclusion as neither voice therapy nor electrolysis is "transsexual surgery" and finasteride is not a drug "associated with transsexual surgery"; (2) electrolysis is not covered for *any* Wisconsin Medicaid beneficiary under Wis. Admin. Code § DHS 107.06(5)(i); and (3) plaintiffs failed to provide any evidence supporting their claim that they were denied these services under the Challenged Exclusion. (*Id.* at 34-36.)

Defendants are correct that this request is outside the scope of plaintiffs' claims. Plaintiffs' lawsuit challenges Wisconsin Administrative Code § DHS 107.03(23)-(24). (*See* Amend. Compl. (dkt. #85) 41-42.) By its terms, this Challenged Exclusion only applies to "[t]ranssexual surgery" and "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or

24

characteristics." Wis. Admin. Code § DHS 107.03(23)-(24). Further, there is no admissible evidence to suggest that Sherwin or Kelly's requests for these services were denied *because* of the Challenged Exclusion.

As an initial matter, there is no admissible evidence supporting plaintiffs' claim that Ms. Kelly's medical provider recommended electrolysis -- or that it was medically necessary -- to treat Kelly's gender dysphoria. (*See* Wesp. Decl. (dkt. #94) ¶¶ 11-12 (stating that Wesp and Kelly "discussed her desire for facial hair removal through electrolysis" and Wesp's opinion that the "gender-confirming surgeries" of "genital reconstruction and female chest reconstruction" were "medically necessary"); *id.* ¶¶ 13-14 (describing "willing[ness] to provide [Kelly] with letters of support stating [her] professional opinion that she meets the criteria for and is eligible to obtain those surgeries"). Rather, plaintiffs offer the statements by Kelly that she "would like to obtain an orchiectomy," as well as "female genital reconstruction, female chest reconstruction, and electrolysis," and that Nurse Wesp "recommended that I obtain these procedures as they are medically necessary to treat my gender dysphoria." (Kelly Decl. (dkt. #93) ¶ 18.) Further, as defendants point out, electrolysis is specifically excluded as a non-covered service under a separate provision of the Wisconsin administrative code. *See* Wis. Admin. Code § DHS 107.06(5)(i).

As to Ms. Sherwin's denied request for voice therapy, the first speech pathologist she saw sought a prior authorization to treat her, but it was denied; the appeal was also denied because the voice therapy "was a transgender service." (Sherwin Decl. (dkt. #95) ¶¶ 26, 28-29.) The reason for the denial is disputed by defendants. (*See* State Adjudication of HMO Grievance (dkt. #121-1) 2 ("[R]eview of all available documentation with this

grievance identified that the provider did not submit an initial evaluation completed by the speech and language pathologist to support the diagnosis of dysphonia and to determine the medical necessity of services."); Wiggins Decl. (dkt. #120) ¶ 4 ("As Chief Medical Officer, it is my position that an adult Medicaid beneficiary's claim for voice therapy services, if it were to be denied, would not be denied pursuant to Wis. Admin. Code § DHS 107.03(23) or (24).").

Accordingly, in granting plaintiffs' request to amend the preliminary injunction, the court will enjoin defendants from enforcing the Challenged Exclusion *alone*.[11]  Again, this does not mean that any member of the class will automatically receive gender-confirming surgeries.  Rather, they will have to seek prior authorization or the equivalent through normal channels, and those requests will have to be evaluated based on their *medical* necessity.

### E.  Bond

Finally, even if a potentially larger number of plaintiffs may be entitled to relief in the next few months, their indigency is still a reason for the court not to require a bond as a condition for the preliminary injunction.  (*See* Prelim. Injunction Op. (dkt. #70) 38.) The amount of unrecoverable expenditures per patient does not change this analysis in light of Wisconsin Medicaid's total program expenditures.  (*Id.* at 37 ("Even if the state

---

[11] While the Eastern District of Missouri entered a preliminary injunction in *Hicklin* requiring defendants to "provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to 'gender-affirming' canteen items," 2018 WL 806764, at *14-*15, that case arose under different circumstances and did not involve the Challenged Exclusion, which by its terms is limited to "transsexual surgery" and related drugs.

were required to cover such procedures for a few additional claimants who meet the same high burden as plaintiffs of proving a medical need during the pendency of this case, the cost of these additional payments would be equally outweighed by the likelihood of reducing those claimants' suffering and of fulfilling the public interest in providing medically necessary procedures.").

## ORDER

IT IS ORDERED that:

1) Plaintiffs' unopposed motion to certify a class (dkt. #89) is GRANTED. The individual plaintiffs are named class representatives and plaintiffs' counsel are named class counsel.

2) Plaintiffs' motion to amend the preliminary injunction (dkt. #107) is GRANTED. Defendants are ENJOINED from enforcing the Challenged Exclusion (Wis. Admin. Code § DHS 107.03(23)-(24)) during the pendency of this lawsuit.

Entered this 23rd day of April, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge