## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

CODY FLACK,
SARA ANN MAKENZIE,
MARIE KELLY, and
COURTNEY SHERWIN,
*individually and on behalf of all others
similarly situated*,

     Plaintiffs,

               Case No. 3:18-cv-00309-WMC
   v.              Judge William Conley

WISCONSIN DEPARTMENT OF
HEALTH SERVICES and
ANDREA PALM, in her official capacity as
Secretary-Designee of the Wisconsin
Department of Health Services,

     Defendants.

## SECOND AMENDED COMPLAINT WITH CLASS ACTION ALLEGATIONS

### INTRODUCTION

1.  Plaintiffs Cody Flack, Sara Ann Makenzie, Marie Kelly, and Courtney Sherwin

("Plaintiffs") are low-income transgender Wisconsin residents who receive medical assistance

through Wisconsin's Medicaid program ("Wisconsin Medicaid"). Plaintiffs—and all other

transgender Wisconsin Medicaid beneficiaries in need of surgical and medical treatments for

gender dysphoria—are being unlawfully denied coverage for such treatments under a

longstanding Wisconsin regulation, Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p) (the

"Challenged Exclusion"), which categorically excludes gender-confirming care from Medicaid

coverage.

2.     On behalf of themselves and all other similarly situated individuals, Plaintiffs file this Amended Complaint with Class Action Allegations ("Complaint") against Wisconsin Department of Health Services ("DHS") and its Secretary-Designee, Andrea Palm, in her official capacity (the "Secretary") (collectively, "Defendants") to contest the discriminatory Challenged Exclusion, as well as Defendants' continuing refusal to cover medically-necessary care for transgender Wisconsin Medicaid beneficiaries pursuant to that exclusion, as a violation of their civil rights under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"); the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

3.     The Challenged Exclusion, which DHS promulgated in 1996, implemented in 1997, and continues to enforce now, expressly prohibits Wisconsin Medicaid coverage for "[t]ranssexual surgery" and "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or characteristics." Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p). Because of this categorical exclusion, Plaintiffs have been denied or prevented from obtaining Medicaid coverage for medically necessary surgical treatments and other medical treatments and services for gender dysphoria—the clinically significant distress associated with having a gender identity (the innate, internal sense of one's sex, *i.e.*, being male or female) that conflicts with the sex one was assigned at birth.

4.     The Challenged Exclusion—which flies in the face of the medical consensus that gender-confirming medical care is the only safe and effective medical treatment for gender dysphoria, and wholly disregards the harms of denying transgender people access to critical and often life-saving care—unlawfully denies medically necessary care to transgender Wisconsin

2

Medicaid beneficiaries. Notably, Wisconsin Medicaid covers these services when they are medically necessary to address health conditions other than gender dysphoria. In short, Wisconsin treats its transgender Medicaid beneficiaries as second-class citizens and their transition-related health care needs as "unnecessary." In doing so, Defendants expose a particularly vulnerable group in Wisconsin to significant and avoidable harms to their health and well-being, in violation of the U.S. Constitution and federal law.

5.     On behalf of themselves and other similarly situated transgender Wisconsin Medicaid beneficiaries, Plaintiffs seek a declaratory judgment that the Challenged Exclusion violates Section 1557, the Medicaid Act, and the U.S. Constitution; preliminary and permanent injunctions barring Defendants from enforcing the Challenged Exclusion to deny medically necessary transition-related health care; their reasonable attorneys' fees and costs; and such other relief as the Court deems just and equitable.

6.     In their individual capacities, Plaintiffs also seek compensatory damages for the economic and non-economic injuries they have suffered as a result of being denied health care based on the Challenged Exclusion.

**BACKGROUND**

7.     Plaintiffs are and have been enrolled in Wisconsin Medicaid at all times relevant to this Complaint.

8.     Wisconsin Medicaid is a health insurance program for low-income individuals and families that is jointly funded by the federal government and the State of Wisconsin (the "State"). Wisconsin Medicaid is offered through several programs, including Medicaid for the Elderly, Blind, or Disabled, which covers low-income individuals who are age 65 or older and

3

people with disabilities, and BadgerCare Plus, which covers low-income children, pregnant women, and low-income adults under 65 who are not eligible on the basis of a disability.

9.     Plaintiffs have been or will be prevented from obtaining medical assistance from Wisconsin Medicaid for medically necessary treatments for gender dysphoria based on the Challenged Exclusion, and have suffered or will suffer significant harm as a result.

10.     Plaintiffs rely on Wisconsin Medicaid for their health care expenses. Plaintiffs Cody Flack and Sara Ann Makenzie are low-income individuals with disabilities who rely exclusively on federal Supplemental Security Income ("SSI") benefit payments to meet their basic needs for food, clothing, and shelter, and are eligible for and receive Wisconsin Medicaid on that basis. Plaintiffs Marie Kelly and Courtney Sherwin are low-income individuals who are eligible for and receive Wisconsin Medicaid through the State's BadgerCare Plus program.

11.     Each Plaintiff has been diagnosed with gender dysphoria. Gender dysphoria is the clinically significant distress associated with having a gender identity that conflicts with one's assigned sex (*i.e.*, the sex one was assumed to be at birth, usually based on a cursory review of external genitalia). Plaintiffs experience dysphoria related to the disconnect between their primary and secondary sex characteristics and their gender identity. Plaintiffs have undergone gender transitions to live in accordance with their respective gender identities. Each Plaintiff has received medical care to treat the gender dysphoria they have experienced when living, or being incorrectly perceived by others, as their assigned sex instead of the sex matching their gender identities. Each Plaintiff has experienced heightened gender dysphoria when others have made incorrect assumptions about their sex, or mistreated them, based on aspects of their physical appearance.

4

12.     Plaintiffs' medical and mental health providers have recommended that they obtain surgical treatments to treat and alleviate their ongoing symptoms of gender dysphoria. Unfortunately, without the injunctive relief sought in this lawsuit, Plaintiffs have been or will be prevented from obtaining these medically necessary procedures because Wisconsin Medicaid will not cover them. As low-income Medicaid beneficiaries, Plaintiffs each lack the financial ability to pay out-of-pocket for that medically necessary care or to obtain private insurance that might cover it. Consequently, each of them has suffered, and is continuing to suffer, exacerbated symptoms of gender dysphoria, emotional distress, and physical harm, all of which would be avoidable if they had access to this medically necessary care.

13.     The Challenged Exclusion violates Section 1557's prohibitions on discrimination in federally-funded health programs, as it discriminates against Plaintiffs and other transgender Wisconsin Medicaid beneficiaries on the basis of sex (including nonconformity to sex stereotypes, gender identity, being transgender, and undergoing a gender transition) by categorically denying them transition-related health care regardless of medical necessity. Furthermore, the Challenged Exclusion violates the federal Medicaid Act's comparability and availability requirements. The Challenged Exclusion, which has no rational or legitimate basis, denies Plaintiffs and similarly situated individuals their constitutional right to equal protection under the laws based on impermissible consideration of sex-based classifications (including nonconformity to sex stereotypes, gender identity, being transgender, and undergoing a gender transition). It further violates the Equal Protection Clause by denying necessary health care to people solely based on their membership in a disfavored group, transgender people, who are subjected to discriminatory treatment based on their membership in that class.

14.     Plaintiffs, on behalf of themselves and similarly situated individuals, ask the Court to: (1) issue a declaratory judgment that the Challenged Exclusion violates the prohibition against sex discrimination contained in Section 1557, violates the availability and comparability requirements of the federal Medicaid Act, and is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (2) preliminarily and permanently enjoin Defendants from enforcing the Challenged Exclusion and from denying Wisconsin Medicaid coverage for medically necessary treatments for gender dysphoria;[1] (3) award compensatory damages for their economic and non-economic injuries arising from being denied medically necessary health care coverage because of the Challenged Exclusion; and (4) award their reasonable attorneys' fees and costs.

**PARTIES**

15.     Plaintiff Cody Flack is an adult male resident of Green Bay, Brown County, Wisconsin. Mr. Flack is a transgender man. Mr. Flack has been eligible for and enrolled in Wisconsin Medicaid at all times material to this Complaint.

