IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CODY FLACK, et al.,
*Individually and on behalf of all others similarly situated*

                    Plaintiffs,                              OPINION AND ORDER

        v.
                                                             18-cv-309-wmc

WISCONSIN DEPARTMENT OF HEALTH
SERVICES, et al.,

                    Defendants.

Over a year ago, this court preliminarily enjoined enforcement of Wis. Admin. Code §§ DHS 107.03(23)-(24) (the "Challenged Exclusion") against the originally named plaintiffs, Cody Flack and Sara Ann McKenzie, who are transgender individuals with severe gender dysphoria. The Challenged Exclusion denied coverage for medically prescribed gender-conforming surgery and related hormones under Wisconsin Medicaid. Since then, the court broadened the preliminary injunction enjoining enforcement during the pendency of the lawsuit and certified a class.[1] (Prelim. Injunction Op. & Order (dkt. #70) 39; Class Cert. & Prelim. Injunction Amend. Op. (dkt. #150) 27.) Presently before the court is plaintiffs' motion for summary judgment, seeking declaratory and permanent

---

[1] Previously, the Challenged Exclusion only referred to Wis. Admin. Code § DHS 107.03(23)-(24). (*See, e.g.*, Class Cert. & Prelim. Injunction Amend. Op. (dkt. #150) 1; Prelim. Injunction Op. & Order (dkt. #70) 6.) However, plaintiffs were granted leave to file a second amended complaint to (1) include Wis. Admin. Code § DHS 107.10(4)(p) as part of the "Challenged Exclusion," (2) replace former defendant Seemeyer with DHS Secretary-Designee Andrea Palm, and (3) conform the class definition to that already certified by the court. (*See* Consent Mot. for Leave to File 2d Amend. Compl. (dkt. #189) 1; June 26, 2019 Order (dkt. #208).) Accordingly, throughout the rest of the opinion, the "Challenged Exclusion" will include § DHS 107.10(4)(p) and defendants refer to DHS and Palm.

injunctive relief.  (Pls.' Mot. Summ. J. (dkt. #151) 1-2.)  For the reasons that follow, plaintiffs' motion will be granted.[2]

UNDISPUTED FACTS[3]

**A. Gender Dysphoria**

**1. Diagnosis**

At its most basic level, gender identity is understood by the medical profession to mean one's internal sense of one's sex.  Everyone has a gender identity, and for most people, their gender identity is consistent with the sex designated on their birth certificate (variously referred to in medical literature as one's "assigned," "designated" or "natal" sex).  Transgender people have a gender identity that differs from their natal sex.  Accordingly, a transgender woman was assigned a natal sex of male but has a female gender identity, while a transgender man was assigned a natal sex of female but has a male gender identity.

---

[2] Also before the court is plaintiffs' motion to strike the declaration and testimony of Michelle Ostrander, Ph.D.  (Mot. Strike (dkt. #192) 1-2.)  That motion will be denied.

[3] Viewing the facts in the light most favorable to defendants as the non-moving parties, the following facts are material and undisputed for purposes of summary judgment, except where noted below.  These facts are drawn from the parties' stipulated facts (dkt. #154) and plaintiffs' proposed findings of fact (dkt. #153), as well as defendants' responses (dkt. #183) and plaintiffs' replies (dkt. #196).  The court also relies on findings of fact set forth in its prior opinions to which neither party has objected.  While the court greatly appreciates the parties stipulating to certain proposed findings of fact, doing so is significantly less helpful when they largely overlap with plaintiffs' separate, proposed findings of fact.  (*Compare* Stip. PFOF (dkt. #154) ¶¶ 2-9, 12, 92-95 *with* Pls.' PFOF (dkt. #153) ¶¶ 13-25.)  Likewise, parties are reminded that in proposing facts, "[e]ach fact must be proposed in a separate, numbered paragraph, *limited as nearly as possible to a single factual proposition*."  (Prelim. Pretrial Packet (available at dkt. #114) 3 (emphasis added).)  While objecting to the inclusion of more than one fact per numbered paragraph is often times a matter of form over substance, streamlining proposed facts is nevertheless appreciated by both the court and opposing counsel.

2

According to plaintiffs' experts, one's gender identity is an immutable characteristic. Defendants dispute this. In particular, defendants argue that "[o]ne's self-awareness as male or female changes gradually during infant life and childhood" based on "interactions with parents, peers, and environment," noting that "[n]ormative psychological literature" fails "[to] address if and when gender identity becomes crystallized and what factors contribute to the development of a gender identity that is not congruent with the gender of rearing." (Defs.' Resp. to Pls.' PFOF (dkt. #183) ¶¶ 35-36 (quoting Endocrine Society's Clinical Practice Guidelines (dkt. #166-9) 7).)

Regardless of its origins, there is now a consensus within the medical profession that gender dysphoria is a serious medical condition, which if left untreated or inadequately treated can cause adverse symptoms, such as anxiety, depression, serious mental distress, self-harm, and suicidal ideation, all of which can cause social and occupational dysfunction. DSM-5 contains the psychiatric consensus as to its definition, diagnostic criteria and features:

> *Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available. The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.

(DSM-5 (dkt. #21-1) 5.)[4]  Not every transgender person suffers from gender dysphoria, and for those who do, the severity of the symptoms and necessary treatment will vary by individual.

## 2.  Treatment

The World Professional Association of Transgender Health outlines the clinical guidelines for treating gender dysphoria in its *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, 7th Edition (2011) (the "WPATH Standards of Care").[5]  The WPATH Standards of Care identify psychotherapy, hormone therapy, and a number of surgical procedures as accepted treatment options for gender dysphoria. In 2017, the Endocrine Society also published clinical practice guidelines addressing hormone treatments for gender dysphoria.[6]

---

[4] DSM-5 is the fifth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, which "is the handbook used by health care professionals in the United States and much of the world as the authoritative guide to the diagnosis of mental disorders." *DSM-5: Frequently Asked Questions*, Am. Psychiatric Ass'n, https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions (last visited Aug. 8, 2019).

[5] WPATH "is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect in transsexual and transgender health." (WPATH Standards of Care (dkt. #166-8) 8.) The Standards of Care "are based on the best available science and expert professional consensus," with the goal of "provid[ing] clinical guidance for health professionals to assist transsexual, transgender, and gender-nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment." (*Id.*)

[6] The Endocrine Society is "the primary professional home for endocrine scientists and clinical practitioners," and is "devoted to advancing hormone research, excellence in the clinical practice of endocrinology, broadening understanding of the critical role hormones play in health, and advocating on behalf of the global endocrinology community." *About the Endocrine Society*, Endocrine Soc'y, https://www.endocrine.org/about-us (last visited Aug. 6, 2019).

Dr. Julie Sager, DHS's medical director for Wisconsin Medicaid's Bureau of Benefits Management ("BBM") from 2016 until April 24, 2019, considered both sources to be generally accepted in the medical community and to outline the appropriate standards for assessing the medical necessity of treatment for gender dysphoria. Transition-related medical interventions have the following goals: (1) preventing or eliminating the development of unwanted secondary sex characteristics of the assigned sex; (2) promoting or reconstructing the development of desired secondary sex characteristics of the sex associated with the patient's gender identity; (3) reducing symptoms of gender dysphoria; and (4) enhancing the patient's ability to "pass" as the sex associated with the patient's gender identity, decreasing harassment, mistreatment, and other discrimination to which transgender people are subjected because they are gender nonconforming.