16.     Plaintiff Sara Makenzie is an adult female resident of Baraboo, Sauk County, Wisconsin. Ms. Makenzie is a transgender woman. Ms. Makenzie has been eligible for and enrolled in Wisconsin Medicaid at all times material to this Complaint.

---

[1] The original complaint in this action [Dkt. No. 1] was filed by Mr. Flack and Ms. Makenzie as individuals, and did not contain class action allegations. On July 25, 2018, the Court preliminarily enjoined Defendants from enforcing the Challenged Exclusion against Mr. Flack and Ms. Makenzie only. Op. & Order, July 25, 2018 [Dkt. No. 70]. Because Defendants have noticed an appeal of that injunction [Dkt. No. 75], the facts alleged in this amended complaint pertaining to Mr. Flack and Ms. Makenzie are similar to those alleged in the original complaint.

17.     Plaintiff Marie Kelly is an adult female resident of Milwaukee, Milwaukee County, Wisconsin. Ms. Kelly is a transgender woman. Ms. Kelly has been eligible for and enrolled in Wisconsin Medicaid at all times material to this Complaint.

18.     Plaintiff Courtney Sherwin is an adult female resident of Janesville, Rock County, Wisconsin.[2] Ms. Sherwin is a transgender woman. Ms. Sherwin has been eligible for and enrolled in Wisconsin Medicaid at all times material to this Complaint.

19.     Defendant DHS is the Wisconsin state agency charged with the administration of Wisconsin Medicaid. Wis. Stat. § 49.45. DHS's principal offices are located at 1 West Wilson Street, Room 650, in Madison, Dane County, Wisconsin. DHS is a recipient of federal funds from the U.S. Department of Health and Human Services ("HHS"), including Medicaid funding. Thus, DHS is subject to the nondiscrimination requirements of Section 1557, which prohibits discrimination on the basis of sex and other factors in any health program or activity that receives funding from HHS, including Wisconsin Medicaid. Wisconsin law expressly authorizes lawsuits against DHS. Wis. Stat. § 46.017.

20.     Defendant Andrea Palm is the Secretary-Designee of DHS and, as such, is responsible for implementing the Medicaid Act consistent with federal Medicaid requirements. Secretary-Designee Palm is sued in her official capacity.

21.     All of Defendants' actions or omissions complained of in this Complaint were under the color of state law.

---

[2] Ms. Sherwin's birth name was Bradley Sherwin. On September 20, 2018, Ms. Sherwin petitioned for a court-ordered name change to her chosen name, Courtney Sherwin, and expects to obtain that name change soon.

7

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

23.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.

24.     Under 28 U.S.C. § 1391, venue is proper in the Western District of Wisconsin because Defendants reside and are subject to personal jurisdiction in the District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District, and Plaintiffs Sara Ann Makenzie and Courtney Sherwin reside in the District.

### FACTS

#### *Gender Identity and Gender Dysphoria*

25.     Gender identity is an innate, internal sense of one's sex—*i.e.*, being male or female—and is a basic part of every person's core identity. Everyone has a gender identity. Most people's gender identity is consistent with the sex they were assigned at birth ("assigned sex"). Transgender people, however, have a gender identity that is different from their assigned sex. A transgender man is a man who was assigned female at birth but has a male gender identity. A transgender woman is a woman who was assigned male at birth but has a female gender identity.

26.     Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[3] Under the DSM-5, gender dysphoria is the "clinically

---

[3] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 removed that diagnosis and replaced it with "Gender Dysphoria," to clarify that being transgender is not itself a disorder, but that the clinically relevant condition is the dysphoria experienced by individuals whose gender identity conflicts with their assigned sex. *See* DSM-5

significant distress or impairment in social, occupational, or other areas of function" associated

with the incongruence between a transgender person's gender identity and assigned sex. *Id.* at

451-53. Distress associated with gender dysphoria often arises "when physical interventions by

means of hormones and/or surgery are not available." *Id.* at 451. A transgender person's gender

dysphoria can be alleviated when the person is able to live, and be treated by others, consistently

with the person's gender identity.

27.     When a transgender person's gender dysphoria is left untreated, or is inadequately

treated, the consequences can be dire. Symptoms of untreated gender dysphoria often include

intense emotional suffering, anxiety and depression, suicidality, and thoughts or acts of self-

harm. All of those symptoms can be mitigated, and often prevented altogether, for transgender

people with access to appropriate individualized medical care as part of their gender transitions.

28.     Certain medical treatments, including hormone therapy and various surgical

procedures that align one's physical characteristics with one's gender identity (collectively

referred to in this Complaint as transition-related or gender-confirming surgeries),[4] are safe and

medically effective treatments for gender dysphoria under the applicable standards of care, and

are recognized as such by the medical profession.

---

at 451 (noting that Gender Dysphoria "is more descriptive than the previous DSM-IV term
*gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se.*").

[4] Certain transition-related procedures are sometimes referred to as "sex reassignment surgery,"
or the archaic and disfavored term "sex change surgery," which is now generally considered
inaccurate and offensive. Under the contemporary medical and psychological understanding of
gender identity, transition-related medical treatments serve to confirm, not "change," an
individual's sex by bringing primary and secondary sex characteristics into alignment with the
person's gender identity. As such, neither of those terms is used in this Complaint.

*Federal Medicaid Program*

29.     Established in 1965 under Title XIX of the Social Security Act, Medicaid is a joint federal-state program that provides medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396-1396w-5 (the "Medicaid Act"). The central objective of Medicaid is to enable states to furnish medical services to persons whose incomes and resources are insufficient to meet the cost of necessary medical services. 42 U.S.C. § 1396-1.

30.     States are not required to participate in the Medicaid program, but all states do.

31.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5).

32.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of the U.S. Department of Health and Human Services. 42 U.S.C. § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

33.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

34.     The Medicaid Act requires that participating states cover health care services when medically necessary, including in-patient and out-patient hospital services and physician services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d. In addition, the statute gives states the option to provide other services, including prescription drugs, when medically necessary.

35.     Under the Medicaid Act, "the medical assistance made available to any individual . . . shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

10

36.     In addition, a state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

37.     Moreover, state Medicaid programs must provide medical assistance "in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

### *Wisconsin Medicaid*

38.     The State of Wisconsin participates in the federal Medicaid program.

39.     DHS is the state agency that administers the Wisconsin Medicaid program.

40.     More than half of Wisconsin's Medicaid expenditures are reimbursed with federal Medicaid funds.

41.     Wisconsin Medicaid provides Medicaid-funded medical assistance through several programs, including Medicaid for the Elderly, Blind, or Disabled, which covers low-income individuals who are age 65 or older and people with disabilities, and BadgerCare Plus, which covers low-income children, pregnant women, and low-income adults under 65 without a qualifying disability. Wisconsin Medicaid beneficiaries' plans are administered either directly by the State or by one of several participating managed care organizations.

42.     Wisconsin Medicaid and all of its programs are governed by Wisconsin's medical assistance statute, Wis. Stat. §§ 49.43-65, and its implementing regulations, Wis. Adm. Code § DHS 107.01-.36. Under the regulations, DHS "shall reimburse providers for medically necessary and appropriate health care services" listed in the statute, including inpatient and outpatient hospital services and physician services. Wis. Adm. Code § DHS 107.01. The State's medical assistance statute does not explicitly address, let alone exclude, coverage for transgender individuals seeking medical treatments for gender dysphoria.

11

***Wisconsin Medicaid's Categorical Exclusion on Transition-Related Health Care for Transgender Medicaid Beneficiaries***

43.     Notwithstanding the federal Medicaid and state statutory mandates that Wisconsin Medicaid provide medically necessary health care to Wisconsin Medicaid beneficiaries, Defendants deny coverage for medically necessary transition-related health care, including gender confirmation surgeries and related care, based on the Challenged Exclusion in Defendant DHS's medical assistance regulations.