The WPATH Standards of Care state that "sex reassignment surgery is effective and medically necessary," while also recognizing that many transgender people who are diagnosed with gender dysphoria will not require surgery. (WPATH Standards of Care (dkt. #166-8) 61 (capitalization altered).) "While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive." (*Id.* at 65.) For appropriate candidates, however, major medical organizations, including the American Medical Association, Endocrine Society, and American Psychiatric Association view gender-confirming surgeries as medically accepted, safe, and effective treatments for severe gender dysphoria. Even defendants acknowledge that DHS does not consider surgical treatments for gender

5

dysphoria to be experimental. (*See* Prelim. Injunction Op. & Order (dkt. #70) 26 n.22 (recognizing defendants' concession).)

## B. Wisconsin Medicaid

Medicaid, a joint federal-state program, was established in 1965 under Title XIX of the Social Security Act to provide medical assistance to eligible low-income individuals. *See* 42 U.S.C. §§ 1396-1396w-5 (the "Medicaid Act"). Medicaid allows states to provide medical services to individuals whose resources and income are insufficient to cover the cost of necessary medical services through federal reimbursement to participating states for a substantial portion of the medical costs. The program's total budget is approximately $9.7 billion and approximately 1.2 million people rely on Wisconsin Medicaid.

Defendant Wisconsin Department of Health Services ("DHS") is responsible for administering the Wisconsin Medicaid program. It receives Medicaid funding from the federal government, including reimbursement for over half the state's Medicaid expenditures from the U.S. Department of Health and Human Services.[7] Defendant Andrea Palm serves as DHS's secretary-designee, making her responsible for implementing the Medicaid Act consistent with both state and federal requirements. At the state level, Wisconsin Medicaid is governed by Wis. Stat. §§ 49.43-.65 and its implementing regulations are found at Wis. Admin. Code § DHS 101-09.

Wisconsin Medicaid beneficiaries receive health care coverage through either a fee-

---

[7] Like all other states, Wisconsin participates in Medicaid. On average, Wisconsin pays 40.6% of that amount.

for-service plan administered directly by DHS or an HMO Medicaid plan offered through third-party managed care organizations. For the fee-for-service plans, DHS uses its own staff to review prior authorization requests, instead of using a third-party administrator. The prior authorization staff typically uses DHS's published guidelines to make clinically appropriate and coverage determinations for requested services. Where published guidelines do not exist -- as is currently true here for gender-confirming surgeries -- medical doctors in BBM, which is part of DHS's Division of Medicaid Services, review the request under statutory and regulatory limits.[8] Dr. Lora Wiggins is BBM's chief medical officer and until April 24, 2019, Dr. Julie Sager served as BBM's medical director.

The vast majority -- approximately 80% -- of Wisconsin Medicaid beneficiaries are enrolled in HMO Medicaid plans, which are offered by the following managed care organizations: (1) Blue Cross Blue Shield of Wisconsin; (2) Care Wisconsin Health Plan; (3) Children's Community Health Plan; (4) Dean Health Plan, Inc.; (5) Group Health Cooperative of Eau Claire; (6) Group Health Cooperative of South Central Wisconsin; (7) Independent Health Care Plan; (8) MHS Health Wisconsin; (9) MercyCare Insurance Company; (10) Molina Healthcare of Wisconsin; (11) Network Health Plan; (12) Quartz Health Solutions, Inc.; (13) Security Health Plan; (14) Trilogy Health Insurance, Inc.; and

---

[8] Unsurprisingly, the BBM medical directors are responsible for overseeing the clinical appropriateness and content of DHS policies, setting clinical policy, and supporting DHS's prior authorization staff when requests are made outside the published guidelines or when a clarification is needed.

(15) UnitedHealthcare Community Plan.[9]  These managed care organizations are responsible for administering, managing and overseeing the Medicaid benefits provided to enrolled beneficiaries in their plans in accordance with DHS's published guidelines and minimum standards.  Accordingly, each managed care organization's clinical staff is responsible for reviewing and addressing prior authorization requests.  Following a prior authorization denial, a beneficiary has the option of submitting his or her request to DHS for a determination whether DHS would have covered the service under the DHS fee-for-service plan.  If the treatment was medically necessary and the fee-for-service plan would have covered it, DHS compels the managed care organization to cover the treatment as well.

## C. Challenged Exclusion

### 1. Overview

The Medicaid regulations were amended to include Wis. Admin. Code §§ DHS 107.03(23)-(24) in 1996, and they have been enforced since 1997, resulting in the denial of coverage for medical and surgical treatment for gender dysphoria for a majority of the period since.[10]  They exclude from Wisconsin Medicaid coverage "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration

---

[9] For various periods since January 1, 2009, Children's Community Health Plan Central, Compcare, CommunityConnect, Physicians Plus Insurance Corporation, Deal Health Plan SE, Gundersen, HTHP, and Unity also offered Wisconsin Medicaid plans.

[10] While the parties stipulated that "Defendants enforce the Challenged Exclusion through the present day" (Stip. of Facts (dkt. #154) ¶ 11), the court previously enjoined them from doing so in this case (Class Cert. & Prelim. Injunction Amend. Op. (dkt. #150) 27).

of sexual anatomy or characteristics" and "[t]ranssexual surgery." Wis. Admin. Code §§ DHS 107.03(23)-(24).[11] "Transsexual surgery" is not defined in the regulations, but DHS interprets it to mean any surgical procedure intended to treat gender dysphoria.[12] Across the country, only nine states -- including Wisconsin -- have categorical Medicaid exclusions on gender-confirming healthcare.

Even though managed care organizations offering Wisconsin Medicaid plans are primarily responsible for enforcing the Challenged Exclusion by denying their plan members' prior authorization requests for services and treatment, DHS has not provided the managed care organizations formal guidance on how to interpret the Challenged Exclusion. Participating managed care organizations have denied coverage to transgender beneficiaries for gender-confirming treatments, including hormone therapy, surgery and related services under the Challenged Exclusion.

## 2. DHS's Evaluation of the Exclusion

When the Challenged Exclusion went into effect on February 1, 1997, DHS's predecessor, the Wisconsin Department of Family and Health Services, opined that the excluded services were "medically unnecessary" and that the Challenged Exclusion was

---

[11] The amendment labeled "transsexual surgery" and the associated "drugs, including hormone therapy" as "not medically necessary," along with other excluded services including "ear lobe repair," "non-medical food," "services related to surrogate parenting," and "tattoo removal." (Clearinghouse Rule 96-154 (dkt. #21-12) 3.)

[12] In fact, for purposes of summary judgment, DHS acknowledges "transsexual surgery" is itself an outdated term that is inconsistent with current medical terminology. (*See* Defs.' Resp. to Pls.' PFOF (dkt. #183) ¶ 80.)

"expected to result in nominal savings for state government."[13]  (Clearinghouse Rule 96-154 (dkt. #21-12) 2, 3; Fiscal Estimate (dkt. #21-14) 2.)  However, DHS has been unable to find evidence that before implementation of the Challenged Exclusion it or its predecessor ever found or opined that the excluded services were experimental, ineffective or unsafe.[14]  Likewise, DHS is unaware of any information indicating that the conclusion that the excluded services were not medically necessary was based on any systematic study or review of the medical literature.  Nor is DHS aware of information indicating that it undertook any study or review of the costs associated with enforcing, amending or eliminating the Challenged Exclusion between its effective date and the start of this lawsuit.