44.     The Challenged Exclusion prohibits Wisconsin Medicaid coverage for "[t]ranssexual surgery" or "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or characteristics." Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p). Although the Challenged Exclusion does not define "transsexual surgery," it has been used since its promulgation to deny coverage to transgender Wisconsin Medicaid beneficiaries seeking gender-confirming surgical procedures and other medical treatments and services for gender dysphoria, including chest reconstruction surgeries, genital reconstruction surgeries, hormone treatments, and other services.

45.     The Challenged Exclusion was approved and adopted by the Wisconsin Department of Health and Family Services ("DHFS") (the predecessor to Defendant DHS) on December 11, 1996, as part of Clearinghouse Rule CR 96-154, and went into effect on February 1, 1997.

46.     At the time the Challenged Exclusion was proposed and ultimately implemented, the federal Medicaid law and Wisconsin medical assistance statute already prohibited coverage for medically unnecessary services. Nevertheless, the State saw fit to single out transition-related care for an express exclusion based on the incorrect premise that such care was medically unnecessary in all instances.

12

47.     When proposing the Challenged Exclusion in 1995, DHFS issued a bulletin explaining that the proposed rule was intended "to limit or discontinue coverage of medically unnecessary services" and "strengthen some definitions of covered services." DHFS, Summary of the Amendments to the Medicaid Rules that Discontinue Coverage of Medically Unnecessary Services, at 1 (Jan. 6, 1995). That document enumerated six "services and products determined not to be medically necessary," including "transsexual surgery" and "drugs or hormone therapy to alter physical sexual characteristics." *Id.* The other enumerated services included "ear lobe repair," "nipple reconstruction and repair," "tattoo removal," and "food products." *Id.*

48.     In promulgating the Challenged Exclusion, the State was not motivated by cost savings, but purely by the incorrect premise that the excluded services, including "transsexual surgery" and related care, were *always* medically unnecessary. The agency's fiscal estimate of the proposed rule reiterated that the proposed amendments to the medical assistance regulations "clarify existing policy and clearly eliminate coverage of some services that [DHFS] has determined are not medically necessary." DHFS, Fiscal Estimate: Medical Assistance: Medically Unnecessary Services, at 1 (Sept. 27, 1996). That document also noted that "[t]he rule changes are expected to result in nominal savings for state government." *Id.* In an accompanying document, DHFS's Office of Legal Counsel ("OLC") explained that "[t]he rule changes make clear that the [Medical Assistance] program will not pay for the specified services or will not pay for them when they are provided for certain purposes." DHFS, OLC, Transmittal to Legislative Council Rules Clearinghouse, Medical Assistance: Medically Unnecessary Services, at 1 (Sept. 27, 1996). OLC's statement admitted that, "[a]ctually the program has hardly ever paid for any of these services or for those purposes, but questions about coverage continue to come up." *Id.* The final rule approved on December 11, 1996 reiterated that the newly-prohibited services were

13

"determined to be medically unnecessary," but noted that "[u]nder current rules the [medical assistance] program requires prior authorization for most of these services and pays infrequently for them." DHFS, Clearinghouse Rule 96-154, 1 (Dec. 11, 1996).

49.     There is no medical or scientific support for Wisconsin's contention that transition-related health care for transgender people with gender dysphoria is "medically unnecessary." To the contrary, there is a strong consensus among medical and mental health professionals that gender-confirming surgical care and related services are the only safe and effective medical treatments for the gender dysphoria experienced by many transgender people.

50.     Under the standards of care for gender dysphoria issued by the World Professional Association of Transgender Health ("WPATH")—widely considered the authoritative international standards of care for transgender health care—gender-confirming medical procedures or treatments are medically necessary for many transgender patients. WPATH, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 9-10, 33-34, 54-55 (7th Ver. 2011) ("WPATH Standards of Care"). As part of a medical transition, effective, recognized, medically necessary treatments may include "[h]ormone therapy to feminize or masculinize the body" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)." *Id.* at 8-9. The WPATH Standards of Care expressly states that these services are medically necessary for many transgender people with gender dysphoria. *Id.* at 33-34, 54-55. Recognizing that particular medical interventions are not appropriate or necessary for every transgender person, the WPATH Standards of Care sets forth criteria to evaluate an individual's eligibility for hormone treatments and various transition-related surgeries.

51.     The broader medical community agrees that, for many transgender people, surgical interventions and hormone treatments are safe, effective, and medically necessary treatments for gender dysphoria. The American Medical Association, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender-confirming surgeries and hormone treatments are safe and effective treatments for gender dysphoria, and that access to such treatments improves the health and well-being of transgender people. Each of these groups has publicly opposed prohibitions on insurance coverage for transition-related health care, including categorical prohibitions on such care like the Challenged Exclusion.

52.     Ignoring the medical consensus that gender-confirming medical treatments are effective and medically necessary to treat gender dysphoria in many transgender individuals, Defendants have failed to take any action to remove the Challenged Exclusion from Wisconsin's medical assistance regulations. Indeed, Defendants continue to enforce the Challenged Exclusion against transgender Medicaid recipients, including Plaintiffs, who are eligible for and in medical need of these forms of care.

53.     Wisconsin is one of just ten states that maintain explicit discriminatory prohibitions on Medicaid coverage for medically necessary treatments for gender dysphoria. In contrast, 18 states and the District of Columbia have express policies affirmatively providing coverage to transgender Medicaid beneficiaries for transition-related health care. The remaining states have no explicit Medicaid policies pertaining to coverage for such care.

15

54.     On its website, DHS confirms that Wisconsin Medicaid does not cover medically necessary health care to treat gender dysphoria. On a webpage entitled, "LGBT Health - Transgender Persons," which was last revised on December 13, 2017, DHS states:

> For people who need medical interventions such as hormones or surgery, these might be covered under private insurance plans. Currently, Wisconsin BadgerCare, BadgerCare Plus, Medicaid, and State of Wisconsin employee health insurance (ETF) do not cover gender reassignment surgery or drugs related to gender reassignment or hormone replacement.[5]

55.     In an April 20, 2018 response to a public records request initiated by Plaintiffs' attorneys, Defendant DHS acknowledged that, pursuant to the Challenged Exclusion, the agency has recently denied multiple requests for prior authorization "for any transsexual surgery" sought by transgender Wisconsin Medicaid beneficiaries.

56.     On information and belief, many transgender Wisconsin Medicaid recipients have been deterred from seeking preauthorization for transition-related surgeries because of their knowledge, or the knowledge of their medical providers, that the Challenged Exclusion would make such preauthorization requests futile.

57.     Wisconsin Medicaid covers surgical procedures, hormone therapy, and related medical treatments and services when necessary to treat conditions other than gender dysphoria. Specifically, Wisconsin Medicaid covers chest reconstruction surgeries (including mastectomies), genital reconstruction surgeries, hormone treatments, voice therapy, and related services to treat serious injuries or certain conditions. However, Wisconsin Medicaid denies coverage for these procedures when they are sought by transgender individuals as medically necessary treatments for gender dysphoria.

---

[5] DHS, LGBT Health - Transgender Persons,
https://www.dhs.wisconsin.gov/lgbthealth/transgender.htm (last visited Sept. 25, 2018).

***Plaintiff Cody Flack***

58.     Plaintiff Cody Flack is a 30-year-old resident of Green Bay, Wisconsin. Mr. Flack was born in Pennsylvania and moved to Wisconsin in 2012.

59.     Mr. Flack has cerebral palsy and other disabilities. Because of his cerebral palsy, Mr. Flack has limited mobility and uses a motorized wheelchair. Due to his disabilities, Mr. Flack is unable to work and relies on SSI for his income and Wisconsin Medicaid for his health care needs.

60.     Mr. Flack is a transgender man. That is, he was assigned female at birth, but is male and has lived in accordance with his male gender identity for many years.