Since the filing of this lawsuit, the only investigations into the financial impact on DHS, Wisconsin Medicaid or the State of Wisconsin from enforcing, amending or eliminating the Challenged Exclusion were the August and November 2018 reports of David Williams, submitted in connection with this lawsuit.  Similarly, the only investigation into the safety or efficacy of the medical or surgical treatments for gender dysphoria performed by DHS since February 1, 1997, were the reports of Lawrence Mayer, Michelle Ostrander, Chester Schmidt and Daniel Sutphin, also submitted in connection with this lawsuit.  In contrast, DHS's own medical providers, the individuals charged with making clinical coverage determinations for Wisconsin Medicaid, acknowledge that

---

[13] The fiscal estimate notes that Wisconsin Medicaid "has hardly ever paid for any of those services or for those purposes, but questions about coverage continue to come up."  (Fiscal Estimate (dkt. #21-14) 3.)

[14] In addressing the analyses that were or were not undertaken, further references to DHS include its predecessor, the Wisconsin Department of Family and Health Services, as applicable.

gender-confirming hormone and surgical treatments for gender dysphoria can be medically necessary and that the Challenged Exclusion conflicts with current medical practice.[15]

Finally, since its enactment, neither DHS nor its predecessor have studied the public health effects or costs of enforcing, amending or eliminating the Challenged Exclusion outside of this lawsuit. Nor is DHS aware of information indicating that it formally considered amending or eliminating the Challenged Exclusion between February 1, 1997, and July 17, 2016. DHS is also unaware of information indicating that it reviewed or considered the efficacy of the Challenged Exclusion following the publication of Version 7 of the WPATH Standards of Care in 2011 or DSM-5's information about the treatment of gender dysphoria following its publication in 2013. For purposes of this lawsuit, defendants estimate that removing the Challenged Exclusion and covering gender-confirming surgeries would cost between $300,000 and $1.2 million annually. There is no dispute that these amounts are actuarially immaterial as they are equal to approximately 0.008% to 0.03% of the State's $3.9 billion share of Wisconsin Medicaid's $9.7 billion annual budget.

### 3. Enforcement

Since January 1, 2009, DHS has denied Wisconsin Medicaid coverage to ten fee-for-service beneficiaries; since 2014, HMOs administering Wisconsin Medicaid have denied numerous requests for gender-confirming surgical procedures, hormone treatments

---

[15] Although defendants unsurprisingly dispute the characterization (and presumably its relevance), plaintiffs argue that continued enforcement of the Challenged Exclusion is, therefore, "exclusively" motivated by politics. (Defs.' Resp. to Pls.' PFOF (dkt. #183) ¶ 6.)

and other medical treatments and services.  Each of these denials was based on application of the Challenged Exclusion, since the denied procedures are covered by Wisconsin Medicaid when deemed medically necessary for other conditions.

Even so, DHS has no published coverage guidelines for gender-confirming health care, nor has it provided formal guidance to Wisconsin Medicaid HMOs about what is excluded by the Challenged Exclusion.  As a result, before 2016, DHS sporadically covered chest surgeries to treat gender dysphoria under a regulation allowing coverage for procedures to treat a condition that significantly interferes with a person's personal/social adjustment or employability.  *See* Wis. Admin. Code § DHS 107.06(2)(c) (requiring prior authorization for "[s]urgical or other medical procedures of questionable medical necessity but deemed advisable in order to correct conditions that may reasonably be assumed to significantly interfere with a recipient's personal or social adjustment or employability, an example of which is cosmetic surgery.").  Moreover, in 2016, BBM's clinical staff wrote to DHS management, opining that the Challenged Exclusion conflicted with federal law because of a final rule implementing the Affordable Care Act's § 1557 prohibiting discrimination on the basis of gender identity (the "Section 1557 Final Rule") and asking if gender-confirming surgeries could be approved.  BBM never received a formal written response.  Instead, mid-level DHS management, which the parties agree was comprised of political appointees, explained informally that DHS's upper management instructed that BBM medical directors were to just leave prior authorization requests, so that they would expire.

Following this letter, BBM received no further direction from DHS management,

and BBM's clinical staff never received written clarification about what procedures were subject to the Challenged Exclusion. As a result, Dr. Sager and Dr. Wiggins concluded that the best option was to deny *all* requests for surgery and related gender-conforming hormones to comply with the Department's directives to the HMOs, even though doing so was contrary to their clinical opinion that the treatments could be both medically necessary and acceptable under current medical standards.

On January 4, 2017, following a preliminary injunction from the Northern District of Texas enjoining part of the "Section 1557 Final Rule," the former director of Wisconsin Medicaid, Michael Heifetz, wrote contract administrators at Wisconsin managed care organizations, informing them that Wisconsin Medicaid would continue to enforce the Challenged Exclusion. (Jan. 4, 2017 Letter (dkt. #165-1) 1.) In part, the letter advised that:

> The Department will continue to abide by its own regulations related to covered services under Medical Assistance/Medicaid ("MA"). Specifically, under the Department's MA regulations, transsexual surgery and medically unnecessary hormone therapy are not covered services. (*See* Wis. Admin. Code §§ DHS 107.03(23), (24); 107.10(4)(p)). . . . The Department will continue to make coverage decisions under its regulations, and will not reimburse entities for procedures that fall outside the Department's regulations.

(*Id.*)

As a result, Wisconsin Medicaid's current policy under the Challenged Exclusion is to exclude from coverage certain medical procedures, services or treatments that are deemed medically necessary by a beneficiary's medical provider to treat gender dysphoria, even though those same procedures are covered when deemed medically necessary to treat

other conditions. These treatments include orchiectomy, penectomy, vaginoplasty, mastectomy, reduction mammoplasty, breast reconstruction, hysterectomy, oophorectomy, and salingo-oophorectomy. The Challenged Exclusion also categorically excludes from coverage feminizing genitoplasty, chondrolaryngoplasty, phalloplasty, metoidioplasty, masculinizing genitoplasty, and intersex surgery (both male to female and female to male). While the Challenged Exclusion categorically excludes some hormone therapy treatments, Wisconsin Medicaid covers the following hormones when medically necessary to treat conditions other than gender dysphoria: estradiol, medroxyprogesterone acetate (Provera), micronized progesterone, and testosterone cypionate. Wisconsin Medicaid also covers some hormones for the treatment of gender dysphoria, but only if not associated with surgery.[16]

In 2019, Dr. Julie Sager sought to have a formal discussion with DHS leadership about providing Wisconsin Medicaid coverage for gender-confirming treatment. She was asked to prepare a proposal about an appropriate policy. In preparation for these discussions, she requested and received a spreadsheet from BBM's medical coder identifying gender-confirming procedures and the coverage for those procedures when treating conditions other than gender dysphoria. A large majority of those procedures are covered by Wisconsin Medicaid when not treating gender dysphoria. (*See generally* Gender Reassignment Procedure Code List (dkt. #166-10).)[17]

---

[16] Despite this latter exception, the parties agree that some hormone treatments for gender dysphoria have been denied because Wisconsin Medicaid managed care organizations make their own drug coverage determinations.