61.     Mr. Flack became aware of his male gender identity around age four or five.

62.     Mr. Flack was later diagnosed with gender dysphoria.

63.     Mr. Flack took steps to begin his gender transition at around age 18. At that time, he began seeing a gender therapist, adopted a traditionally male name, and took other steps to outwardly present as the male he is. Due to a lack of support and resources, and fears that coming out as transgender might isolate him from his family and others, Mr. Flack felt unable to undergo a full transition for several more years, despite experiencing significant gender dysphoria. In 2012, after moving to Wisconsin and feeling more supported in his gender identity, Mr. Flack reinitiated his gender transition and took steps to socially transition to living and presenting as a man in all aspects of his life. He again chose and began to exclusively use a traditionally male name, Cody; began using masculine pronouns to refer to himself; and outwardly presented in a more masculine manner by wearing traditionally men's clothing and cutting his hair; correcting his identity documents to reflect the fact that he is male; and obtaining ongoing therapy and medical care to further his gender transition and treat his gender dysphoria.

64.     All of Mr. Flack's identity documents reflect his male sex. On May 1, 2014, Mr. Flack was granted a court-ordered name change, pursuant to Wis. Stat. § 69.13, from his traditionally female birth name to his chosen male name, Cody Jason Flack. He has obtained a Wisconsin state identification card with a male sex marker. In addition, Mr. Flack is eligible to receive an amended birth certificate with a male sex marker from Pennsylvania, where he was born, but has not yet obtained that document due to his inability to pay the associated fees.

65.     Since 2015, Mr. Flack has seen a psychotherapist, Daniel P. Bergman, MS, LPC, NCC. Mr. Bergman has treated Mr. Flack for gender dysphoria and other conditions. Mr. Bergman has recommended that Mr. Flack obtain medical treatments, including hormone therapy and chest reconstruction, as part of his treatment for gender dysphoria.

66.     In 2016, Mr. Flack contacted Amy DeGueme, MD, ECNU, an endocrinologist at Madison Medical Affiliates in Mequon, Wisconsin, to initiate medical treatments related to his gender transition. Dr. DeGueme determined that Mr. Flack would benefit from hormone therapy to further his gender transition and treat his gender dysphoria. In August 2016, Dr. DeGueme prescribed Mr. Flack hormone replacement therapy (testosterone). Under Dr. DeGueme's supervision, Mr. Flack has remained on this hormone treatment since then. As a result of the hormone therapy, he has developed male secondary sex characteristics, including facial and body hair, a deeper voice, and a more masculine appearance.

67.     Wisconsin Medicaid has covered Mr. Flack's hormone therapy to date. However, because of the Challenged Exclusion, Mr. Flack is worried that coverage for his ongoing testosterone treatments may be denied in the future absent the permanent injunctive relief requested in this lawsuit.

68.     On October 11, 2016, Mr. Flack underwent a hysterectomy with bilateral salpingo-oophorectomy (the total removal of the uterus, cervix, fallopian tubes, and ovaries) for the treatment of dysmenorrhea (a condition characterized by pelvic or lower abdominal pain during menstruation) and premenstrual dysphoric disorder ("PMDD") (a severe form of premenstrual syndrome) under the care of a gynecologist. Wisconsin Medicaid covered that surgery because it was necessary to treat his dysmenorrhea and PMDD. That surgery, while performed to treat those other conditions, had the effect of reducing Mr. Flack's gender dysphoria by further bringing his physical characteristics in alignment with his male identity and by eliminating the pain and distress he experienced from menstruation.

69.     For many years, Mr. Flack has experienced severe gender dysphoria related to the presence of female-appearing breasts on his body. He experiences distress at the sight of his breasts, which are incongruous with his male gender identity, and he has wished to have them removed since developing them during puberty. In addition, because of his breasts, he has been mistaken as female countless times during his life, often being mistreated as a result. Despite his efforts to present as the man that he is, he considers the breasts an undesired visible marker of something he is not—female—that subjects him to mistreatment, social stigma, and related symptoms of gender dysphoria and emotional distress. At various points in his life, Mr. Flack has felt helpless and has had thoughts of suicide and self-harm because of the presence of his breasts.

70.     In an effort to conceal his breasts from public view, Mr. Flack has engaged in a technique called "binding." Binding flattens or reduces the appearance of breasts with chest binders or other constricting materials. Because of Mr. Flack's cerebral palsy and use of a wheelchair, he needs the help of others to bind his chest. In addition, Mr. Flack finds binding extremely painful and has experienced skin irritation and sores as a result of binding. As a result,

he does not consider binding a viable or safe long-term option to alleviate the gender dysphoria associated with his breasts.

71.     In late 2016, with the support of his psychotherapist and medical providers, Mr. Flack sought to obtain chest reconstruction surgery to further his gender transition and treat the ongoing gender dysphoria he has experienced for many years because of the presence of female-appearing breasts on his body. In particular, and consistent with the prevailing standards of care for treating gender dysphoria, Mr. Flack has sought to obtain chest reconstruction surgery in the form of a double mastectomy and male chest reconstruction. These procedures are commonly referred to as "top surgery" or "upper surgery" for transgender men. They are widely accepted and effective surgical procedures for treating gender dysphoria in transgender men.

72.     In consultation with his primary care providers and psychotherapist, Mr. Flack consulted with Clifford King, MD, PhD, a plastic surgeon in Madison, Wisconsin who specializes in providing transition-related surgeries for transgender people.

73.     Mr. Flack provided Dr. King letters of support from Mr. Bergman, his psychotherapist; Dr. DeGueme, his endocrinologist; Erich G. Metzler, MD, the gynecologist who performed his hysterectomy and oophorectomy; and Maryam Shittu, MD, his primary care physician at the time. In their letters, each provider offered their medical opinion that Mr. Flack has gender dysphoria and meets the criteria for male chest reconstructive surgery. Mr. Bergman wrote that, in his professional opinion, Mr. Flack "is quite comfortable and well-adjusted in terms of his male gender identification," that "he is highly intelligent / insightful and most certainly possesses the capacity to make fully informed decisions and consent for treatment, including gender reassignment surgeries," and that Mr. Flack "has my full recommendation and support with respect to his request for surgery." Dr. DeGueme described Mr. Flack's diagnosis

and treatments for gender dysphoria and concluded that "[h]e meets and exceeds the criteria as set forth by the World Professional Association for Transgender Healthcare" for the requested surgery. His primary care physician confirmed his gender dysphoria diagnosis and wrote that "[t]he next step in his treatment is Bilateral Mastectomies with Reconstructive Surgery." His gynecologist confirmed his previous surgeries and his knowledge of Mr. Flack's hormone treatment for gender dysphoria.

74.     Following a lengthy consultation in which Dr. King and Mr. Flack discussed the requested procedures and the associated risks and benefits, Dr. King determined that Mr. Flack met the criteria for obtaining chest reconstruction under the applicable standards of care.

75.     Following the consultation, Dr. King, through Dean Health Systems, Inc., submitted a request on July 18, 2017 for prior authorization to DHS for Wisconsin Medicaid coverage of the chest reconstruction surgeries (bilateral complete simple mastectomy and breast reconstruction). The request submitted to DHS included a prior authorization form completed by Dr. King, Dr. King's clinical notes, the letters of support from Mr. Flack's mental health and medical providers, and surgical notes from his hysterectomy and oophorectomy.

76.     DHS denied the prior authorization request by letter, dated August 2, 2017. For both the requested mastectomy and breast reconstruction procedures, the denial letter stated, "THE SERVICE REQUESTED IS NOT A COVERED BENEFIT," accompanied by the notation, "08/02/17: Per WI administrative code DHS 107.03(24) transsexual surgery is a non-covered service."

77.     Mr. Flack immediately petitioned for a review of the DHS decision by requesting a hearing before the Wisconsin Department of Administration's Division of Hearings and

21

Appeals ("DHA"), the state agency designated to adjudicate administrative appeals involving

DHS.