[17] At least as of mid-April 2019, further discussions between DHS management and BBM about

Finally, DHS applies the Challenged Exclusion *only* to beneficiaries who are at least 21 years old. For younger beneficiaries, DHS considers requests for coverage under the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(b); Wis. Admin. Code § DHS 107.22. (*But see* Vordermann Decl. (dkt. #99) ¶¶ 8-12 (recounting denial of coverage for orchiectomy for 19-year-old sufferer of gender dysphoria by HMO).) When reviewing an HMO denial of a request for gender confirming surgery for a beneficiary who was under 21 years old in July 2018, Wisconsin Medicaid's then-medical director, Dr. Sager, concluded that the requested surgery was medically necessary, recommending approval for coverage. In making that decision, Dr. Sager considered the WPATH Standards of Care, the Endocrine Society Guidelines and other state Medicaid agencies' guidelines.

### D. Named Plaintiffs[18]

Plaintiffs Cody Flack, Sara Ann Makenzie, Marie Kelly and Courtney Sherwin are all adult, transgender, residents of Wisconsin enrolled in Wisconsin Medicaid. They all suffer from gender dysphoria. Each of their individual treatment providers have concluded that hormone therapy and gender-confirming surgery are medically necessary. After nevertheless being denied coverage under the Challenged Exclusion, they each joined this suit on behalf of themselves and a class of similarly-situated plaintiffs.

Cody Flack, one of the two originally named plaintiffs, sought Medicaid coverage for chest reconstructive surgery that his treatment providers deemed medically necessary.

---

policy changes had not occurred.

[18] Additional information about the named plaintiffs can be found in the court's prior opinions.

His prior authorization request was denied and then affirmed on appeal under the Challenged Exclusion without considering his treatment providers' determination that surgery was a medical necessity given the severity of his gender dysphoria. Following this court's entry of a preliminary injunction last summer, DHS reviewed Cody's prior authorization request for the chest surgery for medical necessity. Dr. Sager, then Wisconsin Medicaid's BBM medical director, concluded that his requested surgeries were medically necessary to treat his gender dysphoria. In making her determination, Sager relied on the WPATH Standards of Care and the Endocrine Society Guidelines as indicia of the prevailing, accepted medical standards of care.[19]

After entry of the court's preliminary injunction and Dr. Sager's finding that the surgery was medically necessary, plastic surgeon Clifford King performed Cody's double mastectomy and male chest reconstruction on September 25, 2018. Following surgery, Cody's gender dysphoria has greatly diminished. He was relieved that his outward appearance matched his male gender and that he would no longer be misgendered because of his breasts. He began looking forward to going out in public. He felt "more upbeat and hopeful about [his] life in general." (Flack Suppl. Decl. (dkt. #91) ¶ 4.) He is considering obtaining a phalloplasty to further his gender transition.

Sara Ann Makenzie, the other originally named plaintiff, first encountered the Challenged Exclusion when she sought a chest reconstruction prescribed by her doctors. She contacted DHS to inquire about Wisconsin Medicaid coverage for the procedure, but

---

[19] Dr. Sager testified that she would use the same type of review if considering similar, prior authorization requests and denials if not bound by the Challenged Exclusion.

was informed that it was not a covered benefit.[20]  (Makenzie Decl. (dkt. #23) ¶ 19.)  She then obtained a personal loan from her bank to pay for the surgery out-of-pocket.  UW Health plastic surgeon Venkat Rao performed the surgery in August 2016.  She contends that this surgery helped alleviate her gender dysphoria.  After her medical providers recommended that she obtain a bilateral orchiectomy and vaginoplasty to create female-appearing external genitalia, Sara Ann was twice told Wisconsin Medicaid would not cover the surgery.  Following this court's preliminary injunction in July 2018, Sara Ann's HMO, Care Wisconsin, reviewed her prior authorization request for coverage for genital reconstruction surgery and related procedures, determining that the surgeries were medically necessary and coverage for the surgery was appropriate.

Since 2011, plaintiff Marie Kelly has taken feminizing hormones to treat her gender dysphoria and to further her gender transition.[21]  While the hormones have helped, she still suffers "exacerbated" gender dysphoria and anxiety because of her facial hair, male-appearing chest, and male-appearing genitalia.  Her medical providers have recommended that she obtain electrolysis for facial hair removal, a female chest reconstruction, and a female genital reconstruction.  The providers consider each of these procedures to be

---

[20] Defendants object to this proposed fact as 'vague, ambiguous, and lack[ing] sufficient foundation to enable Defendants to adequately respond."  (Defs.' Resp. to Pls.' PFOF (dkt. #183) ¶ 156.)  However, the court finds this objection entirely unpersuasive.  Sara Ann can testify to her communications with defendants' representative.  Moreover, defendants were free to take discovery to refute her claim of a coverage denial, but absent that, the court will accept her representation, particularly since it is wholly consistent with defendants' *admitted* policy of denying coverage under the Challenged Exclusion without regard to medical necessity.

[21] Unlike the other named plaintiffs, Marie's history with Wisconsin Medicaid is more complicated.  Following placement by a staffing agency at a temporary position in January 2019, her income surpassed the Wisconsin Medicaid limits.  After leaving that position, Marie then re-enrolled in Wisconsin Medicaid.

medically necessary.  After inquiring whether Wisconsin Medicaid would provide coverage for these procedures -- including as recently as in August 2018 -- Marie was repeatedly told that they were not covered because of the Challenged Exclusion.  Since then, Marie has been unable to obtain these treatments for her gender dysphoria, and she cannot afford to pay for them herself.

In March 2018, plaintiff Courtney Sherwin began taking feminizing hormones under the supervision of her primary care physician.  She has been denied coverage for some of the hormone treatments prescribed by her doctors under the Challenged Exclusion, forcing her to pay out-of-pocket for them.  Moreover, while the hormones have helped, Courtney continues to suffer from severe gender dysphoria because of her male-appearing body and her male-sounding voice, as well as the harassment they engender.  Courtney's medical providers have concluded that a genital reconstruction, consisting of an orchiectomy, penectomy and vaginoplasty, and a breast augmentation are medically necessary to treat her gender dysphoria.  They also believe that the orchiectomy is particularly urgent because it would stop her body from producing testosterone and alleviate the adverse side effects from her testosterone-blocking spironolactone.  Her current HMO, Quartz, has denied coverage for these gender-confirming surgical treatments based on the Challenged Exclusion, and she cannot afford to pay for these procedures herself.

Although their exact number is unknowable, other transgender Wisconsin Medicaid beneficiaries with gender dysphoria have also been denied coverage for gender-confirming surgeries under the Challenged Exclusion (or at least are likely to have been discouraged

from applying because of it). Defendants concede for purposes of summary judgment that there are potentially hundreds of transgender Wisconsin Medicaid beneficiaries (if not more) who may be denied gender-confirming surgeries and related hormone treatments during their lifetimes if the Challenged Exclusion remains in place. For example, Lexie Vordermann is a 19-year-old transgender Wisconsin Medicaid beneficiary who has been denied coverage for an orchiectomy by her HMO, Quartz, in early 2018 because of the Challenged Exclusion. In September 2018, her doctor submitted a second prior authorization request, but Quartz denied it as well, citing the Challenged Exclusion. While DHS has maintained that the Challenged Exclusion does not apply to beneficiaries under 21 years of age, Lexie's denials have been based on the Challenged Exclusion.

Another class member, Emma Grunenwald-Ries, a transgender Wisconsin Medicaid beneficiary, experiences significant gender dysphoria related to her voice, chest and genitalia. She is seeking a number of surgeries recommended by her primary care physician, including facial feminization, chest reconstruction, and genital reconstruction. UW Health surgeon Katherine Gast agreed to perform genital reconstruction surgery, but has not submitted a prior authorization request, believing it would be denied because of the Challenged Exclusion. Emma suffers from daily anxiety, worry, and stress about her inability to obtain treatment. She is also upset that the Challenged Exclusion stands in the way of her completing her medical transition.