78.     As part of that administrative appeal process, DHS notified DHA that its denial of

preauthorization was based solely on the Challenged Exclusion. DHS noted that it recognized the

requested surgeries as medically-accepted treatments for gender dysphoria, but that it did not

consider the medical necessity of the requested services for Mr. Flack in reaching its decision. In

a September 25, 2017 letter to DHA, DHS stated the following:

> Mr. Flack is a 29 year old transgender man who is seeking the aforementioned
> services as part of gender confirmation surgery. The primary diagnosis listed with
> the prior authorization request is transsexualism (F64.0). Mr. Flack also carries a
> diagnosis of gender dysphoria which is an accepted medical indication for the
> surgical treatment requested.
>
> This request was denied by [DHS's Division of Medicaid Services] as Wis. Admin.
> Code 107.03(24) specifically lists 'transsexual surgery' as a non-covered service
> under medical assistance.
>
> The medical necessity of the services requested *was not taken into account* as
> reimbursement by Medicaid for this type of surgery is currently excluded by DHS
> regulations.

(emphasis added).

79.     Following an administrative hearing on November 14, 2017, the administrative

law judge dismissed Mr. Flack's petition, affirming the denials on the basis that the requested

surgeries are excluded from coverage by the Wisconsin Medicaid program under the Challenged

Exclusion.

80.     In his decision, the administrative law judge found that "[t]he requested surgery is

part of [Mr. Flack's] transition from female to male." The judge further added that "[w]hile the

proposed surgery presumably would favorably address [Mr. Flack's] gender dysphoria, the

22

surgery nevertheless is transsexual surgery that specifically is not covered under the code," and upheld DHS's denial of prior authorization based solely on the Challenged Exclusion.

81.     Mr. Flack's timely rehearing request was denied by the administrative law judge on December 11, 2017.

82.     Since being denied coverage for surgery last summer, Mr. Flack's gender dysphoria has worsened considerably. Without any other financial means to obtain these medically necessary procedures, Mr. Flack feels hopeless and has experienced profound depression and emotional distress resulting from the denial and his inability to complete these critical steps of his gender transition. He continues to experience distress at the sight of his breasts and has occasional thoughts of self-harming behavior to remove the breasts himself, as well as more frequent suicidal thoughts, though he has not acted on those thoughts. He is also embarrassed to go into public because of his experiences being treated as a woman by others due to the presence of his breasts, and avoids social situations whenever possible. When in public, Mr. Flack is self-conscious about his breasts and, when he becomes aware that others might notice them, experiences immediate distress and does whatever he can to conceal them from view.

83.     Without Wisconsin Medicaid coverage, Mr. Flack lacks the financial means to pay for chest reconstruction surgeries himself and would be unable to obtain those surgeries.

84.     Without chest reconstruction surgeries, Mr. Flack's psychological health would continue to decline. The failure of Defendants to provide coverage for the necessary treatments of Mr. Flack's gender dysphoria absent the preliminary relief ordered in this lawsuit, and the consequent delays in his ability to obtain medically necessary care, has caused him serious harm

and will continue to have serious detrimental effects on his short- and long-term health and well-being.

### *Plaintiff Sara Ann Makenzie*

85.     Plaintiff Sara Ann Makenzie is a 42-year-old resident of Baraboo, Wisconsin. Ms. Makenzie was born in, and has been a lifelong resident of, Wisconsin.

86.     Ms. Makenzie has been diagnosed with mental health disabilities, including bipolar disorder, since childhood. Due to her disabilities, Ms. Makenzie is unable to work and relies on SSI for her income and Wisconsin Medicaid for her health care needs.

87.     Ms. Makenzie is a transgender woman. That is, she was assigned male at birth but is female and has lived fully in accordance with her female gender identity since at least 2012.

88.     Ms. Makenzie has been diagnosed with gender dysphoria.

89.     Ms. Makenzie's birth certificate and current identity documents reflect her female sex. In 2013, Ms. Makenzie obtained a court-ordered name change from her traditionally male birth name to her chosen female name, Sara Ann Makenzie. Also in 2013, she obtained a Wisconsin driver's license with her new name and a female sex marker. In 2014, Ms. Makenzie obtained a United States Passport reflecting her name and containing a female sex marker. In 2017, she obtained an amended Wisconsin birth certificate also listing her legally-changed name and indicating that her sex is female.

90.     To treat her gender dysphoria, Ms. Makenzie has been on hormone therapy since 2013, as prescribed by and under the supervision of her doctors. Her symptoms of gender dysphoria diminished significantly after beginning hormone therapy. Her hormone treatments are currently paid for by Wisconsin Medicaid but, due to the Challenged Exclusion, she is concerned that her coverage for these treatments could end at any time.

91.     In 2013, Ms. Makenzie consulted with her doctor and sought Wisconsin Medicaid coverage for genital reconstruction as part of her medical gender transition and to treat her gender dysphoria. Her doctor's office told her that Wisconsin Medicaid would not cover that surgery because of the Challenged Exclusion.

92.     Ms. Makenzie experienced gender dysphoria related to her lack of female-appearing breasts. Although her hormone treatments resulted in some breast growth, those treatments alone proved inadequate for the development of female-appearing breasts. As a result, Ms. Makenzie has been perceived by others to be a "man" and has consequently experienced mistreatment and harassment. In 2017, in consultation with her medical providers, Ms. Makenzie sought to obtain chest reconstruction surgery, in the form of breast augmentation, to outwardly appear as the woman that she is and to treat her gender dysphoria.

93.     Ms. Makenzie contacted DHS to inquire about whether Wisconsin Medicaid would cover the chest reconstruction. DHS advised her that the procedure was not a covered benefit because of the Challenged Exclusion.

94.     After learning that chest reconstruction would not be covered by Wisconsin Medicaid, Ms. Makenzie sought and obtained a personal loan from her bank of approximately $5,000 to pay out-of-pocket for the procedure. Due to her lack of income and limited financial means, paying back this loan has imposed financial hardship on Ms. Makenzie. She accepted this hardship, however, because she believed it to be her only option to obtain this medically necessary care for her gender dysphoria and to further her gender transition.

95.     In 2017, Ms. Makenzie underwent chest reconstruction (breast augmentation) under the care of Venkat K. Rao, MD, MBA, a plastic surgeon with the University of Wisconsin

Health System and a faculty member at the University of Wisconsin School of Medicine and Public Health. She paid for this procedure using funds from the personal loan.

96.     The chest reconstruction procedure has been an effective treatment for Ms. Makenzie's gender dysphoria. As a result of that surgery, Ms. Makenzie has experienced fewer instances of being mistaken as male by others and of being mistreated or harassed for having masculine features.

97.     Ms. Makenzie continues to experience profound distress at the sight of her male-appearing genitalia. To complete her gender transition and further treat her gender dysphoria, Ms. Makenzie needs additional surgeries. Specifically, her medical providers recommend that she obtain genital reconstruction in the form of a bilateral orchiectomy and vaginoplasty. For transgender women like Ms. Makenzie, these clinically accepted procedures result in the creation of female-appearing external genitalia. Moreover, the applicable standards of care recognize these procedures as effective in treating gender dysphoria in transgender women. Ms. Makenzie has recently consulted with a plastic surgeon, Katherine Gast, MD, at UW Health in Madison, Wisconsin, whose practice focuses on the treatment of transgender people. Dr. Gast advised Ms. Makenzie that she meets the criteria under the applicable standards of care to obtain genital reconstruction surgery for the treatment of gender dysphoria.

98.     As with her earlier chest reconstruction surgery, Ms. Makenzie contacted her insurer to inquire about whether Wisconsin Medicaid would cover genital reconstruction. Once again, her insurer informed her that this was not a covered procedure under the state Medicaid regulations. Dr. Gast also advised Ms. Makenzie that Wisconsin Medicaid would not cover the procedures because of the Challenged Exclusion.

99.     Without Medicaid coverage, Ms. Makenzie lacks the financial means to obtain genital reconstruction surgery and would be unable to obtain that surgery.