OPINION

## I. Plaintiffs' Motion to Strike

Before turning to plaintiffs' motion for summary judgment, the court must first address their lengthy motion to strike the declaration and exclude testimony of defense expert Michelle Ostrander, Ph.D. (Mot. to Strike (dkt. #192) 1.) Plaintiffs raise three arguments: (1) failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B); (2) failure to meet the requirements of Daubert and Federal Rule of Evidence 702; and (3) the Hayes reports that she purports to incorporate as her opinions are inadmissible hearsay. (Mot. to Strike Br. (dkt. #193) 18.) Defendants contend that Ostrander "adequately disclosed her opinions," has appropriate "expertise to opine on the available scientific evidence regarding the safety and efficacy of surgical gender dysphoria treatments," and plaintiffs' motion seeks "to exclude her testimony without having to grapple with its substance." (Mot. to Strike Opp'n (dkt. #200) 1, 3.)

While Plaintiffs' motion will be denied, the actual relevance of Ostrander's "opinion" is quite limited. First, Ostrander expressly "take[s] no position on the medical necessity of any particular medical procedure or service for any particular patient, including the named plaintiffs in this case" (Ostrander Decl. (dkt. #188) ¶ 12), something that should be obvious on its face given that she has no medical degree. Likewise, she makes no claim of any medical expertise, including treatment methods for gender dysphoria, nor did she review DSM-5, WPATH or other standards of care for gender dysphoria. (*See* Ostrander Dep. (dkt. #206) 84:25-85:25 ("I believe the DSM-5 is the current standard for diagnosis. As far as the specific for those, I'm not familiar with those off the top of my

head."; "I am aware of the WPATH standards of care for the treatment of gender dysphoria; but as to the specifics, I could not speak to those."); *see also id.* at 109:10-111:9 (relying on a report's summary of the difference between "gender identity disorder" and "gender dysphoria," adding that the diagnostic criteria are "outside of [her] area of expertise").)

Second, even accepting her declaration on its face, she does nothing more than compile "[i]n [her] role as Product Manager at Hayes, Inc.," various "custom research" prepared largely by unnamed others at Hayes for unnamed "healthcare providers, payers, [or] policy makers" which purport to analyze "the available scientific evidence regarding the efficacy and safety of" "Sex Reassignment Surgery" and "Ancillary Procedures and Services for the treatment of Gender Dysphoria" in 2014 and 2018. (Ostrander Decl. (dkt. #188) ¶¶ 3, 11-9.) While she "worked with analysts in authoring and developing the August 2018 report and reviewed and approved the report prior to its publication," she had no role in developing the other three reports. (*See id.* ¶ 9.) "The analyses and conclusions" found in these reports, attached to her barebones declaration, "represent [her] professional opinion about the available scientific evidence regarding the efficacy and safety of the medical procedures and services . . . as of the dates of those documents." (*Id.* ¶ 11.) Ostrander's declaration does not explain the methodology for assigning grades, although she provides some detail during her deposition. (Ostrander Dep. (dkt. #206) 50:15-51:23; 122:20-123:8.)

Third, whatever the evidentiary value these private analyses may have, it pales in comparison to that of the peer reviewed studies they purport to criticize, and, more

importantly, to the consensus of medical professionals as to the efficacy and safety of gender-confirming surgery.[22]

Fourth, and finally, Ostrander's "opinions" are entirely unhelpful to the issue of fact here: whether gender-confirming surgery and related hormones are now a generally accepted form of medical treatment for gender dysphoria. Even accepting Ostrander's conclusion that studies provide "very low" quality evidence, that does not change the fact that the larger medical community considers these treatments to be acceptable. (*See* Am. Med. Assoc. (dkt. #21-5) 2 ("[M]edical and surgical treatments for gender dysphoria, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice."); Am. Endocrine Soc'y (dkt. #21-9) 3 ("Medical intervention for transgender individuals (including both hormone therapy and medically indicated surgery) is effective, relatively safe (when appropriately monitored), and has been established as the standard of care.").) Further, it is somewhat perplexing that at summary judgment, defendants relied only on the "opinions" of a lone, non-medical, professional researcher, rather than on the previously filed declarations of the few medical professionals who had questioned the efficacy and safety of gender-confirming care. (*See* Sutphin Decl. (dkt. #118); Schmidt Decl. (dkt. #56); Mayer Decl. (dkt. #55-4); Mayer Rpt. (dkt. #55-1).) For all these reasons, Ostrander's "opinions" are of limited value. Even so, plaintiffs' motion to strike is denied.

---

[22] Ostrander's declaration and deposition also both fail to identify any consumers of these reports.

## II. Summary Judgment

Summary judgment is appropriate where the moving party: (1) "shows that there is no genuine dispute as to any material fact" and (2) it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs move for summary judgment on their claims under: (1) § 1557 of the Affordable Care Act; (2) the Medicaid Act's Availability and Comparability provisions; and (3) the Equal Protection Clause of the Fourteenth Amendment. The court addresses each claim in turn.

### A. Affordable Care Act

Plaintiffs contend that the Challenged Exclusion violates § 1557 of the Affordable Care Act by unlawfully discriminating on the basis of sex and ask the court not to change its analysis from that undertaken at the preliminary injunction stage of this litigation. (Summ. J. Br. (dkt. #152) 20.) In response, defendants merely repeat their creative "Spending Clause" argument: "Wisconsin could not have understood that Title IX would impose on it a new anti-discrimination requirement when this federal law passed" because "the Seventh Circuit did not hold that sexual orientation and transgender status discrimination were covered under Title VII and Title IX, respectively, until decades after the enactment of Title IX." (Opp'n (dkt. #182) 5, 7-9.)

The court found defendants' argument less than persuasive before and that has not changed. (Prelim. Injunction Op. & Order (dkt. #70) 29-30 ("Perhaps defendants' least persuasive, though most creative, argument is that § 1557 cannot be read to cover transgender status without violating the Spending Clause of the United States Constitution because 'Wisconsin could have had no idea that this interpretation would

someday prevail when it chose to accept federal Medicaid funding.'  Nonsense." (internal citation omitted)).)  Indeed, the court adopts the same analysis contained in the preliminary injunction opinion and order, finding that the Affordable Care Act's § 1557 provides a private right of action and the Challenged Exclusion discriminates on the basis of sex.  (*Id.* at 23-31.)  Accordingly, plaintiffs' motion for summary judgment on their § 1557 claim is granted.

### B. Medicaid Act

Plaintiffs next contend that the Challenged Exclusion violates the Availability and Comparability Provisions of the Medicaid Act by denying coverage for medically necessary treatments for gender dysphoria despite those treatments being covered for other diagnoses.  (Summ. J. Br. (dkt. #152) 30-37.)  In response, defendants argue that the exclusion of "transsexual surgery" and associated hormones is entitled to "[s]ignificant deference" because there is evidence that these treatments are unproven and thus "not medically necessary" under Wis. Admin. Code § DHS 101.03(96m).  Accordingly, defendants assert, plaintiffs have not -- and cannot -- show that "the Challenged Exclusion is unreasonable as a matter of law" in violation of the Medicaid Act.  (Opp'n (dkt. #182) 10, 22, 23.)