100.     Ms. Makenzie's inability to obtain this necessary care due to the Challenged Exclusion based on the lack of Wisconsin Medicaid coverage for her transition-related care has resulted, and will continue to result, in exacerbated but avoidable symptoms of gender dysphoria and significant emotional distress. She has experienced and continues to experience profound distress at the sight of her male-appearing genitalia, causing her anxiety, depression, and strained personal and romantic relationships. She has engaged in self-harming behaviors, including cutting in her genital area, and has experienced suicidal ideation and other thoughts of self-harm as a result of being unable to complete her gender transition. Ms. Makenzie will continue to have serious detrimental effects on her short- and long-term health and well-being as a consequence of her inability to obtain genital reconstruction surgery because of the Challenged Exclusion.

### *Plaintiff Marie Kelly*

101.     Plaintiff Marie Claire Kelly is a 38-year-old resident of Milwaukee, Wisconsin. Ms. Kelly was born in Chicago, Illinois and has lived in Wisconsin for approximately 22 years.

102.     Ms. Kelly is a low-income individual. She has been enrolled in Wisconsin Medicaid through the BadgerCare Plus program since approximately 2014. She relies on Wisconsin Medicaid for her health care needs.

103.     Ms. Kelly is a transgender woman. That is, she was assigned male at birth but is female and has known herself to be female for most of her life. Ms. Kelly has lived fully in accordance with her female gender identity since 2010.

104.     Ms. Kelly has been diagnosed with gender dysphoria.

105.     In 2012, Ms. Kelly obtained a court-ordered name change from her traditionally male birth name to her chosen female name, Marie Claire Kelly. That same year, she obtained a Wisconsin state identification card with that name and a female sex marker.

106.     To treat her gender dysphoria, Ms. Kelly has been on hormone therapy since 2011, as prescribed by and under the supervision of her doctors. Ms. Kelly's hormone treatments have resulted in the development of female-appearing secondary sex characteristics and have reduced her gender dysphoria resulting from the incongruence between her female identity and her body. Her hormone treatments are currently paid for by Wisconsin Medicaid but, due to the Challenged Exclusion, she is concerned that her coverage for these treatments could end at any time. Ms. Kelly is also under the care of a therapist.

107.     Ms. Kelly continues to experience exacerbated gender dysphoria because of her male-appearing genitalia and facial hair. To further her gender transition and treat her gender dysphoria, Ms. Kelly wishes to obtain gender confirming surgeries. Specifically, she would like to obtain an orchiectomy, female genital reconstruction, female chest reconstruction, and electrolysis for facial hair removal. She has thought about getting these surgeries for years to affirm her female gender identity and treat her gender dysphoria and has discussed these procedures with her doctors.

108.     Three or four years ago, she called her Wisconsin Medicaid managed care organization (at the time, Anthem Blue Cross) to ask whether her insurance would cover transition-related medical procedures, and was told that those procedures were not covered. She was discouraged by this information and experienced distress at the idea of being unable to obtain surgeries to treat her gender dysphoria and conform her appearance to her female identity.

28

109.     In August 2018, Ms. Kelly called her current Wisconsin Medicaid managed care organization, Children's Community Health, to inquire about whether transition-related care was covered. Again, she was told that these services are not covered. Ms. Kelly was once again disheartened by learning this information. She is unable to imagine herself with male-appearing genitalia and other physical traits for the rest of her life, the thought of which causes her distress and exacerbates her gender dysphoria.

110.     Based on her knowledge that Wisconsin Medicaid will not cover these procedures and her inability to pay for these procedures herself because of her low income, she has been unable to obtain any transition-related surgical treatments.

111.     If Wisconsin Medicaid covered these procedures, Ms. Kelly would seek an orchiectomy and electrolysis in the near future, and would seek to obtain the other surgical treatments over the next several years.

112.     Ms. Kelly's inability to obtain medically necessary treatments for gender dysphoria due to the Challenged Exclusion has resulted, and will continue to result, in exacerbated but avoidable symptoms of gender dysphoria and related emotional distress.

### *Plaintiff Courtney Sherwin*

113.     Plaintiff Courtney Sherwin is a 35-year-old woman who resides in Janesville, Wisconsin. Ms. Sherwin was born in Illinois and has lived in Wisconsin for approximately four years.

114.     Ms. Sherwin is a low-income individual. She has been enrolled in Wisconsin Medicaid through the BadgerCare Plus program for approximately two years. She relies on Wisconsin Medicaid for her health care needs.

115.    Ms. Sherwin is a transgender woman. That is, she was assigned male at birth but is female. She has known herself to be female since around the age of 10. In December 2017, she came out as transgender. She is undergoing a gender transition and is living fully in accordance with her female gender identity.

116.    Ms. Sherwin is currently seeking a court-ordered name change from her traditionally male birth name to her chosen female name, Courtney Sherwin. After obtaining the court-ordered name change, Ms. Sherwin plans to correct her Social Security records, birth certificate, and Wisconsin driver's license to reflect her name and female sex.

117.    Ms. Sherwin has been diagnosed with gender dysphoria.

118.    Ms. Sherwin is undergoing a medical gender transition under the care of her primary care doctor and her treating therapist.

119.    Prior to commencing her gender transition in late 2017, Ms. Sherwin experienced severe gender dysphoria resulting from the incongruence between her female gender identity and living outwardly and being perceived by others to be a man. Her gender dysphoria caused her significant anxiety, depression, and emotional distress.

120.    To further her gender transition and treat her gender dysphoria, Ms. Sherwin began receiving hormone therapy, as prescribed by her primary care provider, in March 2018. This includes a testosterone blocker (spironolactone), estrogen, and progesterone. Wisconsin Medicaid covers spironolactone but does not cover her estrogen or progesterone prescriptions. She pays approximately $90 per month out-of-pocket for those prescriptions because Wisconsin Medicaid does not cover them.

121.    Unfortunately, Ms. Sherwin has not tolerated the spironolactone treatments. She has experienced adverse side effects from that medication, including exacerbated symptoms of

irritable bowel syndrome, respiratory problems, nausea, fatigue, dizziness, difficulty focusing, dry mouth, and blackouts. Consequently, her primary care doctor, Adrienne R. Hampton, M.D., referred her to a urologist for a consultation about obtaining an orchiectomy, a surgical procedure that would stop her natural production of testosterone and obviate the need for her continued use of spironolactone.

122.    In May 2018, Ms. Sherwin consulted with a urologist, Andrea Wozniak, M.D., to discuss obtaining an orchiectomy. Dr. Wozniak determined that an orchiectomy was a medically necessary treatment for Ms. Sherwin and that she was eligible to obtain the surgery because of her adverse reaction to spironolactone.

123.    Dr. Wozniak agreed to perform an orchiectomy on Ms. Sherwin and submitted a prior authorization request to Ms. Sherwin's Wisconsin Medicaid managed care organization, Dean Health Plan, seeking coverage for the procedure. The prior authorization request included letters of support for surgery from Ms. Sherwin's primary care doctor, Dr. Hampton, and her treating therapist, Holli K. Tinder, MS, LPC, CSAC. The prior authorization request also included a report by a clinical psychologist, Georgien Dudzek, Psy.D., who performed an independent psychological evaluation of Ms. Sherwin on July 16, 2018 in connection with her request for surgery. Dean Health Plan denied the prior authorization request based on the Challenged Exclusion.

124.    Ms. Sherwin lacks the financial resources to pay out-of-pocket for an orchiectomy without Wisconsin Medicaid coverage for the procedure. She is concerned about the worsening health effects from her continued use of spironolactone if she remains unable to obtain an orchiectomy.

125.    Ms. Sherwin experiences significant gender dysphoria because of her deep, male-sounding voice. Although her hormone therapy has helped to reduce the deepness of her voice somewhat, others still frequently perceive her to be a man because of the sound of her voice. In May 2018, Ms. Sherwin's primary care doctor, Dr. Hampton, referred her to a speech pathologist to discuss obtaining voice therapy as part of her gender transition and treatment for gender dysphoria. Ms. Sherwin had a consultation with a speech pathologist in June 2018. A prior authorization request for voice therapy was denied by Dean Health Plan, Ms. Sherwin's Wisconsin Medicaid managed care organization.

126.    In July 2018, Ms. Sherwin had a consultation with another speech pathologist, Jennifer Knishka, who also recommended voice therapy treatments. On or about July 19, 2018, Ms. Knishka contacted Dean Health Plan, which informed her that the service was not covered because of a benefit exclusion.