As an initial matter, "[a]lthough participation in Medicaid is optional, once a state has chosen to take part . . . it must comply with all federal statutory and regulatory requirements."  *Bontrager v. Ind. Family and Soc. Servs. Admin.*, 697 F.3d 604, 605 (7th Cir. 2012) (quoting *Miller ex rel Miller v. Whitburn*, 10 F.3d 1315, 1316 (7th Cir. 1993)).  Accordingly, while a state "provid[ing] federally subsidized medical assistance to low-

income individuals and families" "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures," *id.* at 605, 608 (internal citations and quotation marks omitted), these limits must be "'reasonable' and 'consistent with the objectives' of the [Medicaid] Act," *Rush v. Parham*, 625 F.2d 1150, 1155 (5th Cir. 1980) (quoting *Beal v. Doe*, 432 U.S. 438, 444 (1977)).

Still, as defendants point out, states have "significant discretion to decide which treatments to cover" and the Medicaid Act does not require participating states to fund experimental procedures as "such treatments are 'medically *un* necessary.'" *Miller*, 10 F.3d at 1318, 1321 (quoting *Rush*, 625 F.2d at 1156) (emphasis in original). Indeed, in *Rush*, the Fifth Circuit held that "Georgia's definition of medically necessary services can reasonably exclude experimental treatment" when confronted with plaintiff's complaint that Georgia refused to pay for her "transsexual surgery" that was prescribed by her doctor. 625 F.2d at 1156. As the Seventh Circuit has explained, however, "the best indicator that a procedure is experimental is its rejection by the professional medical community as an unproven treatment"; put another way, "[i]f 'authoritative evidence' exists that attests to a procedure's safety and effectiveness, it is not 'experimental.'" *Miller*, 10 F.3d at 1320.

Here, whatever the Fifth Circuit held in 1980, defendants' assertion that "transsexual surgery" and the associated hormone treatments are not medically necessary is no longer reasonable. Even at the time the Challenged Exclusion became effective in 1997, DHS's predecessor did not conclude that the excluded services were experimental, ineffective or unsafe. Moreover, at the time of implementation, DHS's predecessor conducted *no* systematic study or review of the available medical literature to conclude that

the excluded services were not medically necessary, nor can defendants point to any now. To the contrary, as noted above, the medical profession has reached a formal consensus as to the safety *and* efficacy of surgical treatments for severe gender dysphoria. Finally, *DHS* has not examined the public health effects of enforcing, amending, or repealing the Challenged Exclusion, aside from the analyses specifically performed and submitted for use in this lawsuit.

Perhaps most compelling, when not constrained by the Challenged Exclusion, even DHS through BBM medical personnel found gender-confirming surgery to be medically necessary for some Medicaid patients, falling in line with the vast majority of states and the American Medical Association, Endocrine Society, American Psychiatric Association, and other medical organizations, all of which have already endorsed gender-confirming surgeries as medically accepted, safe, and effective treatments for gender dysphoria.

Defendants' arguments to the contrary are simply unpersuasive. (Opp'n (dkt. #182) 13-22.) First, defendants rely on two federal circuit court decisions that upheld state prohibitions on coverage for treatment of gender-confirming surgery. (*Id.* at 13-14 (citing *Smith v. Rasmussen*, 249 F.3d 755, 760-61 (8th Cir. 2001); *Rush*, 625 F.2d at 1154-57).) The state of medical knowledge has evolved as to the treatment of gender dysphoria, making these earlier cases medically suspect. *Compare Smith*, 249 F.3d at 760 (noting "the lack of consensus in the medical community" about sex-reassignment surgery) *with Good v. Iowa Dept. of Human Servs.*, 924 N.W.2d 853, 857 (Iowa 2019) (noting uncontradicted testimony establishing "the accepted standards of medical care to alleviate gender dysphoria . . . involve the following options: socially transitioning to live consistently with

one's gender identity, counseling, hormone therapy, and gender-affirming surgery to conform one's sex characteristics to one's gender identity"); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *3 (E.D. Mo. Feb. 9, 2018) (noting testimony establishing that the WPATH Standards of Care are "the internationally recognized guidelines for the treatment of persons with gender dysphoria"). Indeed, even the *Rush* court recognized that "if defendants simply denied payment for the proposed surgery because it was transsexual surgery [as opposed to being 'experimental' or 'inappropriate'], Georgia should now be required to pay for the operation, since a 'state may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition.'" 625 F.2d at 1156 n.12 (quoting 42 C.F.R. § 440.230.(c)(1), as corrected by 43 Fed. Reg. 57253 (Dec. 7, 1978)).

Defendants also point to a 2016 Centers for Medicare and Medicaid Services Report, the Hayes, Inc. reports attached to the Ostrander Declaration, and two more recent circuit court decisions rejecting prisoners' Eighth Amendment claims for gender-confirming surgery as evidence of "conflicting views about the efficacy of treatment." (Opp'n (dkt. #182) 14-22.) However, these documents do not create a material dispute of fact in large part because they were not relied on by DHS in evaluating the Challenged Exclusion, either before *or* after it became effective.

Moreover, the two circuit court decisions are factually and legally distinguishable. Although decided in 2014, the First Circuit sitting *en banc* in *Kosilek*, 774 F.3d 63 (1st Cir. 2014), was actually considering an evidentiary record from *2006*, at which time medical experts disagreed as to whether anything less than a "sex reassignment surgery" for a

Massachusetts inmate's gender dysphoria would constitute such inadequate medical care as to be cruel and unusual under the Eighth Amendment.[23]  Because there was a disagreement among the medical experts in 2006 as to whether surgery, as opposed to hormone and other therapy, would be necessary to treat Kolisek's disorder, the First Circuit held the decision of the Massachusetts' DOC not to approve it did not violate the Eighth Amendment, particularly in light of other, larger security and safety concerns within the prison.  Although the majority opinion and the DOC both emphasized that it was only reaching this decision as to Kolisek's individual treatment plan, one of the dissenters suggested this result amounted to "a de facto ban on sex reassignment surgery for inmates in this circuit."  774 F.3d at 106-07.  Regardless, the First Circuit's majority opinion only addressed WPATH's 2011 recognition of the need for "flexible directions in treatment" for gender dysphoria, which was not part of the evidentiary record, and the only mention of DSM-5 is in recognition of the adoption of a "new" term "gender dysphoria," likely because it was only released around the time of the opinion itself.

In *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019), *petition for cert. filed*, a panel of the Fifth Circuit purported to follow the reasoning of *Kosilek*, by finding that the Texas Department of Criminal Justice ("TDCJ") could adopt a blanket prohibition on "sex reassignment surgeries," without regard to any individualized assessment of prisoners, without offending the Eighth Amendment.  As the dissent explains, the majority's reasoning is difficult to follow given some procedural anomalies, not least of which was the

---

[23] In *Kosilek*, the First Circuit still referred in its opinion to "gender identity disorder," because that was the accepted term in 2006, even though the court acknowledged that the recently adopted DSM-5 had already adopted the more apt diagnosis of "gender dysphoria."

*pro se* plaintiff Gibson's (and later his appointed appellate counsel's) decision not to challenge what the Fifth Circuit described as "respected medical experts fiercely question[ing] whether sex reassignment surgery, rather than counseling and hormone therapy, is the best treatment for gender dysphoria." *Gibson*, 920 F.3d at 215, 220, 223.