127.    Dr. Dudziek, the psychologist who conducted an independent psychological evaluation of Ms. Sherwin in July 2018, stated in her written report that Ms. Sherwin's voice "causes significant anxiety and stress and makes it difficult for her to pass as female," "strongly recommended that she participate in voice therapy to develop gender specific vocal characteristics and non-verbal communication patterns that facilitate comfort with her gender identity," and noted that "[t]here may also be options for voice feminization surgery to consider if voice therapy is not sufficient."

128.    In July 2018, Ms. Sherwin filed a grievance with Dean Health Plan regarding the denial of coverage for voice therapy. In August 2018, Ms. Sherwin appeared telephonically before Dean Health Plan's Grievance and Appeal Committee to contest the denial of prior authorization for voice therapy. At the hearing, Ms. Sherwin told the Committee that her

masculine-sounding voice causes her significant gender dysphoria and triggers anxiety and depression. Because of the gender dysphoria she experiences because of her voice, she also told the Committee that she felt that her inability to obtain this care was causing her social anxiety and forcing her to turn into a hermit.

129.   On or about September 7, 2018, Dean Health Plan verbally notified Ms. Sherwin that the Committee had upheld the prior authorization denial and that coverage for voice therapy would be denied because it was a transition-related service. The Dean Health Plan representative advised Ms. Sherwin to file a grievance directly with Wisconsin Medicaid after she received her formal denial letter. Ms. Sherwin subsequently contacted the Wisconsin Medicaid office's ombudsperson regarding her grievance.

130.   After learning of the prior authorization denials for her voice therapy in June 2018 and her prior authorization denial for an orchiectomy in September 2018, Ms. Sherwin experienced extreme emotional distress, felt hopeless, and contemplated suicide.

131.   If covered by Wisconsin Medicaid, Ms. Sherwin would begin voice therapy and seek to obtain an orchiectomy immediately.

132.   Ms. Sherwin intends to seek other surgical treatments for gender dysphoria, including female genital reconstruction and female chest reconstruction, in the future. If Wisconsin Medicaid covered transition-related medical and surgical procedures, Ms. Sherwin would seek to complete her medical transition over the next year.

133.     Ms. Sherwin's inability to obtain treatments for gender dysphoria due to the Challenged Exclusion has resulted, and will continue to result, in exacerbated but avoidable symptoms of gender dysphoria and related anxiety, depression, and extreme emotional distress.

## INJURIES TO PLAINTIFFS

134.     Through their acts and omissions described above, Defendants have injured and are continuing to injure Plaintiffs by denying them Wisconsin Medicaid coverage for medically necessary treatments for gender dysphoria because of the Challenged Exclusion.

135.     Defendants' promulgation and enforcement of the Challenged Exclusion, and Defendants' denial of Wisconsin Medicaid coverage for medically necessary treatments for gender dysphoria to Plaintiffs pursuant to the Challenged Exclusion, have exposed Plaintiffs to heightened gender dysphoria, depression, anxiety, and emotional distress resulting from their inability to obtain medically necessary health care.

136.     Plaintiffs have also suffered embarrassment, humiliation, social isolation, and stigma resulting from their inability to obtain medically necessary treatments for gender dysphoria because of Defendants' enforcement of the Challenged Exclusion.

137.     Plaintiffs have suffered physical pain and injuries as a result of Defendants' enforcement of the Challenged Exclusion, including, but not limited to, Plaintiffs' injuries from self-harming acts related to their exacerbated gender dysphoria and Mr. Flack's pain and injuries sustained from chest binding to conceal his female-appearing breasts.

138.     Plaintiffs have suffered economic injuries, including out-of-pocket expenses incurred in seeking and/or obtaining medical procedures not covered by Wisconsin Medicaid because of Defendants' promulgation and enforcement of the Challenged Exclusion, including,

but not limited to, Ms. Makenzie's out-of-pocket expenses for her chest reconstruction surgery in 2017 and Ms. Sherwin's out-of-pocket expenses for her hormone treatments.

139.    As a direct and proximate result of Defendants' denial of coverage for Plaintiffs' medically necessary gender-confirming health care because of the Challenged Exclusion, Plaintiffs' respective gender transitions have been impeded and their symptoms of gender dysphoria and related distress have increased.

140.    If Defendants continue to deny Wisconsin Medicaid coverage to Plaintiffs for their medically necessary treatments for gender dysphoria, the above-referenced harms to their physical and emotional health and well-being will continue, subjecting each of them to significant ongoing risks to their health and safety.

## CLASS ACTION ALLEGATIONS

141.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2).

142.    Plaintiffs request that the Court certify the following class ("Proposed Class") under Fed. R. Civ. P. 23(b)(2):

> All transgender individuals who are or will be enrolled in Wisconsin Medicaid, have or will have a diagnosis of gender dysphoria, and are seeking or will seek surgical treatments or medical treatments or services to treat gender dysphoria.

143.    Plaintiffs Cody Flack, Sara Ann Makenzie, Marie Kelly, and Courtney Sherwin are each adequate representatives of the Proposed Class. Plaintiffs are all transgender individuals with a diagnosis of gender dysphoria enrolled in Wisconsin Medicaid who are seeking, or intend to seek, surgical treatments and/or other medical treatments or services (including hormone treatments) to treat gender dysphoria.

35

144.     The Proposed Class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because

the class is so numerous that joinder of all members is impracticable. Several thousand

Wisconsin Medicaid recipients are estimated to be transgender individuals who are receiving

medical treatment for gender dysphoria or may seek such treatments in the future. In addition,

because of the transient nature of the Wisconsin Medicaid population, in part because

individuals' income may make them eligible or ineligible for Medicaid at various points in their

lives, it is impractical to join all transgender individuals with gender dysphoria who may be

denied Wisconsin Medicaid coverage by the Challenged Exclusion at some point.

145.     The Proposed Class satisfies the commonality requirements of Fed. R. Civ. P.

23(a)(2) because there are questions of law and fact common to the class. Pursuant to the

Challenged Exclusion, Defendants have acted or refused to act on grounds generally applicable

to the Proposed Class. This action raises questions of law common to all members of the

Proposed Class, including (a) whether the Challenged Exclusion, facially and as applied to

members of the Proposed Class, violates the prohibitions on sex discrimination under Section

1557 of the Patient Protection and Affordable Care Act; (b) whether the Challenged Exclusion,

facially and as applied to members of the Proposed Class, violates the availability and

comparability provisions of the federal Medicaid Act; and (c) whether the Challenged Exclusion,

facially and as applied to members of the Proposed Class, violates the Equal Protection Clause of

the Fourteenth Amendment to the U.S. Constitution. All members of the Proposed Class share a

common question of fact: Would their surgical treatments and other medical treatments or

services (including hormone treatments) for gender dysphoria be covered by Wisconsin

Medicaid but for Defendants' continuing enforcement of the Challenged Exclusion?

146.     The Proposed Class satisfies the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the named Plaintiffs' claims are typical of the claims of the claims of the Proposed Class. Mr. Flack, Ms. Makenzie, Ms. Kelly, Ms. Sherwin, and all members of the Proposed Class, are all individuals who have been unable, are unable, or will be unable to obtain Wisconsin Medicaid coverage for medically necessary treatments for gender dysphoria because of the Challenged Exclusion, and, as a result, have faced or will face delayed or denied access to these medically necessary treatments. Plaintiffs and members of the Proposed Class share the same legal claims under Section 1557, the Medicaid Act, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

147.     The Proposed Class satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Proposed Class. The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Proposed Class: a declaratory judgment that the Challenged Exclusion violates Section 1557, the Medicaid Act, and the Equal Protection Clause, and preliminary and permanent injunctions enjoining Defendants from enforcing the Challenged Exclusion and denying them access to medically necessary transition-related care based on that exclusion. Each of the named Plaintiffs seeks this relief to benefit themselves and to protect other low-income transgender Wisconsin residents who are or will be enrolled in Wisconsin Medicaid. In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Proposed Class fairly and adequately. The class representatives have no interests that are antagonistic to the interests of other members of the Proposed Class.