The oddest part of the *Gibson* decision is that the *only* "evidence" on this issue came not from the record in that case, but rather from adoption of the same *2006* expert testimony relied upon by the First Circuit in *Kosilek*. *Gibson*, 920 F.3d at 221-25. Regardless, based on Gibson's failure to establish that surgery "is so universally accepted" that its denial in favor of mental health counseling and hormone therapy "amounts to deliberate indifference," the Fifth Circuit found no Eighth Amendment violation. *Id.* at 220-21. More specifically, the court found that "it cannot be cruel *and unusual* to deny treatment that no other prison has ever provided -- to the contrary, it would only be unusual if a prison decided *not* to deny such treatment." *Id.* at 216 (emphasis original).

Even if the reasoning of *Gibson*, or at least *Kosilek* (which only endorsed the right of a prison to deny reassignment surgery after an individualized assessment of the inmate's treatment needs for gender dysphoria), were adopted as law by the Seventh Circuit in applying an Eighth Amendment "cruel and unusual" standard, both opinions hold the plaintiff to a much higher burden of proof *and* rely on medical testimony now some thirteen

years old.[24]  (*See* Prelim. Injunct. Op. & Order (dkt. #70) 20 n.15 (recognizing the limited value of dated medical knowledge).  At summary judgment, the only "opinion" offered to dispute the current medical consensus is from a professional researcher purporting to discount the reliability of peer reviewed studies rather than a medical society (or even a lone doctor), disagreeing as to the existence of such a consensus.

As noted above, any attempt by defendants or their experts to contend that gender-confirming care -- including surgery -- is inappropriate, unsafe, and ineffective is unreasonable, in the face of the existing medical consensus.  The few documents cited by defendants do not change the unreasonableness of the decision-making process or its conclusion.  Accordingly, the state's adoption, or at least continued enforcement, of the Challenged Exclusion is unreasonable as a matter of law and not entitled to deference.  *See Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir. 2006) ("While a state has discretion to determine the optional services in its Medicaid plan, a state's failure to provide Medicaid coverage for non-experimental, medically-necessary services within a covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid.") (collecting cases); *White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977) ("[W]hen a state decides to distribute a service as part of its participation in Title XIX, its discretion to determine how the service shall be distributed, while broad, is not unfettered: the service

---

[24] Defendants also offer a fleeting cite here to *Smith*, 249 F.3d at 760-61.  However, it, too, is unavailing.  First, the decision is 18 years old.  Second, unlike DHS, the state there contracted with a medical peer review organization that had "conducted a review of the medical literature and contacted various organizations" to "report[] a lack of consensus on definition, diagnosis, and treatment."  *Id.*  Third, the Iowa Supreme Court recently affirmed a lower court decision invalidating the prohibition on Medicaid coverage for gender-affirming procedures.  *See Good*, 924 N.W.2d at 856.

must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it"); *Rush*, 625 F.2d at 1156 n.12 ("[A] 'state may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition.'" (quoting 42 C.F.R. § 440.230(c)(1), as corrected by 43 Fed. Reg. 57253 (Dec. 7, 1978))).

Finally, plaintiffs' claims under the Availability and Comparability Provisions of the Medicaid Act rise or fall together. The Availability Provision requires states to make covered treatment available in "sufficient . . . amount, duration and scope to reasonably achieve its purpose," subject to "appropriate limits," such as "medical necessity" or "utilization control procedures." 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.230(b); *see also Bontrager*, 697 F.3d. at 608 (Under federal regulations, "a state's Medicaid plan must 'specify the amount, duration, and scope of each service that it provides,' and '[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.'" (quoting 42 C.F.R. §§ 404.230(a)-(b), (d))). The Comparability Provision "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions," *Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016) (citations omitted), by requiring participating States to provide medical assistance to all participants in equal "amount, duration, [and] scope," 42 U.S.C. § 1396a(a)(10)(B)(i); 42 C.F.R. § 440.240(a)-(b) (requiring "services available to any individual" be provided in "equal . . . amount, duration, and scope for all beneficiaries"). As such, these provisions require that states make offered services sufficiently available to treat beneficiaries without discriminating based on diagnosis.

Here, there is no dispute that the Challenged Exclusion prevents Wisconsin Medicaid from covering the medical treatment needs of those suffering from gender dysphoria, at least for breast reconstruction, hysterectomy, mastectomy, oophorectomy, orchiectomy, penectomy, reduction mammoplasty, salingo-oophorectomy and vaginoplasty, as well as estradiol, medroxyprogesterone acetate (Provera), micronized progesterone, and testosterone cypionate hormone treatments. Nor is there any dispute that these treatments *are* covered when used to treat other medical conditions. Accordingly, the Challenged Exclusion both fails to make covered treatments available in sufficient "amount, duration and scope" *and* discriminates on the basis of diagnosis. As such, plaintiffs are entitled to summary judgment on these claims as well. *See Davis*, 821 F.3d at 256 ("By denying plaintiffs access to such services purely on the basis of the nature of their medical conditions, New York's restrictions thus provide some categorically needy individuals lesser medical assistance than is available to others with the same levels of medical need," thereby "offer[ing] an unequal 'scope' of benefits" in violation of the Comparability Provision.) (affirming summary judgment for plaintiffs on their Comparability Provision claim); *White*, 555 F.2d at 1151 ("We find nothing in the federal statute that permits discrimination based upon etiology rather than need for the service.") (affirming injunction prohibiting enforcement of state regulation limiting Medicaid coverage for glasses to beneficiaries with eye disease); *id.* at 1152 ("The regulations permit discrimination in benefits based upon the degree of medical necessity but not upon the medical disorder from which the person suffers."); *Cruz v. Zucker*, 195 F. Supp. 3d 554, 571 (S.D.N.Y. 2016) (holding that "a state cannot say 'never' when it comes to medically

necessary treatments, because there are no such reasons justifying categorical bans on medically necessary treatment. A categorical ban on medically necessary treatment for a specific diagnosis would not 'adequately . . . meet the needs of the Medicaid population of the state'" (internal citation omitted)) (granting plaintiffs summary judgment that ban on coverage for presumptive cosmetic procedures violated Medicaid Availability Provision and Comparability Provision).[25]

## C. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment prevents a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This "is essentially a direction that all persons similarly situated should be treated alike" and accordingly "protects against intentional and arbitrary discrimination." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (internal citations and quotation marks omitted), *cert. dismissed sub nom. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138 S. Ct. 1260, 200 L. Ed. 2d 415 (2018). Plaintiffs contend that "the Challenged

---

[25] The district court in *Cruz* had originally granted defendant's motion for summary judgment in part on plaintiffs' Availability Provision claim relating to off-label uses of hormones to provide hormone therapies to minors with gender dysphoria, and denied plaintiffs' motion for summary judgment in part on their Comparability Provision claim as to "drugs promoting hair growth or loss," because they did not appear to be covered by New York Medicaid for other conditions. 195 F. Supp. 3d at 573, 577. The court further denied motions for summary judgment on plaintiffs' Availability and Comparability Provision claims relating to the medical necessity of providing gender-confirming surgeries and specific hormone therapies for minors. *Id.* at 573-78. On reconsideration, however, the court "direct[ed] the entry of final judgment for plaintiffs in all respects" after the defendant published a Notice of Proposed Rulemaking that would authorize New York Medicaid to "cover medically necessary surgeries and hormone therapies to treat gender dysphoria ('GD') in individuals under age 18," thereby resolving all disputes of fact. *Cruz v. Zucker*, 218 F. Supp. 3d 246, 247-49 (S.D.N.Y. 2016).