148.     The Proposed Class further satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because counsel for the Proposed Class will fairly and adequately represent the interests

of the Proposed Class. The Proposed Class is represented by counsel from Relman, Dane &

Colfax PLLC, a national civil rights law firm based in Washington, D.C.; McNally Peterson,

S.C., a law firm based in Milwaukee, Wisconsin; and the National Health Law Program

("NHeLP"), a national health rights advocacy organization. Relman, Dane & Colfax and

McNally Peterson have significant experience litigating civil rights cases, including transgender

rights cases, and complex class action civil rights cases in federal court. NHeLP has significant

expertise in Medicaid issues and has extensive experience litigating Medicaid-related lawsuits,

including class actions, in state and federal courts around the country.

149.     A class action is superior to other available methods for fairly and efficiently

adjudicating this litigation and protecting the rights of the named Plaintiffs and the members of

the Proposed Class.

## FIRST CAUSE OF ACTION

**Unlawful Discrimination on the Basis of Sex in Violation of
Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116**

*Against Defendant Wisconsin Department of Health Services (for declaratory and injunctive
relief for Plaintiffs and all similarly situated individuals, and for compensatory damages for
Plaintiffs only) and Defendant Palm (for declaratory and injunctive relief for Plaintiffs and all
similarly situated individuals)*

150.     Plaintiffs reallege and incorporate by reference paragraphs 1 to 149 of this

Complaint.

151.     Under Section 1557 of the Affordable Care Act, "an individual shall not . . . be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under,

any health program or activity, any part of which is receiving Federal financial assistance,

including credits, subsidies, or contracts of insurance, or under any program or activity that is

administered by an Executive Agency or any entity established under this title (or amendments)"
on the basis of sex. 42 U.S.C. § 18116.

152.    Section 1557's prohibitions on sex discrimination are enforceable by Plaintiffs in
a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference. 42
U.S.C. § 18116(a).

153.    The Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24),
107.10(4)(p), on its face and as applied to Plaintiffs and members of the Proposed Class, violates
Section 1557's prohibition against discrimination on the basis of sex in a health program or
activity receiving federal financial assistance.

154.    The individual Plaintiffs have been and are continuing to be injured by
Defendants' application of the Challenged Exclusion to deny them Wisconsin Medicaid
coverage for surgical treatments and other medical treatments and services for gender dysphoria,
and have suffered damages as a result.

### SECOND CAUSE OF ACTION

**Violation of the Medicaid Act's Availability Requirements,
42 U.S.C. § 1396a(a)(10)(A)**

*Against Defendant Palm (for declaratory and injunctive relief for Plaintiffs and all similarly
situated individuals)*

155.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 154 of this
Complaint.

156.    The Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24),
107.10(4)(p), and the Secretary's refusal, based on the Challenged Exclusion, to provide
coverage for medical and/or surgical treatments and services for gender dysphoria to Plaintiffs
and members of the Proposed Class, eliminate mandatory Medicaid coverage of medically

necessary services and violate Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A),

which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION

**Violation of the Medicaid Act's Comparability Requirements,
42 U.S.C. § 1396a(a)(10)(B)**

***Against Defendant Palm (for declaratory and injunctive relief for Plaintiffs and all similarly
situated individuals)***

157.   Plaintiffs reallege and incorporate by reference paragraphs 1 to 156 of this

Complaint.

158.   The Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24),

107.10(4)(p), and the Secretary's refusal, based on the Challenged Exclusion, to provide

coverage for medical and/or surgical treatments and services for gender dysphoria to Plaintiffs

and members of the Proposed Class, while covering the same services for other Wisconsin

Medicaid beneficiaries with different diagnoses, violate Medicaid's comparability requirement,

42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983 Based on the Deprivation of
Plaintiffs' Rights Under the Equal Protection Clause of the Fourteenth Amendment**

***Against Defendant Palm (for declaratory and injunctive relief for Plaintiffs and all similarly
situated individuals)***

159.   Plaintiffs reallege and incorporate by reference paragraphs 1 to 158 of this

Complaint.

160.   First, the Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24),

107.10(4)(p), on its face and as applied to Plaintiffs and members of the Proposed Class,

impermissibly discriminates against Plaintiffs and members of the Proposed Class on the basis of

sex and violates their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

161.    Second, the Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p), on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs and members of the Proposed Class for being transgender and violates their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

162.    Defendants' promulgation and continued enforcement of the Challenged Exclusion did not, and do not, serve any rational, legitimate, important, or compelling state interest. Rather, the Challenged Exclusion serves only to prevent Plaintiffs and members of the Proposed Class from obtaining medical and/or surgical care and services that will enable them to treat their gender dysphoria, complete their gender transitions, and fully live as their authentic selves. In effect, the Challenged Exclusion punishes vulnerable transgender people for being transgender and taking necessary steps to live in accordance with their gender identities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Certify a class of all transgender individuals who are or will be enrolled in Wisconsin Medicaid, have or will have a diagnosis of gender dysphoria, and who are seeking or will seek surgical or medical treatments or services to treat gender dysphoria (the "Class");

B.    Name Cody Flack, Sara Ann Makenzie, Marie Kelly, and Courtney Sherwin as representatives of the Class, and appoint Plaintiffs' counsel at Relman, Dane & Colfax PLLC; McNally Peterson, S.C.; and the National Health Law Program as Class counsel;

C.     On behalf of Plaintiffs and all similarly situated individuals, issue preliminary and permanent injunctions enjoining any further enforcement or application of the Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p), and directing Defendants and their agents to provide Medicaid coverage for all surgical treatments and other medical treatments and services for gender dysphoria (including hormone treatments) without regard to the Challenged Exclusion;

D.     On behalf of Plaintiffs and all similarly situated individuals, enter a declaratory judgment that the Challenged Exclusion, Wis. Adm. Code §§ DHS 107.03(23)-(24), 107.10(4)(p), facially and as applied to Plaintiffs and members of the Proposed Class:

     1.     Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including sex stereotyping, gender identity, being transgender, and undergoing a gender transition);

     2.     Violates the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A);

     3.     Violates the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B); and

     4.     Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including sex

stereotyping, gender identity, being transgender, and undergoing a

gender transition), and for being transgender;

E.     Award compensatory damages to the individual Plaintiffs, as permitted under

Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C.

§ 18116, in an amount that would fully compensate each of them for: (1) the

harms to their short- and long-term health and well-being, including emotional

distress, from being denied access to medically necessary health care as a result of

the Challenged Exclusion and its application to them, (2) their economic losses,

and (3) all other injuries that have been caused by Defendants' acts and omissions

alleged in this Complaint;

F.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42

U.S.C. § 1988 or other applicable statutes; and

G.     Award such other and further relief as the Court may deem just and proper.


Dated: June 27, 2019                              Respectfully submitted,

                                                  /s/ Joseph J. Wardenski
                                                  Joseph J. Wardenski*
                                                  Jennifer I. Klar*
                                                  Orly T. May*
                                                  Alexa T. Milton*
                                                  RELMAN, DANE & COLFAX PLLC
                                                  1223 19th Street, NW, Suite 600
                                                  Washington, DC  20036
                                                  Telephone: (202) 728-1888
                                                  Facsimile: (202) 728-0848
                                                  jwardenski@relmanlaw.com
                                                  jklar@relmanlaw.com
                                                  omay@relmanlaw.com
                                                  amilton@relmanlaw.com

Robert Theine Pledl (SBN 1007710)
DAVIS & PLEDL, S.C.
1433 N. Water Street, Suite 400
Milwaukee, WI 53202
(414) 488-1354
rtp@davisandpledl.com

Abigail Coursolle*
Catherine McKee*
NATIONAL HEALTH LAW PROGRAM
200 N. Greensboro Street, Suite D-13
Carrboro, NC  27510
Telephone: (919) 968-6308
Facsimile: (919) 968-8855
coursolle@healthlaw.org
mckee@healthlaw.org

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*