Exclusion subjects transgender people to disparate and inferior health care on the basis of sex," and it further subjects them to discriminatory treatment because they are transgender, which, they contend, is itself a suspect or quasi-suspect class. (Summ. J. Br. (dkt. #152) 37.) Regardless, there is no longer a disagreement between the parties that some form of heightened scrutiny applies here. (*Compare id.* (arguing whether viewed as discrimination on the basis of sex or transgender status "some form of heightened scrutiny" applies) *with* Opp'n (dkt. #182) 29 n.7 ("In light of *Whitaker* and this Court's previous decisions, and in the furtherance of efficiency, the Department does not repeat its arguments for rational basis review here."))[26]

When a classification is based on sex, the state action is subject to heightened scrutiny meaning that "the burden rests with the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Whitaker*, 858 F.3d at 1050 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). More specifically, the state must "show that the 'classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* (quoting *Virginia*, 518 U.S. at 524). In addition, "the justification must be genuine" and cannot be hypothesized, created in response to litigation, or based on "overbroad generalizations about sex." *Id.* (citing *Virginia*, 518 U.S. at 533).

While defendants identify two possible government interests -- "containing costs

---

[26] Accordingly, the court need not consider whether transgender status is a suspect or quasi-suspect class and will proceed to analyze the Challenged Exclusion as a sex-based classification. *See Boyden v. Conlin*, 341 F. Supp. 3d 979, 1000 n.16 (W.D. Wis. 2018) (outlining factors to determine whether heightened scrutiny applies based on suspect or quasi-suspect class).

and protecting public health in face of uncertainty" (Opp'n (dkt. #182) 32) -- they do not meet their burden of demonstrating that either justification was genuine, nor that the Challenged Exclusion was substantially related to achieving those objectives.[27]   As to protecting public health, for reasons already discussed above, defendants provide *no* evidence that, *before adopting the Challenged Exclusion*, DHS or its predecessor: (1) conducted "any systematic study or review of relevant peer-reviewed scientific or medical literature relating to the excluded services" to conclude that the services "were not medically necessary"; or (2) made an informed determination that any of the excluded services were experimental, unsafe, or ineffective in treating gender dysphoria.  (Stip. PFOF (dkt. #154) ¶¶ 70-73.)  To the contrary, DHS concedes that neither is true.  Even after adoption of the Challenged Exclusion, DHS neither "undertook any study or review of the safety or efficacy of medical or surgical treatments for gender dysphoria," nor "undertook any study or review of the public health effects of enforcing, amending or eliminating the Challenged Exclusion," aside from the expert reports specially prepared in defense of plaintiffs' present lawsuit.  (*Id.* ¶¶ 76-78.)  Defendants stipulated to as much by agreeing that "DHS is not aware of information indicating" that any of these things occurred.  (*Id.* ¶¶ 70-73, 76-78.)

As also set forth in detail above, the medical consensus is that gender-confirming treatment, including surgery, is accepted, safe, and effective in the treatment of gender dysphoria, meaning that the denial of Medicaid benefits for needed medical treatment

---

[27] For reasons discussed below, even accepting defendants' argument that "intermediate scrutiny does not require that a regulation *perfectly* solve the problem it was enacted to solve -- the regulation is valid even if it only partially solves the problem" (*id.* at 30) (emphasis added), defendants' evidence falls short of that mark.

completely fails to protect the public health. (*See* Mayer Rpt. (dkt. #55-1) 8-9 (recognizing that gender dysphoria "is a serious medical condition that deserves to be treated" so that "reducing or eliminating the very real distress associated with the condition is the "[o]ptimality consideration[]").) In fact, this consensus is so strong that it includes DHS's own former BBM medical director, Dr. Julie Sager, who acknowledged that removing the Challenged Exclusion would be consistent with accepted medical practice and standards of care, as well as BBM's chief medical officer, Dr. Lora Wiggins, who considers surgical treatment for gender dysphoria to be medically reasonable. So, too, Wisconsin Medicaid has concluded that gender-confirming surgeries were medically necessary in at least a handful of cases, including the approvals of chest surgeries before 2016.[28] Accordingly, there is no evidence from which a reasonable jury could conclude that protecting the public health was a genuine motivation for the Challenged Exclusion.[29]

Defendants' other, stated justification, based on cost-savings, fares no better on summary judgment. While documents predating the Challenged Exclusion concluded that it -- along with a larger list of excluded services -- "was expected to result in nominal

---

[28] Defendants' citation to the Ostrander Declaration and the attached reports does not help them. There is no evidence to suggest that DHS or its predecessor entity considered these reports -- or their underlying studies -- in adopting the Challenged Exclusion. In fact, it would have been disingenuous to do so: the Hayes reports post-date the Challenged Exclusion by nearly two decades and no medical literature search was performed. Likewise, there is no indication that these reports have been relied on since then -- except, of course, during this litigation.

[29] This conclusion is only strengthened by the uncontradicted evidence that: (1) mid-level DHS management -- comprised of political appointees -- instructed BBM medical directors to just leave prior authorization requests so that they would expire; and (2) Dr. Sager was ultimately unsuccessful in her attempt to discuss with management the possibility of providing Wisconsin Medicaid coverage for gender-confirming treatment. While plaintiffs argue political considerations motivated the Challenged Exclusion, the court need not reach that.

savings," those same documents add that Wisconsin Medicaid "has hardly ever paid for any of those [excluded] services or for those purposes." (Fiscal Estimate (dkt. #21-14) 2-3.) Likewise, since the Challenged Exclusion's effective date, the only investigation DHS has made into any actual cost savings from adoption of the Exclusion was performed in connection with defendants' defense of this lawsuit. (Stip. PFOF (dkt. #154) ¶¶ 74-75.) Moreover, even these analyses reveal such small estimated savings resulting from the Challenged Exclusion that they are both practically and actuarially immaterial. Defendants estimate that removing the Challenged Exclusion and covering gender-confirming surgeries would cost between $300,000 and $1.2 million annually, which actuarially speaking amounts to one hundredth to three hundredth of one percent of the State's share of Wisconsin Medicaid's annual budget. As in *Boyden*, 341 F. Supp. 3d at 1000-01, "the court is hard-pressed to find that a reasonable factfinder could conclude that the cost justification was an 'exceedingly persuasive' reason or that this minuscule cost savings would further 'important government objectives.'"[30] Defendants' argument that "a penny saved is a penny earned" simply does not meet its burden under any form of intermediate scrutiny. Indeed, no reasonable jury could conclude that cost concerns were genuine or an "exceedingly persuasive" justification for the Challenged Exclusion. Accordingly, plaintiffs are entitled to summary judgment on this claim as well.

---

[30] In *Boyden*, the cost of covering gender-confirming care was "immaterial at 0.1% to 0.2% of the total cost of providing health insurance to state employees." 341 F. Supp. 3d at 1000.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for summary judgment (dkt. #151) is GRANTED and defendants are PERMANENTLY ENJOINED from enforcing the Challenged Exclusion (Wis. Admin. Code §§ DHS 107.03(23)-(24), 107.10(4)(p)) against the named plaintiffs and other members of the class.

2) The parties may have fourteen (14) days to meet and confer on the scope of this and any other permanent relief, at which point they are to submit a joint, proposed injunction or competing proposals.

3) Plaintiffs' motion to strike (dkt. #192) is DENIED.

4) The telephonic scheduling conference before Magistrate Judge Crocker remains scheduled for August 27, 2019, at 2:30 p.m.

Entered this 16th day of August, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge